IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * * * * * | CRIMINAL ACTION |
| USA * | 07-005S |
| * | |
| VS. * | JANUARY 28, 2008 |
| * | JANUARY 29, 2008 |
| * | |
| RICARDO MEJIA * | PROVIDENCE, RI |
| * * * * * * * * * * * * * * * * | |

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH
DISTRICT JUDGE
(TESTIMONY OF MICHAEL S. NAYLOR)

APPEARANCES:

FOR THE GOVERNMENT: SANDRA BECKNER, ATTY.
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

FOR THE DEFENDANT: GEORGE J. WEST, ESQ.
One Turks Head Place
Suite 312
Providence, RI 02903
(401) 861-9042

Court Reporter: Anne M. Clayton, RPR
One Exchange Terrace
Providence, RI 02903

Proceeding reported and produced by computer-aided stenography

I N D E X

| WITNESS | PAGE |
| --- | --- |
| MICHAEL STEVEN NAYLOR | |
| Direct Examination by Ms. Beckner: | 4 |
| Cross-Examination by Mr. West: | 105 |
| Continuation of Cross-Examination by Mr. West: | 204 |
| Redirect Examination by Ms. Beckner: | 286 |
| Recross-Examination by Mr. West: | 291 |

GOVERNMENT EXHIBITS

| | | |
| --- | --- | --- |
| 2 | - | 85 |
| 3 | - | 91 |
| 4 | - | 77 |
| 4A | - | 80 |
| 5 | - | 82 |
| 5A | - | 83 |
| 6 | - | 55 |
| 6A | - | 70 |
| 7 | - | 93 |
| 8 | - | 71 |
| 8A | - | 72 |
| 8B | - | 73 |
| 8C | - | 74 |
| 8D | - | 75 |
| 9 | - | 52 |
| 9A | - | 53 |
| 10 | - | 29 |
| 10A | - | 30 |
| 11 | - | 37 |
| 11A | - | 37 |
| 12 | - | 39 |
| 12A | - | 40 |
| 13 | - | 43 |
| 13A | - | 43 |
| 14 | - | 86 |
| 15 | - | 87 |
| 16 | - | 94 |
| 17 | - | 80 |
| 18 | - | 78 |

I N D E X (Continued) PAGE

DEFENDANT'S EXHIBITS


| | | |
|---|---|---|
| A | - | 136 |
| B | - | 205 |


____________________________

MICHAEL S. NAYLOR, first having been duly sworn, testified as follows:

THE CLERK: Please state your name and spell your last name for the record.

THE WITNESS: Michael Steven Naylor, N-A-Y-L-O-R.

DIRECT EXAMINATION BY MS. BECKNER

Q. Agent Naylor, who do you work for?

A. I work for the Newport Police Department, ma'am.

Q. How long have you worked for the Newport Police Department?

A. Over 14 years.

Q. When you were first assigned to the Newport Police department, what section were you assigned to?

A. First off, I was assigned to patrol division, ma'am.

Q. How many years did you spend in patrol?

A. A little over four years.

Q. Tell me what kind of work you did while working in patrol.

A. Did routine patrol. I basically concentrated on any narcotics arrests I could make, but routine patrol, answered my calls, as well as narcotics, working in the public housing area, ma'am.

Q. While working patrol, what kind of narcotics did

you encounter?
A. I basically encountered every kind of narcotics there were. I did cocaine, crack cocaine, marijuana, Ecstasy, prescription medications as well, ma'am.
Q. While working as a patrol officer for Newport, how many narcotics cases do you think you either worked yourself or assisted on during that time period?
A. Hundreds, ma'am.
Q. After working patrol, what section were you assigned to?
A. I was assigned to the vice narcotics division as a detective.
Q. What is the vice narcotics division?
A. It's the division of patrol officers, detectives that work in the police department that do narcotics investigations, drug, prostitution, investigations upon those. We also worked directly for the chief when I first got there, so we would do any other type of case that was called upon for the chief.
Q. While working as a narcotics detective, how many narcotics cases do you think you worked on?
A. I'd say around a thousand all together, ma'am.
Q. Once again, did you encounter all the same types of drugs you'd encountered while working patrol?
A. Yes, ma'am.

Q. For the last three years, what section or what department have you been assigned to?
A. I've been assigned to the Drug Enforcement Administration as an assigned Task Force Agent.
Q. While working with the DEA Task Force, what kind of work do you do?
A. Primarily, larger narcotics transactions and deals, ma'am. I've done wiretaps, which are Title III investigations. I've done search warrants, long-term multi-jurisdictional investigations. All things of that nature, ma'am.
Q. How many federal narcotics cases have you worked on since being assigned to the DEA Task Force?
A. I've worked on hundreds. I've been a lead case agent in over, I think, 35 cases, ma'am.
Q. What sort of special narcotics training have you received since becoming a police officer?
A. I've been to numerous schools. I go to approximately two to three schools per year on different kinds of training techniques. I've been to the DEA basic school, which is a two-week school for narcotics officers assigned to the narcotics units in their police department, as well as Task Force Agents to go over basic drug investigations. I've been to -- I think it's Federal Law Enforcement Officers

Association, I'm a narcotics instructor as well as assigned narcotics instructor. I went to a week long school for that. I went to numerous schools, ma'am.

Q. Well, all total, during your 14 years as a police officer, how many drug cases do you think you've worked on?

A. Again, just over a thousand. A little over a thousand, ma'am.

Q. What percentage of those cases involved cocaine?

A. The majority. The majority of my cases were crack cocaine and powder cocaine, as well as probably around 30 percent marijuana, ma'am.

Q. I notice you said while working on the DEA Task Force you've worked on wiretap investigations. What's a wiretap?

A. A wiretap is when we get permission from the court to intercept someone's telephones. In these cases, they were all cellular telephone calls, and we were able to intercept them through the permission of the courts and conduct our investigation utilizing that technique, ma'am.

Q. So through your work on a wiretap case, have you been able to hear how drug dealers interact and how they speak with each other?

A. Yes, ma'am.

Q. And what have you learned as a result?
A. We learned about the drug codes. We learned methods of transportation, different types of things like that, stuff you wouldn't normally learn because you're listening to conversations covertly, ma'am.
Q. Now, what do you mean by methods of transportation?
A. You learn how people are transporting the drugs from one location to another. There's various different techniques, ma'am.
Q. Such as what?
A. They'll use couriers. They'll use transporters. They'll use what's called a lead vehicle; they'll put drugs in one vehicle, people in another vehicle behind. They'll have like what are called spotters along the way to check to make sure that the drugs are getting where they're going, things of that nature. Counter-surveillance, as well, ma'am.
Q. You mentioned drug code. What is that, Agent Naylor?
A. Drug code is when two drug dealers, a drug purchaser and a drug supplier, are communicating, they will not use the words of "I would like two kilograms of cocaine," for example. They would use terminology that would be familiar with them, such as, "Can I get

two of those birds" or two ladies, two of the white, two of the platinum, and the drug dealers themselves, as they communicate, will know what they're saying. If you and I were familiar with each other, to a degree, or familiar with the drug business, we would know what we're speaking about. Average layperson might not know what they're speaking about, ma'am.
Q. What's the purpose of this code?
A. To assist in not getting caught by law enforcement, ma'am.
Q. Because you might have a wiretap, right?
A. Correct. Or you could be -- the calls could be recorded, ma'am.
Q. Now, you said you performed a number of searches during your career. Have you searched vehicles before?
A. Yes, ma'am.
Q. How many vehicle searches do you think you've done?
A. Into the hundreds, ma'am. Well into the hundreds. Probably around a thousand I've assisted with or done myself.
Q. Have you executed narcotics-related search warrants before?
A. Yes, ma'am, numerous.
Q. How many searches do you think you've been

involved in, in which narcotics were seized?
A. Again, well into the hundreds. Possibly thousands, ma'am.
Q. Now, what types of items are seized during a narcotics search warrant?
A. During search warrants, we'll seize telephones, we'll seize packaging materials, we'll seize obviously the drugs, we'll seize scales which are used to weigh the drugs, we'll seize packaging materials. Depending on the type of drug dealer, the packaging materials could vary. Could be, if they're kilogram size, they could be duct tape and Saran wrap. If they're ounce, they could be plastic baggies and smaller scales, drug ledgers, things of that nature. Pagers, also. When I first started out, pagers were big. A lot of pagers, ma'am.
Q. Have you also had to search drug users during your career?
A. Yes, ma'am.
Q. What kind of paraphernalia do drug users have on them?
A. Drug users use, if it's like a powder cocaine type dealer, user, they'll use like a roll paper, dollar bill to snort the cocaine, straws. If it's crack cocaine, they'll use crack pipes, things of that

nature. If it's a marijuana person, they'll use -- a while back they used to use rolling papers, now today most people use these types of bongs and pipes. They'll have those things on them, ma'am.

Q. Agent Naylor, in drug investigations, what does it mean to work undercover?

A. When you work undercover, the police officer actually poses as the user or the buyer or -- I should say the purchaser or the dealer himself, and acts as the person in an undercover capacity.

Q. How is the undercover agent typically introduced to the drug dealer?

A. There is two different ways. You could go in which is referred to as cold. You could go in not knowing anybody and try and do it that way. Primarily, since I've been doing it, in the last nine years, it's been utilizing a cooperating witness or an informant, ma'am.

Q. Have you ever worked undercover before?

A. Yes, ma'am.

Q. When you worked undercover, did you have direct interaction with the drug dealers?

A. Yes, ma'am.

Q. What types of substances have you purchased from drug dealers?

A. I've purchased, again, powder cocaine, crack cocaine, marijuana. I've purchased LSD, large amounts of marijuana, small amounts of marijuana, as well. Just about almost everything, as well. Heroin, as well.
Q. What types of roles have you played in the drug world?
A. I played the purchaser on numerous occasions. I've also purchased -- I've been undercover as a distributor where I've sold large amounts of OxyContin to distributors. I did that several different occasions for approximately $25,000 each deal. I posed as a dealer who's selling large amounts of marijuana to dealers in Providence. Again, that was probably around another $25,000 deal.
Q. Have you ever had to interview a cooperating witness before?
A. Yes, ma'am.
Q. Have you ever had to interview a defendant before?
A. Yes, ma'am. Numerous times.
Q. In general, what kind of information can you learn about the drug world from interviews with those involved in the drug world?
A. You'll learn just about everything. I try and interview basically everybody I arrest or anyone I come

in contact with in some form. You can learn about their methods themselves, how they particularly do it, how they distribute, how they package, where they hide. You can also learn about their competition or people they know, deal. If they're dealing with distributors, you can learn how the other distributors utilize their methods. And as far as users, users will tell you everything about what they do, as well as all their suppliers, their methods of operation, as well, ma'am.
Q. Agent Naylor, with all this information that you've acquired about the drug business and how it operates, do you exchange this information with other local police officers and federal agents that are also involved in narcotics investigations?
A. Yes, I do, ma'am.
Q. And based upon all that you've learned firsthand and all you've learned from the other officers you work with, have you obtained a good working knowledge of the methods of operations used by drug dealers?
A. I believe I have, ma'am.
Q. Have you obtained a good working knowledge of the equipment used in the drug business?
A. Yes, ma'am.
Q. How about the paraphernalia used by drug users?
A. Yes, ma'am.

Q. Have you obtained a good working knowledge of physical appearance of controlled substances?
A. Yes, I have, ma'am.
Q. How about the street and the wholesale value of various controlled substances?
A. Yes, I have, ma'am.
Q. Have you ever testified in federal court as an expert before?
A. Yes, I have, ma'am.
Q. How many times?
A. Two or three, ma'am, that I can remember.
Q. How about in state court?
A. Yes, ma'am.
Q. And when you've testified in both federal and state court, have you testified about your knowledge of the drug world that you've acquired through all this experience?
A. Yes, ma'am.
Q. All right. What is cocaine?
A. Cocaine is a white, powdery substance that you can ingest it; you can cook it into crack cocaine and smoke it, as well.
Q. How is it typically ingested?
A. Typically, if it's in the powder form, it's snorted. It can also be cooked into crack cocaine and

can also be cooked as a freebase, as well, ma'am.
Q. What does that mean, freebase?
A. A different form of cooking without cooking it into crack where they heat it up, ma'am.
Q. I want to focus on powder cocaine. What quantity of powder cocaine is a dosage unit that a typical user would be using as a single instance?
MR. WEST: Objection.
THE COURT: Grounds?
MR. WEST: Foundation.
THE COURT: Sustained.
Q. Agent Naylor, what quantity of drugs are sold at the street level to -- to the end user?
MR. WEST: Objection. Same objection.
THE COURT: Overruled.
A. On the street user, it would be a gram -- we see one gram to 3.5 grams, which is commonly called like an eight-ball, ma'am.
Q. What's the price of a gram if you're just buying it in a gram quantity on the street?
MR. WEST: Objection. Foundation.
THE COURT: Overruled.
A. You can buy a gram, if you're buying one gram at a time, it could cost you about $50. If you're buying an eight-ball, which is 3.5 grams, that varies because

you're buying, again, a little bit more on the street level, so it would go from like $90 to 150. Sometimes in Newport will pay $200 for an eight-ball, ma'am.
Q. Now, in December of 2006, what was the price, the going rate for a kilogram of cocaine in this area?
MR. WEST: Objection, your Honor.
THE COURT: A little more foundation. So sustained. A little more foundation.
Q. Agent Naylor, could you tell me how you've developed familiarity with the prices of drugs in this area?
A. Through the interview of cooperating witnesses, people who were arrested. We have intelligence that comes over our computer every day from DEA with going prices, rates of drugs throughout the country, and throughout the world, ma'am.
Q. And have you worked undercover before where you've purchased narcotics yourself?
A. Yes, ma'am.
Q. Have you been the case agent in investigations using cooperating witnesses where you had the cooperating witnesses purchase narcotics?
A. Numerous times, ma'am.
Q. And have you had cooperating witnesses purchase everything from dosage unit up to kilograms worth of

drugs?
A. Yes, ma'am.
Q. Have you been involved in wiretap investigations involving the transportation and sale of multiple kilograms of cocaine?
A. Yes, ma'am.
Q. Have you been involved in drug deals involving the sale of a dosage unit to an end user?
A. Yes, I have, ma'am.
Q. Have you interviewed both defendants involved in selling multiple kilograms as well as end users purchasing cocaine?
A. Yes, I have, ma'am.
Q. Agent Naylor, through all of this, through your undercover work, through the information that you share with other officers, through your interviews of cooperating witnesses and defendants, through all of the investigations you've conducted over the last 14 years, the last three of which were on a federal Task Force, do you feel that you've become familiar with the price of cocaine in this area?
MR. WEST: Objection, your Honor. That's a multi-part question.
THE COURT: It is a multi-part question. I'll sustain the objection. Focus in on the time period

that you asked him originally about. That's what I'd like to see you get a foundation on.
Q. Agent Naylor, can you tell me how you know what the price of cocaine was in December of 2006?
A. During that time, we were actively working investigations where we were trying to purchase cocaine, so, again, through all those other bases, through the DEA databases as well as informants and people who have been arrested, I was checking the price. You need to know the price when you're in this job so you can actually go out and know if you're paying too much or paying too little. Things of that nature, ma'am.
Q. Now, in December of 2006, what was the price of cocaine in this area?
MR. WEST: Objection, your Honor. This calls for hearsay.
THE COURT: Overruled.
MR. WEST: Foundation, as well.
THE COURT: All right. I note your objection. Overruled.
A. Eighteen to $23,000 at that time, ma'am.
Q. What happens to the price per gram in general as a customer buys in larger quantity at a single time?
A. It will go down.

Q. How do drug dealers earn a profit in the drug business?
A. You can either sell more of the product or you can take the product -- I'll use a kilogram as an example. If you bought one kilogram, you could add what's called cutting agents to it, mix it up and then make maybe a kilogram and a half diluting the quality but getting more product.
Q. You were talking about code a little bit earlier. Have you ever had, in your 14 years, have you ever had a drug dealer mention drugs by name on the telephone?
A. Never, ma'am.
Q. And what type of code have you heard for money?
A. They'll use terms of tickets, papers. It depends on the people that you're dealing with. But they'll use -- if you and I were having a conversation, or two people were having a conversation, they might say, I need five of those. If they were thousand dollar people, you know it's 5,000 when they use "those."
Q. What is counter-surveillance, Agent Naylor?
A. Counter-surveillance is utilized by the drug dealers or drug traffickers to check for law enforcement. They'll do it different ways. They'll, you know, check the area. If we set up a deal at a certain location, they may drive by earlier to check it

out. They may have someone following them to make sure things are going -- someone ahead of them to see how things are going. Things of that nature. A way to check for law enforcement, ma'am.
Q. In your experience, what other steps do narcotics traffickers take to avoid detection by law enforcement?
A. They'll use techniques like counter-surveillance is one. Hidden compartments is another. They'll use -- code language is another way so they're not detected by law enforcement, things of that nature, ma'am.
Q. How about in the transportation of narcotics?
A. Yes. They'll have -- like the drug dealers themselves will have couriers transport the drugs and money so they're not caught with them themselves. They'll mail it to locations, things of that nature, with drug dealers, as well.
Q. What are some common tools of the trade in the drug business?
A. The tools of the trade would be, again, scales, packaging materials. Firearms is a popular tool, cell phones, things of that nature, ma'am.
Q. Now, you mentioned cell phones. How are cellular phones used in the drug business?
A. Basically, to communicate. You need a way to communicate with your other dealers as well as the

purchasers themselves. That's a form of communication. They will utilize what's called a prepaid cellular phone now. Whereas a prepaid cellular telephone you could call up and activate it today without giving any actual data about yourself. We've had people utilize the name of Santa Claus, Mickey Mouse. Actually, one wiretap case we had the defendant used the name Jesus Christ. The phone company doesn't check. You can put any address down and go from there.
Q. How are firearms used in the drug business?
A. As protection. Utilized as protection, ma'am.
Q. Agent Naylor, what is a controlled buy of narcotics?
A. A controlled buy is when we're using a cooperating witness, and that witness -- we're trying to control all the aspects of that deal. We will particularly search the vehicle before, the informant before. We'll have law enforcement in certain locations along the way. We'll try and videotape and audiotape, and we'll try to control all the circumstances around that buy. That's why we call it a controlled purchase.
Q. How does that differ from a rip?
A. A rip is a different thing. A rip is when we call up and order a quantity of drugs with no intentions of purchasing the drugs when the parties come. And they

arrive, and we know they've arrived with the narcotics, they're arrested. That's what we commonly call a rip, ma'am.

Q. Why are cooperators used in drug investigations?

A. They're a tool of the narcotics officers in this world. They'll get information that we couldn't get. They'll spend numerous hours with drug defendants that law enforcement can't. They utilize it for information. Basically sometimes only the informants can get information that they get.

Q. How are cooperators compensated by law enforcement for their work?

A. There's numerous different ways. One way is, if a person is arrested, they can elect to cooperate with the permission of the attorney general or the U.S. Attorney, we get permission for people to cooperate, and they can reduce their sentence that way.

If people are arrested, they could also do what's called third-party cooperation whereas they're in jail, they could have somebody else cooperate on their behalf, and they'll get the benefit, which would be a reduced sentence, as well.

Cooperators also cooperate for money. They get paid by the Drug Enforcement Administration or the local law enforcement who actually make purchases and

give supply information, as well.
Q. Now, in this investigation, you used two cooperators; is that correct?
A. Yes, ma'am.
Q. And how are they compensated for their efforts?
A. Well, I'll refer to the one as the male informant. The male informant had been arrested by DEA and cooperated at the time of the arrest, was then sentenced. I believe he might have gotten a reduced sentence as well for his cooperation, was deported, and then wanted to cooperate again, was brought back into this country with the permission of the Immigration, I think the U.S. Attorney, as well, brought back into this country on what's called a significant benefit package. He's cooperating in hopes of getting an S-Visa as well as getting paid while he's here.
Q. This male informant, he's been paid a lot of money by the DEA; is that right?
A. Yes, ma'am. He's worked numerous cases for us.
Q. And money by the ATF, as well; is that correct?
A. Yes, ma'am.
Q. How much was the male informant paid for his cooperation in this case?
A. I believe it was 2500, ma'am. I believe it was 2500.

Q. Okay. Could it have been as much as 3,000?
A. It could have been. That's about the price. I think it was 2500 or 3,000, ma'am.
Q. Now, how about the female informant.
A. Her husband was given a reduced sentence of, I believe, 21 months on a drug charge that was unrelated to this investigation.
Q. What was the ultimate sentence her husband ended up receiving?
A. I don't remember. I want to say just under ten years, 87 months.
Q. Could it have been 78 months?
A. Yes, ma'am.
Q. Now, who are the targets --
THE COURT: Ms. Beckner, before you get further on this line, why don't we take a morning break.
Generally, ladies and gentlemen, we try to take one break in the morning and one break in the afternoon as well as the lunch break. You'll find some snacks in the jury room for you. Just for your planning purposes, we'll reconvene in about ten minutes and we'll go to about 12:30 when we'll take a lunch break. We're going to try to limit the lunch break today to one hour. Sometimes we take a little bit more, but I want to keep this case moving. Then we'll go to about

4:30, 4:45 this afternoon. All right? So I'll remind you not to discuss this case with anyone, especially among yourselves. Talk about other things. Charlie will show you out.

(Proceedings out of the presence of the jury as follows:)

THE COURT: About ten minutes or so. All right. And try to make that phone call. I just want to get as much done today as we can.

MS. BECKNER: Yes, your Honor.

(Short recess.)

(Proceedings in the presence of the jury as follows:)

THE COURT: Welcome back, ladies and gentlemen. Ms. Beckner, you may continue with your examination.

BY MS. BECKNER: (Continuing)

Q. Agent Naylor, I was asking you about the informants in this case. What was the initial type of contact that the male informant had with Mr. Soto?

A. The first time they contacted each other was a three-way call that I conducted from my home residence utilizing my NEXTEL telephone.

Q. Were you able to record this telephone call?

A. Yes, I was.

Q. What day did it occur on?

A. December 11th, ma'am, 2006.
Q. Now, was anyone present with you when you recorded the call?
A. No, ma'am.
Q. And who was on the three-way call?
A. Mr. Soto was on the call, the informant, Ambrioris Falette, and the informant, Marie Perez, was on, as well.
Q. So both the male and female informants?
A. Yes, ma'am.
MS. BECKNER: May I approach the witness, your Honor?
THE COURT: Yes.
Q. Agent Naylor, I've handed you what's been marked as Government Exhibit 10. Do you recognize that, sir?
A. Yes, ma'am.
Q. What is it?
A. This is a copy of the recorded call that I had made on December 11th, ma'am.
Q. Now, tell me how the equipment, meaning the three-way call equipment, how that worked.
A. My NEXTEL cellular phone has a feature that also does three-way calling, and what I would do is while I'm speaking with Ms. Perez, I'd put her on hold, I dialed the cooperating Ambrioris Falette, I dialed his

number, then I hit a button called join, and all three of us can communicate at once. Then I have another feature on the phone that you hit record, and it will record that conversation. That's what I did on that day, ma'am.

Q. Did you ever use your NEXTEL on the phone in this fashion before?

A. On numerous times, ma'am.

Q. So you have experience with dealing with this type of three-way calling?

A. Yes, ma'am.

Q. And was your cellular phone working that day?

A. Yes, it was.

Q. And was the recording feature on that phone working that day?

A. Yes, it was, ma'am.

Q. And you dialed the numbers yourself, isn't that right?

A. Correct.

Q. Were you able to listen in during the calls?

A. Yes, I was. What I do is I hit the mute so they can't hear me speaking, but I can hear what's going on in the conversation.

Q. Now, were you able -- what language was the conversation in?

A. Primarily Spanish, ma'am.
Q. And were you able to tell when the call ended?
A. Yes.
Q. How were you able to tell when it ended?
A. I can hear them stop talking and they hung up.
Q. What did you do with this recorded call after recording it on your telephone?
A. I took the call and I transferred it into my computer, into a wave file on the computer.
Q. Is Exhibit 10 a complete copy of that recording?
A. Yes, it is, ma'am.
Q. Did you compare it to the original recording downloaded onto your computer?
A. Yes, I did, ma'am. I compared them both side-by-side as they played, and I initialed it after I did that, ma'am.
Q. Were you able to recognize all the voices on there?
A. Yes, ma'am.
Q. How were you able to recognize the voices?
A. I'm very familiar with Mr. Falette. I'm very familiar with Ms. Perez. And after the arrest, I was very familiar with Mr. Soto.
MS. BECKNER: Your Honor, at this time, I'd offer Government Exhibit 10 into evidence.

MR. WEST: I object. I'm preserving a pretrial objection that I made.

THE COURT: All right. Your objection is noted. It's overruled, and Exhibit 10 will be full.

(Government's Exhibit 10 admitted full.)

THE COURT: Do you wish to play it now?

MS. BECKNER: Well, first I just want to authenticate the transcript, your Honor.

THE COURT: Fine. Go ahead.

Q. Agent Naylor, if you would flip to Exhibit 10A in your book.

A. Yes, ma'am.

Q. Can you tell me what that is, sir?

A. That's a transcript of the call that was made on December 11th and recorded on my phone.

Q. And is that an authentic transcript of the Spanish to the English?

A. I believe so, ma'am, yes.

MS. BECKNER: Your Honor, at this time, pursuant to an agreement with defendant, I offer Exhibit 10A into evidence.

THE COURT: Is there any objection?

MR. WEST: No objection.

THE COURT: All right. 10A then will be a full exhibit, transcript of the recording that was admitted

as Exhibit 10, correct?

MS. BECKNER: Yes, your Honor.

THE COURT: All right.

(Government Exhibit 10A admitted full.)

MS. BECKNER: Your Honor, at this time, I would like to publish Exhibit 10 and 10A for the jury.

THE COURT: That's fine. Do you have copies of the transcript?

MS. BECKNER: I do. Your courtroom deputy has the jury's copies of the transcript. If I may, your Honor, the booklets prepared for the jury include all of the agreed-upon transcripts, so I would just ask that the jury flip to 10A and be asked to only look at 10A at this time.

THE COURT: Are all of transcripts going to come in by stipulation?

MR. WEST: Your Honor, we've stipulated to the translation, and I've preserved my objection to the introduction of these transcripts on --

THE COURT: Why don't you come forward.

(Side-bar conference.)

MR. WEST: Petrozziello relevance.

THE COURT: I've made a conditional finding of that already so I just don't want to put anything in the hands of the jury or if there's a serious issue

with respect to the admission.

MR. WEST: There's no other issue.

THE COURT: I'm still going to instruct them all to refer to them one at a time.

(End of side-bar conference.)

THE COURT: All right. You may distribute the copies of the transcripts to the jury. Ladies and gentlemen, while this is being done, I just want to say to you that while I expect all of the transcripts will come into evidence, I just ask that you only refer to 10A for the time being, and then as evidence is admitted, then I'll have you refer to the corresponding transcript. All right?

Q. Agent Naylor, before we begin, who is VF1 indicated in the transcript?

A. That is the female, ma'am, female informant.

Q. And VM1?

A. Is the male informant.

Q. And VM2?

A. Would be Enoc Soto, also known as Eudy Tejada-Pichardo.

MS. BECKNER: Your Honor, may I play the recording?

THE COURT: Yes.

(Recording played.)

Q. Agent Naylor, if you could turn to page two of the transcript, please.

Based upon your experience, Agent Naylor, what does that mean when, for example, two-thirds to three-quarters of the way down they say: (Reading:) I think it'll be six. I got for six.

Based on your experience, what is that kind of talk, first of all?

MR. WEST: Objection.

THE COURT: Grounds?

MR. WEST: It speaks for itself, your Honor. The jury has the transcript.

THE COURT: All right. Overruled.

A. I believe what he's saying is I've got -- it'll be -- I've got six. If you want, I'll give you, you know, I want to get a -- I want to agree on a price. He's saying he has enough for six, basically. So if you come down it will be six. Like he's saying in his words, so it'll be six, I want to agree on a price. I'll have six. He's saying roughly he has enough for six. That's what I'm getting at, ma'am.

Q. Six what?

A. Six kilograms.

Q. Now, further up on the page where it says, I've got like six pesos for rent. What is "pesos" in your

experience?
A. Pesos could be utilized for money. Like I have enough pesos for six. I can get that from that, as well.
Q. Now, if you turn to page four, and if you would look at the second time VM2, Mr. Soto speaks, and he says 20-and-a-half, based on your experience, do you understand what that's a discussion of?
A. Yes.
Q. What?
A. 20,500.
Q. What date was this call on, Agent Naylor?
A. December 11th, 2006, ma'am.
Q. Based upon this call, what day did you believe originally the drugs would be delivered?
A. On the 12th, ma'am.
Q. Did that, in fact, happen on the 12th?
A. No, ma'am.
Q. Were there two recorded phone calls on the 12th?
A. Yes, ma'am.
Q. I want to talk about the first recorded phone call from the 12th. Was this a short conversation, Agent Naylor?
A. Yes, ma'am.
MS. BECKNER: And may I approach the witness,

your Honor?

THE COURT: Yes.

Q. I'm handing you what's been marked as Government Exhibit 11. Is this the short conversation on December 12th?

A. Yes, ma'am.

Q. Who is on this conversation?

A. The cooperating witness and -- both cooperating witnesses, the male and the female, ma'am.

Q. This is a brief conversation preceding what?

A. Preceding another conversation, ma'am.

Q. Involving whom?

A. Enoc Soto and the male informant.

Q. How did you record this conversation, Agent Naylor?

A. This was recorded on my digital recorder. It's a recording device that after you make the recording, you take it, put it right into the computer data port and you download it right to the case file, ma'am.

Q. And where were you when you made this recorded conversation?

A. At the Drug Enforcement Administration in Warwick.

Q. Who was there with you?

A. Myself, the informant, Mr. Falette and Special Agent Cardello.

Q. And was the recorder, the digital recorder working that day?
A. Yes, ma'am.
Q. Have you had experience using this digital recorder before?
A. Yes, ma'am.
Q. Tell me how you set it up.
A. What I will do, if -- on that date I knew he was coming in to make a phone call, so I tested it, made sure it was working, and I actually -- usually, I'll download one folder to make sure it's able to be downloaded, and I take the recorder, I put a microphone inside that goes into the cooperator's ear so when he's speaking, the call, he can hear it and hear his voice, as well. It was recorded that way, ma'am.
Q. All right. And did you listen during the entire call?
A. Yes, ma'am.
Q. Were you able to hear the whole call?
A. I could hear the whole call, yes.
Q. What language was it?
A. Spanish, ma'am.
Q. How did you know when the call ended?
A. Actually, he told me. I could hear him hang up. They say -- I think he says it in English towards the

end. He says to me she's going to call when he gets inside, they're drinking. It was in English. And then --

Q. That's the male informant speaking to you; is that right?

A. Yes, ma'am.

Q. What did you do with this recording on the digital recorder after the call was made?

A. I stored that one until I made the second call and then I put them both into the case file, digitally downloaded.

Q. Now, is Government's Exhibit 11 that you have before you, is that a complete recording of the first call made on December 12th of 2006?

A. Yes, ma'am.

Q. And you're able to recognize the two voices on that call?

A. Yes, ma'am.

Q. Once again, who were those two voices?

A. Ambrioris Falette and Marie Perez, the two cooperators.

MS. BECKNER: Your Honor, at this time, I'd offer Government Exhibit 11 into evidence.

THE COURT: Any objections?

MR. WEST: Subject to my continuing objection.

THE COURT: Your objection is noted. Overruled. Government 11 will be full.

(Government Exhibit 11 admitted full.)

Q. Agent Naylor, if you could turn to Government Exhibit 11A, is that the transcript of this call?

A. Yes, ma'am.

Q. This is a translation from Spanish to English; is that correct?

A. Correct, ma'am.

MS. BECKNER: Your Honor, at this time, I'd offer Government Exhibit 11A into evidence.

THE COURT: Objections?

MR. WEST: Continuing objection, your Honor.

THE COURT: 11A will be full.

(Government Exhibit 11A admitted full.)

MS. BECKNER: May I retrieve the exhibit from the witness, your Honor?

THE COURT: Yes.

MS. BECKNER: Your Honor, may I ask that if the jury hasn't already done so, they be asked to turn to Exhibit 11A?

THE COURT: Yes. Go ahead, ladies and gentlemen, you may refer to 11A. And you may play 11.

(Recording played.)

MS. BECKNER: I apologize, your Honor. It

started to play again.
Q. Agent Naylor, shortly after that call, was another recorded call made with the male informant?
A. Yes, ma'am.
MS. BECKNER: May I approach the witness, your Honor?
THE COURT: Yes.
Q. Agent Naylor, I'm handing you what's been marked as Government Exhibit 12. What is that, sir?
A. That's an accurate recording copy of the call that was made on the 12th, the second call.
Q. Once again, were you using the same digital recorder that you had been using on the last one?
A. Yes, ma'am.
Q. Were the same individuals present when you made the second recorded call that day?
A. Yes, ma'am.
Q. About how long after the first one was the call made?
A. A few minutes. Maybe a minute to two minutes, ma'am. I'm not sure of the exact time.
Q. Were you able to tell when the call ended?
A. Yes.
Q. How were you able to tell when it ended, Agent Naylor?

A. I believe, again, he says "Bye" at the end, but the informant was directed to hang up the phone right at the end.
Q. After the call was completed, what did you do with the recording?
A. I digitally downloaded it into the case file and later made copies, ma'am.
Q. And is Government Exhibit 12 a complete copy of that digital recording of the telephone call?
A. Yes, ma'am.
Q. Once again, what's the date of this call?
A. This was on December 12th, 2006.
Q. Were you able to recognize the voices on there?
A. Yes, ma'am.
Q. Who were they?
A. Ambrioris Falette and Enoc Soto, also known as Eudy Tejada-Pichardo.
MS. BECKNER: Your Honor, at this time, I'd offer Government's Exhibit 12 into evidence.
MR. WEST: I have my continuing objection.
THE COURT: Subject to your continuing objection, which is overruled, 12 will be full.
(Government Exhibit 12 admitted full.)
Q. Agent Naylor, if you could turn to Government Exhibit 12A, please. Is that the transcript of the

call in this case?
A. Yes, ma'am.
Q. Does it include a Spanish to English translation?
A. Yes, it does, ma'am.
Q. Who is VM1 during the call?
A. The cooperating witness, Ambrioris Falette.
Q. Who is VM2?
A. Is Enoc Soto, also known as Eudy Tejada-Pichardo.
MS. BECKNER: At this time I would offer Exhibit 12A into evidence.
MR. WEST: Same objection.
THE COURT: Overruled. 12A will be full.
(Government Exhibit 12A admitted full.)
MS. BECKNER: May I publish this for the jury, your Honor?
THE COURT: Yes. Ladies and gentlemen, you may refer to 12A in your books.
(Recording played.)
Q. Now, Agent Naylor, did the drug delivery actually happen the next day on the 13th?
A. No, ma'am.
Q. When did you have -- when did you next record a call between the male informant and Mr. Soto?
A. December 18th, 2006.
Q. And what happened?

A. The informant was directed to come to the office. We were anticipating a telephone call being made. And I instructed him to come to the office immediately. As he was walking in, I had the recorder in my hand. He signaled to me that the call was going on. I immediately started recording it at that point, ma'am.
Q. About what time was that?
A. I want to say around seven o'clock that night, ma'am.
Q. Who was present when the call was recorded?
A. Myself, Special Agent Cardello and Ambrioris Falette.
Q. Once again, were you using the same digital recorder?
A. Yes, ma'am.
Q. Did you set it up the same way that you did on December 12th?
A. Yes, ma'am.
Q. Had you tested it to make sure that it was working?
A. Yes, ma'am.
Q. Were you able to listen during the call as it was being recorded?
A. Yes, ma'am.
Q. Was the entire call recorded?

A. From the entire call, when he got there, it started midstream. I don't know how much was on before that, ma'am.
Q. Was this call in Spanish or English?
A. Spanish, ma'am.
Q. How are you able to tell when the call was over?
A. He hung up the phone. He was told to hang up the phone when it was over, ma'am.
Q. What did you do with the recording after the call was completed?
A. I later digitally downloaded it into the computer and put it into the case file, ma'am.
MS. BECKNER: May I approach the witness, your Honor?
THE COURT: Yes.
Q. Agent Naylor, I'm handing you Government's 13. Do you recognize that?
A. Yes, ma'am.
Q. What is it?
A. It's an accurate recording of the call I made on December 18th, 2006.
Q. Is that a complete recording of the call as you were able to record it?
A. Yes, ma'am.
MS. BECKNER: Your Honor, at this time, I would

offer Government Exhibit 13 into evidence.

MR. WEST: Standing objection.

THE COURT: Objection is noted. Overruled. 13 will be full.

(Government Exhibit 13 admitted full.)

Q. Agent Naylor, if you could turn to Exhibit 13A in your exhibit book. What is that, sir?

A. That's a transcription of the call on the 18th, ma'am.

Q. It's a translation of the Spanish to English as well; is that correct?

A. Correct, ma'am.

MS. BECKNER: At this time, I'd offer Government Exhibit 13A into evidence.

MR. WEST: Same objection.

THE COURT: Overruled. 13A will be full, and ladies and gentlemen, you may refer now to 13A.

(Government Exhibit 13A admitted full.)

Q. Before we begin, Agent Naylor, can you tell me who VM1 is in the call?

A. Ambrioris Falette.

Q. That's the male cooperator, correct?

A. Correct.

Q. And VM2?

A. Is Enoc Soto, also known as Eudy Tejada-Pichardo.

MS. BECKNER: Your Honor, you said I may publish it?

THE COURT: Yes.

(Recording played.)

Q. Agent Naylor, based upon that call, what action did you take?

A. I instructed all the agents to get -- I got all the agents in the office that were working on that case particularly ready and told them to head to the McDonald's on Broad Street, ma'am.

Q. This is in Providence, Rhode Island?

A. Yes, ma'am.

Q. Approximately what time did the agents set up at Broad Street, McDonald's?

A. I had them get there approximately around nine o'clock, ma'am, that night.

Q. What did you do with the male informant, Mr. Falette?

A. We met with him at a location further down from the McDonald's on Broad Street. I believe it's a Walgreen's behind there. Myself, Task Force Agent Colanduono, and Detective Andres Perez from the Providence Police Department.

Q. What did you place on Mr. Falette?

A. We placed a monitoring device that we could

listen, it's called a KEL, and we would monitor it from our police vehicle.
Q. Now, you must have expected most of the conversation would be in Spanish; is that right?
A. Correct, ma'am.
Q. Who amongst you spoke Spanish?
A. We had Detective Perez there for that reason, ma'am. He's a Spanish-speaking police detective.
Q. So would this KEL allow Detective Perez to listen to what's happening?
A. Correct.
Q. What kind of vehicle was Mr. Falette put in?
A. He was placed into a vehicle that we have at the Drug Enforcement Administration with a hidden camera I had placed inside there, as well, that would record whatever happened inside the vehicle.
Q. Was this camera working that night?
A. Yes, ma'am.
Q. Did you set it up?
A. Yes, ma'am.
Q. How did you set it up?
A. I set it up so it had a view of the front seat of the vehicle, and I tested it on the machine, the working device, before. I usually do a test recording, make sure it's working and then set it up in the

vehicle, ma'am.
Q. Did you put a blank tape in it?
A. Correct.
Q. Now, after getting Mr. Falette set up in the DEA vehicle and outfitted with the KEL transmitter, what did you and the other agents do?
A. We waited for the phone call and then we eventually headed to the McDonald's.
Q. Can you describe the scene when you arrived at McDonald's?
A. When we arrived at McDonald's, a small red vehicle that we knew the cooperator Marie Perez was driving had already been there, and the Toyota Camry that we knew Mr. Soto was driving had already been there, as well.
Q. Who was the Toyota Camry registered to?
A. Enoc Soto.
Q. What did you see once you got into position there?
A. I saw the target arrive -- Ambrioris Falette arrives, sorry, the cooperator arrives. He parks next to Marie Perez's red vehicle, which is also right next to the Camry. At one point, we see Marie Perez come out. She speaks with the cooperator. She goes back inside. We're also listening to this on the KEL, as well, so Detective Perez tells us that they're coming out in a minute. So we're anticipating that. Then I

see Mr. Soto walk out, Ms. Perez and Ricardo Mejia walk out of the McDonald's.
Q. Let me stop you right there. You said you see Ricardo Mejia. Do you see that individual in the courtroom here today?
A. Yes, I do, ma'am.
Q. Can you please point him out?
A. He's right next to Mr. West in the blue button-down shirt, ma'am.
MS. BECKNER: Your Honor, may the record reflect that the witness has identified the defendant?
THE COURT: Yes, the record will so reflect.
Q. Agent Naylor, you said you saw Mr. Soto, the defendant and Ms. Perez exit McDonald's. What did you see next?
A. Mr. Soto, I'm going to call him Soto, it's also Tejada-Pichardo, walked over to the vehicle.
Q. What vehicle?
A. To the cooperator's vehicle, which is the DEA vehicle, I'll refer to it as the DEA vehicle, leans in, has a conversation for a second, he walks out, goes around the car, gets the large black suitcase out of the rear passenger side door of the red vehicle.
Q. Let me stop you for a moment. What was the defendant doing while Mr. Soto was speaking to the

cooperator in the DEA vehicle?
A. He was standing, I want to say in the area of the red car, the front portion of the red car, looking in both directions, in all directions, back and forth, looking around, ma'am.
Q. When Mr. Soto went over to the red car and grabbed the black suitcase, what was the defendant doing?
A. He was looking all around. What I would appear to be doing counter-surveillance, looking both ways, checking around, ma'am.
Q. All right. What did Mr. Soto do with the black suitcase?
A. He put it inside the DEA vehicle in the back seat.
Q. What did you see the defendant do?
A. The defendant then walked over to the red car, got in the passenger seat of the red car and sat down.
Q. And what did Marie Perez do?
A. She got in the driver's seat, ma'am.
Q. Now, this whole time was Detective Perez monitoring the KEL?
A. Yes, ma'am.
Q. What happened next, Agent Naylor?
A. The cooperator and Mr. Soto backed out, the vehicle out. It was coming out towards us out of the parking lot from McDonald's heading onto Broad Street.

The red vehicle then again started -- then this time started following the DEA vehicle with Ms. Perez driving and the defendant, Mr. Mejia, in the passenger seat. They pulled across the street to Washington Street, and at that point, I don't remember the exact signal but I knew there was a signal given, and I believe we also knew that once the suitcase was transferred, we were going to apprehend the defendants. Both vehicles pulled onto Washington Street shortly thereafter. We pulled them over and approached both vehicles, ma'am.
Q. All right. And what did you do with the defendant once you approached both vehicles?
A. At one point, he was taken out at gunpoint, handcuffed and read his Miranda rights.
Q. Who read him his rights?
A. Detective Perez.
Q. Were they read to him in Spanish or English?
A. Spanish, ma'am.
Q. What was done with Mr. Soto?
A. Mr. Soto, we approached him first. We approached his vehicle first, then I went over to Mr. Mejia's second. But he was read his Miranda rights, as well, and told him we'd talk at the police station.
Q. Were both -- was the defendant and Mr. Soto placed

in handcuffs?
A. Correct.
Q. Now, Agent Naylor, you described a video camera that was set up in the DEA car. Did you eventually that evening retrieve the blank tape you had placed in that camera recording device?
A. Yes, I did, ma'am.
MS. BECKNER: May I approach the witness, your Honor?
THE COURT: Yes.
Q. Agent Naylor, I'm handing you what's been marked as Government Exhibit 9. Do you recognize that?
A. Yes, ma'am.
Q. What is it?
A. That's a recording of what took place on the 18th, ma'am.
Q. Can you describe for me how this camera works that is placed in the car?
A. It's a hidden camera placed somewhere in the vehicle, and it will transmit a recording to another device which will record it. It can be in the vehicle. It could be in another vehicle, as well, ma'am.
Q. Okay. And have you had experience with the camera recording device used in the DEA vehicle?
A. Yes, ma'am. Numerous times.

Q. You said earlier you had tested the camera that night?
A. Correct.
Q. So it was working?
A. Yes, ma'am.
Q. What did you do with the recording after you retrieved the tape from the camera?
A. I made a copy of it.
Q. Okay. And is that one of the copies that you made right there?
A. Correct, ma'am.
Q. And have you -- did you watch the original, the original tape?
A. Yes, ma'am.
Q. And have you compared the original tape to the copy that you have before you here in court today?
A. Yes, ma'am.
Q. And does the copy, Government Exhibit 9, completely and accurately reflect the entire original recording?
A. Yes, ma'am.
Q. Did you recognize the individuals on the videotape?
A. Yes, ma'am.
Q. Who did you see on the videotape?

A. You see the cooperating witness, Ambrioris Falette and Mr. Soto in the vehicle.
Q. And what language was spoken?
A. Spanish.
MS. BECKNER: Your Honor, at this time, I'd offer Government Exhibit 9 into evidence.
MR. WEST: Objection, your Honor. May we be heard at side bar?
THE COURT: All right.
(Side-bar conference.)
MR. WEST: This is a copy of.
MS. BECKNER: The original was a little teenier tiny tape. This was a tape we gave to you on Friday.
MR. WEST: It's not a copy of the tape that I was watching Friday.
MS. BECKNER: It's the same tape. You can play them. And the VCR.
THE COURT: It went onto a VCR tape.
MS. BECKNER: Right.
(End of side-bar conference.)
THE COURT: So Government 9 is full.
(Government Exhibit 9 admitted full.)
MR. WEST: I want to note my continuing objection. Same grounds.
THE COURT: All right.

Q. Agent Naylor, if you can turn to Government Exhibit 9A in the exhibit book. What is this, sir?
A. A transcript, English to Spanish -- Spanish to English of the incident that took place on the 18th.
Q. Who is VM1 in the transcript?
A. The cooperator, Ambrioris Falette.
Q. Who is VF1?
A. Is the cooperator, Ms. Perez.
Q. Who is VM2?
A. Is Enoc Soto.
MS. BECKNER: I would at this time offer Government's Exhibit 9A into evidence.
MR. WEST: Same objection.
THE COURT: All right. The objection is overruled. 9A will be full.
(Government Exhibit 9A admitted full.)
THE COURT: Are you ready to publish that?
MS. BECKNER: Yes, your Honor. May I put it in the VCR, please?
THE COURT: Yes.
Ladies and gentlemen, are your screens on?
MS. BECKNER: Your Honor, may I just make sure the tape is rewound all the way?
THE COURT: You go ahead and do that, yes.
(Tape played.)

Q. Agent Naylor, before we continue with what happened at the scene of the arrest, could you just describe for me the lighting conditions at McDonald's while you were conducting surveillance?
A. It was a lit parking lot, ma'am. A lit parking lot with streetlights, ma'am.
Q. Did you search the defendant upon arresting him that night?
A. Yes, ma'am.
MS. BECKNER: May I approach the witness, your Honor?
THE COURT: Yes.
Q. Handing you what's been marked as Government Exhibit 6, do you recognize that, Agent Naylor?
A. Yes, ma'am.
Q. What is it?
A. It's a NEXTEL phone seized from the defendant.
Q. What did you do with that phone after seizing it that night?
A. Placed it into evidence.
Q. And have you retrieved it for trial here today?
A. Yes, ma'am.
Q. Is that -- is Government Exhibit 6 the cellular phone seized from the defendant in substantially the same condition now as it was when you seized it that

night?
A. Yes, ma'am.
MS. BECKNER: At this time, I would offer Government Exhibit 6 into evidence.
THE COURT: Any objection?
MR. WEST: No objection.
THE COURT: Six will be full.
(Government Exhibit 6 admitted full.)
Q. Agent Naylor, before putting the phone into evidence that night, did you turn it on to detect the phone number?
A. Yes, I did, ma'am.
Q. Were you able to find out what the phone numbers were for that cellular phone?
A. Yes, I did.
Q. What was the number for that cellular phone?
A. That cellular telephone was area code (978) 420-5235, with a direct connect of 180*262409*4.
Q. Agent Naylor, after obtaining the phone and the phone number, were you able to, or was the Government able to obtain the phone records for that phone?
A. Yes, ma'am.
MS. BECKNER: Your Honor, may I give some of the admitted exhibits to the courtroom deputy, because I'm running out of space.

THE COURT: Yes.

MS. BECKNER: May I approach the witness?

THE COURT: Yes.

Q. Agent Naylor, I'm handing you what has been marked Government's Exhibit 6A. What is that, sir?

A. Those are subpoenaed records of defendant's phone.

Q. Who does the subscriber come back to?

A. Denise Geraldi, 82 Nesmith Street, Lawrence, Mass.

Q. But these are the records of the phone that was seized from the defendant that night?

A. Yes, ma'am.

MS. BECKNER: At this time, I would offer Government Exhibit 6A into evidence?

MR. WEST: Objection.

THE COURT: Objection?

MR. WEST: Your Honor, the authentication of the records are not in question. It's the relevance at this point.

THE COURT: Well, why don't you ask him a few more questions about these records so I can assess the relevancy.

Q. Agent Naylor, can you tell me what are some characteristics of cell phone use in the narcotics business?

A. Well, through someone's telephones, you can find

out who their suppliers are, who their customers are. To a degree, you can find out who their associates are. If they have associates in the drug world, who their common calls are. We do what's called a common-call analysis. We can do things of that nature, to utilize it from the phone. You can actually learn the operations of use of some particular drug dealers.

Some particular drug dealers will only work at night, so you'll see a majority of the phone calls are at nine to two in the morning, perhaps. Other drug dealers are in the morning, so you can get a description of what times you need to follow the drug dealers and things of that nature, ma'am.

Q. How about the quantity of phone -- excuse me, the volume of phone calls placed?

A. Yes. You can -- again, you can tell the amount of business that a suspected drug dealer would be doing by the amount of calls, ma'am.

Q. Agent Naylor, do you know whether or not the cell phone records -- first of all, over what period of time were these records covering?

A. These particular records -- hold on one second, ma'am. They go from --

Q. Would it be November 1st to December 18th, Agent Naylor?

A. I believe so, ma'am. Yes.
Q. Do you know whether or not an analysis of these cell phone records has been performed?
A. Yes, ma'am.
Q. Do you know whether or not there were a large number of calls to Mr. Soto?
A. Correct, ma'am, there were.
MR. WEST: Objection, your Honor. Move to strike the answer. The records haven't been introduced yet.
MS. BECKNER: Your Honor, may I be heard?
THE COURT: I think what I'll do, ladies and gentlemen, is we're going to take a lunch break anyway in about three minutes. So I'm going to send you out on your lunch break. I'll talk to the attorneys briefly about this exhibit after I send you out. We will reconvene at 1:30. I want to continue to stress my instructions to you not to discuss the case with anyone, including among yourselves. If you're out and about, if you go out for a sandwich or anything like that, you see anybody associated with this case, you're to avoid them. They know to avoid you. Don't take it personally if they cross the street to avoid you. You're not to have contact with anybody having anything to do with the case.

Charlie, would you show them out, please.

(Proceedings out of the presence of the jury as follows:)

THE COURT: Okay. Ms. Beckner, you're making a lot of representations in your questions regarding what these records are and what they show. I think it would be better if we just got to the facts of what the records are and what they actually show. In other words, asking questions like are there a high number of calls to Mr. Soto as opposed to the exact number of calls to Mr. Soto. So where is this going to go?

MS. BECKNER: Yes, your Honor. I'm sorry. The defense attorney challenged the relevance of the exhibits, and it's hard to demonstrate the relevance of the exhibits through a witness. Normally, I would just make argument as to what the relevance are at a side bar but the defense attorney asked for more questioning on this, and it's difficult to demonstrate relevance without actually asking about the exhibit itself.

THE COURT: The jury is not in the room now. Tell me what it is that you think these records show.

MS. BECKNER: Yes, your Honor. These records are indicative of the contact between Mr. Soto and Mr. Mejia. There were four hundred seventy some calls placed between Mr. Soto and Mr. Mejia during the period

of time for which the records were obtained, which I think is significant as to their relation to each other in this conspiracy.

In addition, the high volume of calls placed is indicative, maybe not exclusively so, but certainly a factor that could be considered by the jury in determining to what use the defendant was putting the cell phone which the Government would certainly argue is drug use.

In addition, there were a number of common calls between the defendant's cell phone and a cell phone seized from Mr. Soto. This shows the relationship, once again, between the defendant and Mr. Soto and the other participants, whether it be either suppliers or their customers, that sort of thing. The fact that they both are calling the same people is indicative of the connection between the conspirators alleged in the indictment.

So, your Honor, the Government would submit that a cell phone is a tool of the trade in the drug business and the information obtained from the cellular phone shows both the connection between the defendants, as well as the use to which he was putting it.

THE COURT: All right. Well, I understand it shows a connection between the defendant and Mr. Soto,

but what demonstrates that it was being used for any drug transactions? In other words, you referred to a common number being called. Is there some evidence that that common number is a number of a known drug dealer or supplier or something else?

MS. BECKNER: Well, your Honor, there are 38 common numbers called by the defendant. In addition, some of the ledgers seized from the defendant's pocket, the phone numbers indicated on those ledgers are calls by both the defendant as well as Mr. Soto. And the defendant was also calling some of the phone numbers from the ledgers in his pocket.

So while I am by no means saying the cell phone in and of itself is proof beyond a reasonable doubt, I believe it is relevant to this case and relevant to the conspiracy in the case.

To me, a cell phone, and I believe the evidence supports this, a cell phone is another tool of the trade and the information derived from those records is indicative of both the conspiracy as well as the defendant's intent in this case.

THE COURT: Well, just because people call each other a lot doesn't make them drug dealers, and it doesn't mean that the phone calls are about drug dealing.

MS. BECKNER: I agree, your Honor, and I'm not going to argue that. I'm going to argue that they called each other a lot, which shows the connection between these people. They're charged with a conspiracy beginning on a date unknown until December 18th, 2006. The Government has an obligation to show how these two --

THE COURT: I understand that. It seems to me you can put them in for purposes of showing that they talked to each other a lot, but you have gone one step further. You have elicited expert testimony that says, number one, cell phones are a tool of the drug trade; and, number two, that drug dealers call each other a lot. And then you introduce the records to show these two called each other a lot. The syllogism is that they, therefore, are drug dealers. And the thing is that syllogism doesn't work. I mean, I can see you putting them in to show that they placed 470 calls to each other during the period in which this transaction took place. That's fine. But taking it to the next step and saying, well, they have all these common numbers, and there's this -- there was one other thing you listed. And therefore, it's clear that this phone was being used for drug dealing, I'm not going to allow that.

MS. BECKNER: Your Honor, if I may. I did not ask the agent whether or not drug dealers call each other a lot. When the relevance -- I was not going to ask the agent any questions about the record. It was only because the relevance was challenged and I was asked to elicit the relevance from the agent. I would have simply offered them because they're stipulated to, and I had prepared another agent to discuss those records. The authenticity of those records themselves are not disputed.

However, now that I've made my proffer as to relevance, I do not intend to argue these guys call each other a lot, drug dealers call each other a lot; therefore, they're drug dealers. And I didn't elicit that testimony. What I intend to argue is these guys call each other a lot. They're connected. They call a lot of the same people. And they call some of the phone numbers listed on the paperwork seized from Mr. Mejia. That is all I intend to argue from these records.

THE COURT: Well, you did ask some questions that elicited answers of the type that I'm talking about. I'm not going to repeat them all here. Maybe you're saying you did that after you were asked to, or challenged on the relevance, but there certainly were

questions of the type that I'm talking about. Let me hear from Mr. West.

MR. WEST: Your Honor, going right to the theory of my case, the first issue I have with the telephone records is that they are not tied factually to the case. In other words, there's no telephone call from Ambrioris Falette to Mr. Mejia. There's no telephone call from Marie Perez to Mr. Mejia. There is no factual linkage that's been set forth as a foundation upon which you could introduce this evidence into this trial.

THE COURT: Why aren't they relevant for purposes of proving the conspiracy, that is, the connection between the two defendants?

MR. WEST: Your Honor, the fact that the defendants were friends or called each other on the telephone proves a conspiracy? That's where I struggle with this thing. They can call each other on the telephone all they want. Unless there's some factual connection that they arrange with each other to deliver drugs down here, that's been observed by the police or it's going to be put into evidence by the police, and they haven't done so, I might add at this point, then these telephone calls are irrelevant. They can talk to each other all they want. And to submit them now to

the jury in support of this thesis that the Government has developed that people who call each other a lot are drug dealers, I think is asking the jury to engage in rank speculation.

We don't know what they were talking to each other about. Nor does the Government. It's unfair to submit these records into evidence to have them leap to that conclusion, that because they talked a lot, because they called friends in common a lot, or numbers in common. There's not going to be any testimony in this trial as to what those common numbers are. That's irrelevant. They have nothing to suggest what those numbers are, and they've never introduced any evidence to show any aspect of that side of the case.

THE COURT: Ms. Beckner just represented that some of the numbers and common numbers called are numbers that were on the so-called drug ledgers.

MR. WEST: Ms. Beckner may be referring to phone numbers that Mr. Mejia had in his wallet. I take it that's what she was referring to when she made that argument. I've maintained all along that those pieces of paper he had in his pocket had some phone numbers on them. Your Honor, everyone carries phone numbers on cards, notes, papers in their wallets. To jump to the conclusion that because a phone number appears on a

piece of paper that has something that the Government can call a drug ledger allows in a whole ream of telephone calls between the defendant and Mr. Soto, I think is a real stretch. I don't think it establishes any linkage in this case and it unnecessarily is going to have the jury make some conclusions that they oughtn't be making. The Government can't prove those facts. I submit the Government is not going to call witnesses that are going to show any kind of calls to Mr. Mejia from the salient players in this case having to do with the arrangement of a drug deal. If they're not going to do that, then there's no other purpose for introducing the phone records. Salient people being Marie Perez and Mr. Falette.

Certainly the phone, you've already heard who they talked to. Falette talked to Soto, Marie talked to Soto. There's nothing else there. So I would submit they're irrelevant to this proceeding.

MS. BECKNER: Could I be heard just briefly again, your Honor?

THE COURT: Yes.

MS. BECKNER: Your Honor, I think Mr. West's argument goes to the weight the jury should attach to the records and not to their actual admissibility. The Government has a theory of relevance that it put forth

to the Court. Mr. West may argue from the same set of facts a completely different inference for the jury to make but that does not negate the relevance put forth by the Government.

THE COURT: I still don't understand really the relevance. I mean, other than the fact that -- my kids might make 400 phone calls to somebody on their cell phone. It doesn't make them a drug dealer. What is it that connects these phone calls? A lot of people don't have home phones anymore; they just use cell phones. What is it that connects these calls to this drug deal? That's the part I'm struggling with.

MS. BECKNER: Your Honor, Mr. West identified the salient characters in this case but he left out one very important name, Mr. Soto. He is an important player in this case, and it's the individual that the defendant's charged in conspiring with, so the connection between the two is important, especially in light of the fact that the recorded calls in this case occurred on December 11th. So did calls between Mr. Soto and Mr. Mejia. Another recorded call was on December 12th. So were calls between Mr. Soto and Mr. Mejia. And Mr. Mejia and Mr. Soto had a direct connect on the night in question of the drug deal.

So your Honor, I'm simply -- I'm not trying to

say that I subpoenaed all these other numbers, or know anybody else he's calling. What I'm offering them for is to show the connection between the defendant and his co-conspirator, Mr. Soto, and that is it.

MR. WEST: I just have one more thought, your Honor, on this issue, if I could be heard. Your Honor, Ms. Beckner has just said there are a lot of people who Mr. Soto called on his cell phone, but because Mr. Mejia was there that night, therefore, he's the one whose records are relevant. What about all the other people who Mr. Soto called? There are hundreds of calls that Soto made in those records to very specific numbers. I have them sorted, but I'm not going to go into them at this point. There's aggregates of numbers of calls to various people. But all of a sudden, the only one that's relevant is Mr. Mejia's.

THE COURT: You can raise that on cross-examination, however many calls he made to however many people.

The way I'm going to leave this is that I'm going to allow Ms. Beckner to ask really one question, which is after conducting an analysis of these records, have you determined how many calls took place in this time period between the defendant and Mr. Soto. And he can answer that question. That's it.

MR. WEST: Your Honor, they're talking about from November 1st to December 18th. November 1st isn't even the relevant time frame. The time frame that's relevant would at least be narrowed to the 11th to the 18th, it seems to me.

THE COURT: Why the 11th? What's the magic of that?

MR. WEST: That's the date that --

THE COURT: You mean December 11th?

MR. WEST: December 11th, the date they supposedly started negotiating a drug deal.

MS. BECKNER: Your Honor, I believe that would leave an incomplete picture for the jury to think that all of a sudden this person appears in Mr. Soto's life that he's never had any connection to.

THE COURT: No. I'm okay with -- you can deal with all of those things on cross-examination. I think that's a fair snapshot of a relationship, and that's really what they're being put in for. But beyond that -- well, that's all. Okay. We're going to take -- be back around 1:30.

(Lunch recess.)

(Proceedings in the presence of the jury as follows:)

THE COURT: Welcome back, ladies and gentlemen.

Ms. Beckner, are you ready to proceed?

MS. BECKNER: Yes, your Honor.

THE COURT: Go ahead.

MS. BECKNER: Your Honor, at this time, I would offer Government Exhibit 6A into evidence.

THE COURT: All right.

MR. WEST: Same objection.

THE COURT: All right. I'm going to overrule the objection and 6A will be full.

(Government Exhibit 6A admitted full.)

MS. BECKNER: May I approach the courtroom deputy, your Honor?

THE COURT: Yes.

Q. Agent Naylor, as you were searching the defendant, aside from the cell phone, what else did you -- what else did you find on his person?

A. We found personal belongings like a registration, some pictures, some papers, and some business cards and notes that I had located, as well.

MS. BECKNER: May I approach the witness, your Honor?

THE COURT: Yes.

Q. Agent Naylor, I'm handing you what's already been marked as Government Exhibit 8A through 8Z. Let's start with Government Exhibit 8. Do you recognize

that, Agent Naylor?
A. Yes.
Q. What is it?
A. It is a business card that I located on the defendant the night of the arrest with some numbers on the back.
Q. Agent Naylor, after you seized that card, did you place it into evidence?
A. Yes, I did, ma'am.
Q. Did you maintain custody of it in evidence until trial?
A. Yes, ma'am.
Q. Is it in substantially the same condition now as it was that night?
A. Yes, ma'am.
MS. BECKNER: Your Honor, at this time I'd offer Government Exhibit 8 into evidence.
MR. WEST: Your Honor, I made a pretrial objection to these matters. I wish to preserve that.
THE COURT: Right. The objection is overruled. Exhibit 8 will be full.
(Government Exhibit 8 admitted full.)
MS. BECKNER: Your Honor, as a matter of housekeeping, my understanding is I already admitted Government Exhibit 6. I just want to confirm that fact

before I keep going.

THE COURT: Yes. We just did that.

MS. BECKNER: That's what I thought.

Q. Agent Naylor, if you could take a look at Government Exhibit 8A, what is that, sir?

A. That is a paper napkin with some numbers that I seized from the defendant on that night, as well.

Q. And did you, after seizing it, place it into evidence?

A. Yes, I did.

Q. And did you maintain custody of that Government Exhibit 8A until trial here today?

A. Yes, ma'am.

Q. And is it in substantially the same condition now as it was when you seized it?

A. Yes, ma'am.

MS. BECKNER: Your Honor, at this time I'd offer Government Exhibit 8A into evidence.

MR. WEST: Your Honor, I have the same objection.

THE COURT: The objection is noted. Overruled.

(Government Exhibit 8A admitted full.)

Q. Agent Naylor, if you could take a look at Government Exhibit 8B, what is that, sir?

A. That, again, is a piece of paper with numbers and

names next to it, again, that I located on the suspect the night of the arrest.

Q. Did you place that into evidence, as well?

A. Yes, ma'am.

Q. Is it in substantially the same condition now as it was that night?

A. Yes, ma'am.

Q. Did you maintain custody of Government Exhibit 8C, the paper with the names and notations on it until trial here today?

A. Yes, ma'am.

MS. BECKNER: Your Honor, at this time I would offer Government Exhibit 8C into evidence.

MR. WEST: Same objection, your Honor.

THE COURT: Objection is noted, overruled, and 8C will be full.

Q. Finally, Agent Naylor, if you could take a look at Government Exhibit 8 -- actually, I think I skipped over one, your Honor. I think that was the foundation for 8B that I should have moved to offer 8B into evidence?

THE COURT: Just a minute. That's correct. That was 8B, as in boy. You can go on to C.

(Government Exhibit 8B admitted full.)

Q. Agent Naylor, if you could take a look at

Government Exhibit 8C, what is that, sir?
A. Yes. That is a bunch of business cards that were located on the party as well as the writing on the back of most of these, as well.
Q. Did you once again place those business cards that you seized from the defendant into evidence?
A. Yes, ma'am.
Q. You maintained custody of them in evidence until trial; is that correct?
A. Yes, ma'am.
Q. Are they in substantially the same condition now as when you seized them?
A. Yes, ma'am.
MS. BECKNER: Your Honor, at this time I would offer Government Exhibit 8C into evidence.
MR. WEST: Same objection.
THE COURT: Objection is noted and overruled. 8C will be full.
(Government Exhibit 8C admitted full.)
Q. Agent Naylor, if you could look at Government Exhibit 8D, what is that, sir?
A. That is a business card with writing on the back. It's got a phone number and some numbers on the side, as well.
Q. Sir, where did you obtain that business card?

A. I located this on Mr. Mejia the night of the arrest, as well.
Q. Did you place it into evidence?
A. Yes, I did.
Q. Did you maintain custody of it until trial?
A. Yes, I did.
Q. Is it in substantially the same condition now as when you seized it?
A. Yes, ma'am.
MS. BECKNER: Your Honor, at this time I would offer Government Exhibit 8D into evidence.
MR. WEST: Same objection.
THE COURT: Objection is noted. Overruled. 8D will be full.
(Government Exhibit 8D admitted full.)
MS. BECKNER: May I retrieve the exhibits, your Honor, and publish them to the jury, your Honor?
THE COURT: Yes.
MS. BECKNER: I'm publishing Government Exhibit 8 for the jury. I'm now publishing Government Exhibit 8A for the jury. Government Exhibit 8B. Government Exhibit 8C, the stack of cards, and the jury will be able to examine them closer later on. And Government Exhibit 8D.
Q. Agent Naylor, did you also search Mr. Soto at that

time?

A. Yes, I did, ma'am.

MS. BECKNER: May I approach the witness, your Honor?

THE COURT: Yes.

Q. Agent Naylor, I'm handing you what's been marked as Government Exhibit 4 and 5 for evidence. Do you recognize that, sir?

A. Yes, ma'am.

Q. And what are those exhibits?

A. Exhibit 4 is a NEXTEL phone that I has seized from Mr. Soto, and Exhibit 5 is a Disney telephone that I had seized from Mr. Soto on the night of the arrest.

Q. Did you examine Exhibit 4, the NEXTEL cell phone, that evening?

A. Yes, ma'am.

Q. Were you able to obtain the phone number associated with that phone?

A. Yes, I was, ma'am.

Q. Did you place Government Exhibit 4 into evidence after you had examined it?

A. Yes, ma'am.

Q. And is it in substantially the same condition now as it was when you seized it?

A. Yes, ma'am.

MS. BECKNER: Your Honor, at this time I would offer Government Exhibit 4 into evidence.

THE COURT: Any objection?

MR. WEST: No objection.

THE COURT: Government 4 will be full.

(Government Exhibit 4 admitted full.)

Q. Agent Naylor, I'm showing you what has been marked as Government Exhibit 18. It should already be identified in your witness book. Can you tell me what that is, sir?

A. This is a photograph that I took the night of the arrest. This is of Mr. Soto's telephone showing the time that he had called the cooperator, Ambrioris Falette's telephone number.

Q. Actually, if you could take a look at Government Exhibit 18, sir?

A. I'm sorry. That's a picture of the telephone information that I -- how I retrieved the telephone number from the exhibit, I believe it's Exhibit 4.

Q. And this is a photograph of Government Exhibit 4, the NEXTEL phone seized from Mr. Soto; is that correct?

A. Yes, ma'am.

Q. Does it fairly and accurately depict the screen as it appeared to you that night?

A. Yes, ma'am.

MS. BECKNER: Your Honor, at this time I would offer Government Exhibit 18 into evidence.

MR. WEST: No objection.

THE COURT: 18 will be full.

(Government Exhibit 18 admitted full.)

MS. BECKNER: May I publish Government Exhibit 18 for the jury, your Honor?

THE COURT: Yes.

Q. Agent Naylor, if you could just explain how it is you got the phone number by referencing the screen. I believe it is showing before the jury.

THE COURT: It is.

A. Yes, ma'am. You go into the feature on the NEXTEL phone that says "My information" and below it will say the name. Sometimes they'll list the name if it's registered to an active person. Then below it is line one, that will give you the telephone number, and below that is the walkie-talkie number, which will give you the direct-connect number. A direct-connect is a telephone, like a two-way walkie number, and that identifies that number, as well.

Q. Now, was the Government able to obtain the cell phone records associated with Government Exhibit 4, the NEXTEL phone seized from Mr. Soto?

A. Yes, ma'am.

MS. BECKNER: May I approach the witness, your Honor?

THE COURT: Yes.

Q. I'm handing you what's been marked as Government Exhibit 4A. Do you recognize it, sir?

A. Yes, ma'am.

Q. What is it?

A. These are telephone records from the telephone from Exhibit 4, ma'am.

MS. BECKNER: Your Honor, at this time I would offer Government Exhibit 4A into evidence.

THE COURT: Do you want to establish a time frame of those records?

MS. BECKNER: Yes, your Honor.

Q. Agent Naylor, if you could tell me the period of time covered by those records?

A. From November 1st until December 18th, ma'am.

Q. Is the phone number addressed in the records of -- excuse me. Is the phone number that you retrieved from the NEXTEL phone, the phone number that relates to those records?

A. Yes, ma'am.

MS. BECKNER: Your Honor, if I could offer Government Exhibit 4A into evidence?

THE COURT: Any objection?

MR. WEST: No objection.
THE COURT: 4A will be full.
(Government Exhibit 4A admitted full.)
Q. Now, Agent Naylor, if you could turn to Government Exhibit 17 in the witness book, sir.
A. Yes, ma'am.
Q. Do you recognize that?
A. Yes.
Q. What is it?
A. That is a picture of the telephone of Mr. Soto showing the number he dialed to call Mr. Falette, and it has a star 67 in front of it with the time 7:52 on the 18th. The length of time is 4:43.
Q. Agent Naylor, does the photograph fairly and accurately depict the phone as it looked that night when you took the picture?
A. Yes, ma'am.
MS. BECKNER: At this time, I would offer Government Exhibit 17 as a full exhibit.
THE COURT: Any objection?
MR. WEST: No objection.
THE COURT: 17 may be full.
(Government Exhibit 17 admitted full.)
MS. BECKNER: May I publish this for the jury, your Honor?

THE COURT: Yes.
Q. Agent Naylor, how do you know that that is Mr. Falette's phone number?
A. I've called it numerous times.
Q. Now you say there's a star 67 here in front of the number, what is that, sir?
A. That is a feature on telephones that will block your number. If your number becomes unblocked, you hit star 67, and the person you're calling, your number does not show up on their screen if they have caller ID, ma'am.
Q. Agent Naylor, you also have Government Exhibit 5 in front of you. What is Government Exhibit 5?
A. That is the Disney phone that I seized from Mr. Soto on the night of the 18th.
Q. Did you also obtain the phone number from that phone, as well?
A. Yes, I did.
Q. Did you then place the phone into evidence, sir?
A. Yes, ma'am.
Q. Have you maintained custody of it in evidence until trial here today?
A. Yes, ma'am.
Q. Is it in substantially the same condition now as when you seized it?

A. Yes, ma'am.

MS. BECKNER: At this time, I would offer Government Exhibit 5 into evidence.

MR. WEST: No objection.

THE COURT: Government 5 will be full.

(Government Exhibit 5 admitted full.)

MS. BECKNER: May I approach the witness, your Honor?

THE COURT: Yes.

Q. Agent Naylor, I'm handing you what's been marked as Government Exhibit 5A. Do you recognize it, sir?

A. Yes, ma'am.

Q. What is it?

A. This is the subpoenaed data for the Disney telephone.

Q. So these are the phone records relating to Government Exhibit 5?

A. Yes, ma'am.

Q. And what period of time was the subpoena?

A. From December 14th, 2006, the activation date, until 12/18/2006.

Q. So the activation date was the date that phone service was started?

A. Yes, ma'am.

MS. BECKNER: At this time, I would offer

Government Exhibit 5A into evidence?

MR. WEST: No objection.

THE COURT: 5A will be full.

(Government Exhibit 5A admitted full.)

Q. Agent Naylor, can you tell me whose name the Disney phone was in? It should be in your exhibit book, too, if you don't want to remove it from the plastic.

A. What exhibit number was that?

Q. Exhibit 5A.

MS. BECKNER: May I also publish this for the jury, your Honor?

THE COURT: Yes.

A. It's in the name of Enoc Soto, ma'am.

Q. And with respect to Government Exhibit 4A, previously admitted, can you tell me whose name those records are in.

MS. BECKNER: May I also publish it for the jury, your Honor?

THE COURT: Yes.

A. Those come under the name of Marlin Jimenez-Mercedez.

Q. These are associated with the phones seized from Mr. Soto?

A. Yes, ma'am.

MS. BECKNER: Your Honor, may I approach the courtroom deputy and turn in some of the exhibits?

THE COURT: Yes.

Q. Agent Naylor, after you searched the person of the defendant and Mr. Soto, which vehicle did you search first?

A. After we searched the two of those, then I went to the DEA vehicle and we located a black bag.

MR. SHAH: May I approach the witness, your Honor?

THE COURT: Yes.

Q. Agent Naylor, do you recognize what has -- first of all, I'm showing you what has previously been marked as Government Exhibit 2. Do you recognize it, sir?

A. Yes, ma'am.

Q. What is it?

A. This is the black bag, the suitcase, that we located on the 18th that had been placed in the vehicle by Mr. Soto.

Q. If you could take a moment to examine it and then tell me if it's in substantially the same condition now as when you found it?

A. Yes, ma'am, it is, except it's missing the four screws that I had taken out.

Q. The four screws that you had taken out of what,

sir?
A. It had four screws that hold the compartment on the bottom in, and I had taken those four screws out.
Q. And, of course, did you, in fact, take the suitcase apart?
A. Yes, I did, ma'am.
Q. Other than that, is it in substantially the same condition now as when you first opened it?
A. Yes, ma'am.
MS. BECKNER: Your Honor, at this time, I would offer Government Exhibit 2 into evidence.
MR. WEST: No objection, your Honor.
THE COURT: Government 2 will be full.
(Government Exhibit 2 admitted full.)
MS. BECKNER: May I publish this for the jury, your Honor?
THE COURT: The witness may just hold it up. I think that would be fine.
MS. BECKNER: Your Honor, may I ask the witness to show the hidden compartment?
THE COURT: Yes.
Q. Agent Naylor, what was missing from the hidden compartment in relation to when you first found it and opened it?
A. Two kilogram size packages of cocaine, ma'am.

MR. WEST: Objection. Move to strike.
THE COURT: What are the grounds?
MR. WEST: Your Honor, he's identifying material in these --
THE COURT: Not in evidence yet?
MR. WEST: Not in evidence.
THE COURT: Overruled. Go ahead.
Q. Agent Naylor, could you please turn in your exhibit book to Government Exhibit 14?
A. Yes, ma'am.
Q. What is that a photograph of?
A. That's a photograph of the suitcase that night with the two kilograms of suspected cocaine on the left-hand side of the suitcase, ma'am.
Q. Does that picture fairly and accurately depict the way the suitcase looked once you had opened the hidden compartment?
A. Yes, ma'am.
MS. BECKNER: At this time, I would offer Government Exhibit 14 into evidence.
MR. WEST: No objection.
THE COURT: 14 will be full. You may publish it.
(Government Exhibit 14 admitted full.)
Q. Agent Naylor, could you please point out what you

believe to be suspected cocaine?

A. The two spots where I marked, those are two separate suspected kilos of cocaine, ma'am.

Q. And if you could turn to Government Exhibit 15 in your book, Agent Naylor?

A. Yes, ma'am.

Q. Is that a close-up picture of the same thing?

A. Yes, ma'am.

Q. Does it fairly and accurately depict, although in a larger form, the way the cocaine, or the suspected cocaine in the suitcase looked that night?

A. Yes, ma'am.

MS. BECKNER: At this time, I would offer Government Exhibit 15 as a full exhibit.

MR. WEST: No objection.

THE COURT: 15 will be full.

(Government Exhibit 15 admitted full.)

MS. BECKNER: May I publish it, your Honor?

THE COURT: Yes.

Q. Agent Naylor, what were -- what's this gray thing here?

A. Those are two support beams that when you pull the handle out, that's where the handle goes in the suitcase. If you look at the exhibit now, they've been removed.

Q. Now, after you found this suitcase, who did you turn over custody of it and the suspected cocaine to?
A. To Task Force Agent Joe Colanduono of the Providence Police Department.
MS. BECKNER: May I approach the witness, your Honor?
THE COURT: Yes.
Q. Agent Naylor, I'm showing you what has been marked as Government Exhibit 1. Is that the substance from within the suitcase that Agent Colanduono obtained custody of?
A. Yes, ma'am.
Q. All right. After searching the DEA car, what was the next thing you searched, Agent Naylor?
A. We went over to the red vehicle that Ms. Perez and the defendant were in, ma'am.
Q. And what did you find in that vehicle, Agent Naylor?
A. We observed -- I observed a loaded .45 caliber Highpoint firearm in that vehicle, ma'am.
Q. And what happened with that firearm, Agent Naylor?
A. That firearm was turned over to Special Agent Jaime Schiffer of the ATF. I'm sorry. It was turned over to Task Force Agent Colanduono of the Providence Police Department at that time, ma'am.

Q. Did you have an opportunity to examine it after you saw it in that position that night?
A. Yes, ma'am.
Q. I'm sorry. Did you describe where you saw it in the red car?
A. It was behind the driver's seat on the floor. If you were seated behind the driver in a vehicle, where your feet would go, right in that area, ma'am.
Q. Can you describe the condition of the firearm you saw that night?
A. It was in good condition. Appeared to be working, ma'am.
Q. How about the serial number? Were you able to see the serial number?
A. Yes, ma'am. That had been obliterated where it was worn down so you couldn't see it.
MS. BECKNER: May I approach the witness?
THE COURT: Yes.
Q. Showing you what's been marked as Government Exhibit 3, do you recognize that, sir?
A. Yes, I do, ma'am.
Q. And could you examine it and where the serial number was?
A. Yes, ma'am.
Q. When Agent Colanduono submitted it to Providence

Police Department, were attempts made to raise the serial number?

A. Yes, ma'am.

Q. With the exception of that, and I guess some of the protective items that have been put on it now, is it in substantially the same condition now as when you saw it that night?

A. Yes, ma'am.

Q. Could you just describe what some of the protective conditions are on it that differ from the way it was that night?

A. Well, to bring it into the courtroom today, they had to put a locking device on it. The two bullets that were in it are now placed in the plastic bag, and the clip itself that holds the bullets is outside it, ma'am.

MS. BECKNER: At this time, I would offer Government Exhibit 3 into evidence.

MR. WEST: Objection. May we be heard at side bar, your Honor?

THE COURT: Yes.

(Side-bar conference.)

MR. WEST: Your Honor, the gun that she's trying to put into evidence right now, I object on relevancy grounds because no foundation has been laid as to how

this relates to the charges against Mr. Mejia in terms of what he is accused of having done with it. So I think that at this point, no foundation has been laid for the introduction of the gun.

THE COURT: Well, he was in that car, right?

MR. WEST: At some point.

THE COURT: I think there's been evidence of that.

MR. WEST: That is correct.

THE COURT: Right. And so, I mean, I think this all just goes to what you're going to argue about, whether he did or didn't know of it, whether he possessed it, actually possessed it, constructively possessed it, or what. I'll overrule it.

(End of side-bar conference.)

THE COURT: The last objection is overruled. The Exhibit 3 is full.

(Government Exhibit 3 admitted full.)

MS. BECKNER: May I have the agent publish it for the jury, your Honor?

THE COURT: Yes.

Q. Agent Naylor, could you indicate once again the extra items added to it for safety reasons?

A. This is the locking device that was placed on it so you wouldn't be able to fire it, ma'am.

Q. And what were the other two items you placed in the box last?
A. I'm sorry. This is the clip that holds the bullets, and these are the two bullets that were inside the vehicle, ma'am.
Q. Agent Naylor, what was the next vehicle you searched after that?
A. Then we went over to the vehicle of Enoc Soto, the Toyota Camry, and we searched that vehicle, ma'am.
Q. Where was that vehicle located?
A. In the parking lot at McDonald's.
Q. What did you find in that vehicle, sir?
A. Inside that vehicle we located an Allen wrench, which had the -- was the same size that opened the bolts that went to the luggage and a notebook that would appear to be a drug ledger, ma'am.
MS. BECKNER: May I approach the witness, your Honor?
THE COURT: Yes.
Q. Agent Naylor, I'm first handing you what's been marked as Government Exhibit 7. What is that, sir?
A. This is the Allen wrench that was seized from the vehicle, and also in the evidence bag I had placed the four bolts that went to the suitcase, and I tested them that night to make sure the wrench fit the bolts.

Q. So the four bolts that are included in Government Exhibit 7 actually were removed from Government Exhibit 2, the suitcase?
A. Correct, ma'am.
Q. Is the wrench and are the bolts in substantially the same condition now as when you seized it?
A. Yes, ma'am.
Q. And did you maintain custody of those in evidence until trial here today?
A. Yes, ma'am.
MS. BECKNER: At this time, I would offer Government Exhibit 7 into evidence.
THE COURT: Any objection?
MR. WEST: No, your Honor.
THE COURT: Seven will be full.
(Government Exhibit 7 admitted full.)
Q. Where did you say you seized the Allen wrench from?
A. The glove compartment of the vehicle, ma'am.
Q. What else did you find in the glove compartment, Agent Naylor?
A. A blue notebook that appeared to be a drug ledger, ma'am.
MS. BECKNER: May I approach the witness?
THE COURT: Yes.

Q. Agent Naylor, I'm handing you what has been marked as Government Exhibit 16. What is that, sir?
A. That is the notebook that I located from Enoc Soto's vehicle, ma'am.
Q. And it was also in the glove compartment?
A. Yes, ma'am.
Q. Is it in substantially the same condition now as when you seized it?
A. Yes, ma'am.
Q. And did you place that into evidence after seizing it that night?
A. Yes, ma'am.
Q. And you have maintained custody of it in evidence until trial here today?
A. Yes, ma'am.
MS. BECKNER: At this time, I'd offer Government Exhibit 16 into evidence.
MR. WEST: Your Honor, I have a pretrial motion on this piece of evidence. I renew it.
THE COURT: Your objection is noted. It's overruled, and 16 will be full.
(Government Exhibit 16 admitted full.)
MS. BECKNER: May I publish it for the jury, your Honor?
THE COURT: Yes.

Q. Agent Naylor, what was done with the defendants after they were arrested that night?
A. They were taken to the Providence Police Department, ma'am.
Q. And did you engage in an interview with the defendant that night?
A. Yes, I did, ma'am.
Q. About how long after the arrest was that?
A. Approximately one hour, ma'am.
Q. And who was present in the interview room with you and the defendant?
A. Myself and Detective Andres Perez of the Providence Police Department.
Q. What happened before the interview began?
A. Mr. Perez was asked to read him his rights in Spanish and have him sign off on a rights form after he indicated he understood them. That was done, ma'am, and then an interview was taken place.
Q. All right. And what did you ask the defendant?
A. I asked him a series of questions that were relayed through Detective Perez. Some were answered in English, and some were answered in Spanish. I asked him why he was down here.
Q. What did the defendant say?
A. He said to protect him, to watch his back.

Something of that effect, ma'am.
Q. What else did you ask the defendant?
A. If he knew anything about the gun. He had said that he had gotten the gun from Mr. Soto at the McDonald's.
Q. What did the defendant say he had done with the gun?
A. He had placed it under the seat.
Q. In which vehicle?
A. The red vehicle, ma'am.
Q. What else did the defendant say to you that night as you interviewed him?
MR. WEST: Objection. Your Honor, there was some indication this was in Spanish and English. I don't think that's been clarified as to whether these are direct statements.
THE COURT: I understand. I understand. If you could just be specific with respect to your questions as to which questions were placed in English and answered in English, and which were translated by Detective Perez, that would be helpful.
MS. BECKNER: Yes, your Honor.
Q. Agent Naylor, based upon your recollection, what question or what answer do you remember the defendant giving in English?

A. Well, some of the answers that he gave, the shorter ones, were in English like when I had asked him the question of why did you have to protect -- why did you watch his back? Why were you here to watch his back? He said, you know, and I said something like, no, I don't know. Try to explain that to me. He said, I assumed he was making a deal. We went on. I believe the next part came in Spanish. Like the shorter questions again, more than 50 percent was in Spanish, but the other questions were like to the effect, one of the specific questions was, when did you get the gun? He said at the McDonald's.

Q. Did he say that in Spanish or English?

A. He said that in English, ma'am. I said to him, when did you put it -- where did you put it? He said, behind the seat. Again, I don't remember if this part was in English or in Spanish but he had said --

MR. WEST: Objection. Move to strike.

THE COURT: Just stick to what you remember.

MR. WEST: Your Honor, if he's going to relate what was in Spanish, there's no foundation.

THE COURT: Right. So I'll sustain that objection. You ask your next question.

Q. Is there any other question that you remember the defendant answering in English?

A. Yes. There were other questions. We were talking -- the conversation at one point switched over to him being -- he stated he wanted to be a cooperator. I explained to him that some of the people involved were cooperators in this case. Actually, I only explained to him that Mr. Falette was a cooperator. The conversation started being about him being a cooperator. So I had asked him how many kilos could he get. He was being evasive, but he said he could bring drugs down from Mass, get people to bring drugs down from Mass. Those were in English. I asked him some specific questions about a garage, if he hung around with Enoc Soto at a garage. That was in English. I asked him specific questions if he had gone to Chicago with Mr. Soto. I remember asking him a couple of questions about that. And he had -- I think he denied going to Chicago with Mr. Soto. He said, no, he hadn't gone to Chicago.
Q. Now after you finished questioning the defendant, what did you do?
A. Sometime after we finished questioning him, we took him over to the computer and we were going to take a statement from him. We sat in front of the computer, and I started to type out a bunch of questions that I was going to ask him, have Mr. Perez ask and answer.

We started to do that, and again, his conversation, every time I'd ask him a question, he'd start talking about wanting to cooperate again. I'd try and get the conversation back on track between myself and Mr. Perez onto the statement.

Q. Was this in English or Spanish?

A. Both English and in Spanish, and I would try to relate to Mr. Perez, Detective Perez, if we could just get him to speak about the facts. And he again started talking about cooperating again, and I ended the interview.

Q. What did you do with the cooperator after you had finished your interviews?

A. The cooperators? We let them go.

Q. But prior to letting them go, what did you make it appear that you had done?

A. That both of them had been arrested, ma'am.

Q. Why did you take that step, sir?

A. We do that to try and protect the identity of the informants in some cases. In some cases just to continue the ruse that it was just a random stop, ma'am.

Q. Agent Naylor, before I finish, I want to ask you some questions about Government Exhibit 8A through 8D, and Government Exhibit 16, the notebook and papers that

were seized.

MS. BECKNER: Your Honor, I would like to publish both of these at the same time for the jury, if that's possible.

THE COURT: Yes.

Q. Agent Naylor, I have placed Government Exhibit 16 up on the screen. Sir, just to refresh everyone's memory, where was Government Exhibit 16 seized from?

A. From the vehicle of Enoc Soto from the glove compartment with the wrench, ma'am.

Q. And I'm also placing at this time Government Exhibit 8 for the jury, as well. Where was Government Exhibit 8 seized from, sir?

A. From the person of Mr. Mejia.

MS. BECKNER: If I could have just a moment, your Honor?

Q. Agent Naylor, what do you notice about the second letter in say this first word here, next to the 31, and say this letter here, and this one from Government Exhibit 16?

MR. WEST: Objection.

THE COURT: Overruled.

A. Both of the A's seem to have the same pattern, ma'am. Everywhere where there's like an A, they have that almost like a triangle, ma'am.

Q. Now, I'm putting Government Exhibit 8A in front of you. Where was that seized from, Agent Naylor?
A. From the person of Mr. Mejia.
Q. Okay. Now, this notation here, what does that say, Agent Naylor?
MR. WEST: Objection.
THE COURT: Did you object?
MR. WEST: Yes, your Honor, I did, for the same grounds which I think --
THE COURT: I understand. I'm going to overrule the objection.
A. That says "Primo," ma'am.
Q. All right. Now I'm showing you Government Exhibit 16, what does that say, sir?
A. Again, it looks like "Primo," ma'am.
Q. This is the second page of Government Exhibit 16. What does that look like to you, Agent Naylor?
A. Looks like it says "Aris," A-R-I-S.
Q. And how about here on Government Exhibit 8A?
A. Same thing, "Aris," ma'am.
MR. WEST: I have the same objection to this line.
THE COURT: I note your objection. It's overruled.
Q. Back to the first page of the letter, what does

that look like to you, Agent Naylor?
A. It looks like it says "Dinea," something to that effect, ma'am.
Q. How about down here on Government Exhibit 8A, Agent Naylor?
A. Same thing, ma'am.
MR. WEST: Same objection.
THE COURT: Objection is noted and overruled.
Q. I'm now showing you also Government Exhibit 8B. What does that look like to you, Agent Naylor?
A. That's the same "A" I've been talking about, the R-A-M."
Q. How about what word right here on Government Exhibit 16?
MR. WEST: Same objection.
THE COURT: Objection is noted and overruled.
A. Same thing, ma'am, R-A-M.
Q. Now, Agent Naylor, you testified that in your experience this appears to be a drug ledger. Could you explain why you are saying that based upon your training and experience with respect to let's start with Government Exhibit 8B.
A. 8B is the one on the right, ma'am. Yes.
Well, when you're dealing with drug ledgers, you have to particularly take the type of the case you're

working on. So in this case, we apprehended the suspect with cocaine, and we had suspected that they were cocaine traffickers. So we would go with the name, 150, and say that's times 23 up here, that's a common price, $23 per gram of cocaine. And with that price on the end, you would do it on that one on 8B. Similar all the way down, like 200 times -- as you see, this person, Alex, bought 200 times 22, so his price was a little bit different.

With drug ledgers, the bookkeeping in a ledger, if I'm selling to, in this case several different people, I might not charge each one the same price. So what I want to do in that is I want to keep track of how much I charge that person. So when I collect, sometimes drugs are given on what's called the cuff or the front, so to collect that, that's how you would keep track of how that's done, ma'am.

Q. All right. Now, I'm showing you the second page of Government Exhibit 16. Based upon your training and experience, sir, can you explain what this means to you?

A. Yes, ma'am. Again, now, we're suspecting that these are kilo-size dealers of cocaine. If you take the numbers, I'm going to exclude this one here that I touch, and you add all them down on that column, I

believe it comes to --
Q. Let me slow you down for a second.
A. I'm sorry, ma'am.
Q. When you say all of them down in that column, do you mean this column right here?
A. Correct.
Q. So excluding this second notation, if you add all of these numbers, what do you get?
A. I believe it comes to 926. Then if you add the other number which appears to be an 84, you're going to come into just over a thousand, so that would coincide with a thousand grams which is a kilogram. Then you'd go to the 21,775 which would be, if it was sold in those quantities, rough amount that you would get, 21,775, for a kilogram of cocaine.
So when you do that, that's based on my training and experience, that that would appear to be a drug ledger to me, ma'am.
Q. Okay. So this column, what you're saying is based on your experience, you believe that adds up to a thousand grams, or a kilogram?
A. Just about. I really --the second number looks like an 80, 84. It's scratched out. If you add all the other numbers, I believe it comes to 926, so given the other number.

Q. Then if you add up the numbers in the column right next to that, you're saying it comes up to 21,775?
A. Correct, ma'am.
Q. And what did you say that the price of a kilogram of cocaine was during that period of time?
A. Again, it was 18 to $23,000, around that point. So if he had been -- he had purchased the cocaine for say 18,000, his profit would be 3,775 off that one particular kilogram, ma'am.
MS. BECKNER: If I could have just a moment, your Honor?
THE COURT: Yes.
MS. BECKNER: Your Honor, I have no further questions for this witness at this time. If I may just approach the courtroom deputy and submit the exhibits.
THE COURT: That's fine. Mr. West, are you ready to cross-examine the witness?
MR. WEST: Yes, your Honor.

CROSS-EXAMINATION BY MR. WEST

Q. Agent Naylor, I'm calling your attention to December 1st, 2006. Do you remember that date?
A. December 1st?
Q. Yes, sir.
A. I remember the date, sir. Yes, sir.
Q. And on that date, you were not working down in

Newport? You were working up in Providence with the DEA, isn't that right?
A. Correct, sir.
Q. But you still work cases in Newport from time to time; is that right?
A. Yes, sir.
Q. So, I mean, you're mostly a Newport policeman?
A. I'm a Newport policeman assigned to the Drug Enforcement Administration so the majority of my time I'm assigned to the DEA. Sometimes I'll go back to assist. Sometimes my Drug Enforcement Administration investigation will lead to an investigation in Newport and I'll be in Newport, sir.
Q. But on December 1st, you were in Providence at a meeting; is that right?
A. I believe so, sir.
Q. And at that meeting, you were debriefing a cooperating informant; is that right?
A. I may have, yes, sir.
Q. Okay. And present at that meeting was Dan MacIsaac, William -- I'm going to say Marcaccio?
A. Marsocci.
Q. And Jaime Schiffer?
A. Correct, sir.
Q. And you met with Marie Perez; is that right?

A. I believe so, sir.
Q. Okay. And you debriefed her; is that right?
A. I believe I was there at the debriefing, sir.
Q. And at that debriefing, Agent Perez on December 1st, 2006, she described to you one individual, isn't that right?
MS. BECKNER: Objection. Hearsay.
THE COURT: Let's approach.
(Side-bar conference.)
THE COURT: Sounds like it's going to be a continuing problem. What are you doing here?
MR. WEST: Well, he debriefed Marie Perez and was told only about Enoc Soto. This is the report that was generated as part of the meeting. I can ask the question who did you -- you know, I'll try to rephrase it, exactly who he's investigating.
THE COURT: Well, you could use the report to ask the question of what he said in his report.
MR. WEST: It's Agent Cardello's report, which I'll have to call as a witness if this is going to be sustained.
MS. BECKNER: May I be heard on this issue?
THE COURT: Yes.
MS. BECKNER: I think it's hearsay to ask an agent what an informant says outside of court. And

what troubles me about this is, I don't think Mr. West wants to go down this road because then I would assume the Government would be allowed to ask everything that Marie Perez said about the defendant to the agent without actually calling Marie Perez to the witness stand, and I don't think Mr. West wants me to go there.

To repeat, I did not have statements made by the informant repeated to -- repeated through the agent. And the reason for that is because there has to be an opportunity for cross-examination.

So, for example, it would be very improper for me to have Agent Naylor testify to all the things Marie Perez has said about Mr. Mejia. This is the same exact thing.

And the other reason I'm concerned about this, your Honor, I believe what Mr. West is attempting to do is to elicit hearsay statements of the informant so he then can impeach the same hearsay statements of the informant, and I think this is highly improper, and I also think that --

THE COURT: That's what I talked about at the motion hearing, you know, it was not permissible. You can't bring her statements in through somebody and then impeach her through that person. I can't allow you to do that.

MR. WEST: I can't establish that this agent was talking to this witness about only one defendant in a debriefing?

MS. BECKNER: It's an out-of-court statement, your Honor.

THE COURT: What you asked was what did Marie Perez say.

MR. WEST: I'll rephrase it. I'll move on. The point is --

THE COURT: You may be able to bring him in as to what he said in his statement. But then, ultimately, you may have this problem that Ms. Beckner is referring to, and I don't know what all those things are.

MS. BECKNER: In addition, even to call Agent Cardello to repeat what Marie Perez said to them is blatant, classic hearsay.

THE COURT: If it comes in as that, but I mean, there are ways of asking -- I don't know what's in the report, but one could ask if -- who did you identify as a suspect. And the answer could be Soto. And if he says, well, Soto and Mejia, you could use the report to say, well, here's your report. It only says Soto. Now that's not eliciting hearsay. That's just asking him what happened, or what the events are.

MS. BECKNER: What troubles me about that, your Honor, is if you say who did you identify as a target based on your conversation, is asking for an answer that is completely dependent on hearsay.

THE COURT: It's not nearly as blatant of hearsay as what was just asked, but I'll just take it one question and one witness at a time. We'll see.

(End of side-bar conference.)

THE COURT: So the last question, the objection is sustained. And you may ask your next question.

Q. After that meeting on December 1st, 2006, you continued with your investigation; is that correct?
A. Yes, sir.
Q. And in the context of that investigation, Detective Naylor, you have explained that you utilized two cooperating witnesses, Ambrioris -- I'm going to say the names wrong probably continuously, Abriosi or --
A. Ambrioris Falette.
Q. Ambrioris Falette and Marie Perez; is that right?
A. Correct, sir.
Q. Now, you've testified that you have a fair amount of experience in this area of using cooperating witnesses; is that correct?
A. Correct, sir.

Q. Okay. And in the context of your testimony, you've previously testified that when utilizing cooperating witnesses, you take great care in the utilization of cooperating witnesses; is that correct?
A. Well, I don't know where I've testified to that, sir. But I know I do take care, sir.
Q. Okay. You've given testimony before as an expert witness, isn't that right?
A. Yes, sir.
Q. And in that context, you've talked about these very same things Ms. Beckner asked you about, the efforts you make to preserve your investigation; is that right?
MS. BECKNER: Object, your Honor. I think he's mischaracterizing the direct testimony.
THE COURT: All right. Let's -- I'm going to sustain that objection. Ask your next question.
Q. Well, for example, you've talked about controlled buys; is that right?
A. Correct, sir.
Q. And in a controlled buy, you would take steps with the informant; is that right?
A. Correct, sir.
Q. And what would you do in a controlled buy circumstance with the informant?

A. Controlled buy, we'd search the informant. We'd search the vehicle that he was utilizing. We'd try and give him some video and audio records if that ability is there. We'd try again to control all the circumstances surrounding. If we had surveillance on him, we knew the location. Depending upon the amount of information we have, it varies, sir.
Q. Why would you do that? Why would you have surveillance on the informant?
A. For a controlled buy?
Q. Yes.
A. To control all the factors for the informant's safety, for the investigative techniques, sir.
Q. Why do you search him?
A. Just so you know no contraband can come to the scene that your informant is bringing, sir.
Q. So you are trying to remove the possibility that the informant would bring contraband to the scene?
A. Correct, sir.
Q. That's why you would search the informant?
A. Correct.
Q. What would be contraband that you wouldn't want at a drug buy?
A. Extra money. If we're making a purchase, in this situation we want to make sure they only have our

money. Or if they have some of their own money, we count it, things to that effect. Other contraband would be some people would show up, sometimes they have a little buck knife. We don't want them coming up with anything like that. Other things like that. They might come with their own drugs. Things of that nature. We want to control all those circumstances, sir.

Q. So you want to make sure that an informant doesn't show up with their own drugs, that's why you search them; is that right?

A. Correct, sir.

Q. Okay. And when you're doing that sort of thing, you take a lot of care to document that you did those things; is that right?

A. Correct, sir.

Q. And I think you said that you will use video and audio; is that correct?

A. When the ability -- when we have the ability to, sir.

Q. Okay. And why would you make an audio record of that sort of thing?

A. To help corroborate what happened, sir.

Q. To help corroborate what happened. Why would you have to corroborate what happened?

A. For cases of going to trial, you know, things of that nature, sir. Make a record of it, sir.
Q. So it's important to make a record of something like that; is that correct?
A. If you can, sir, yes.
Q. Not only an audio record but a video record; is that correct?
A. If you can, sir.
Q. And, Agent Naylor, you have the ability when you're working for the DEA to record audio conversations when you want to; isn't that right?
A. If the opportunity arises, sir, yes.
Q. I think you testified in your direct testimony that from your own home you were able to record a multi-person conversation, preserve it on your computer and produce it in court?
A. I utilized it on my cell phone, sir.
Q. But you were at home?
A. Correct.
Q. I think that's what you testified to?
A. Yes, sir.
Q. So you didn't have to be at the DEA office to, for example, in that circumstance, effectuate the recording?
A. Because I had my phone with me at all times and I

did it through my phone, sir.
Q. Very well. In these circumstances where you're making the controlled buy, you've used cameras; is that right, to take video and still photography?
A. In some cases we have and in some cases we haven't, sir, yes.
Q. And you've taken some pictures in this case. You utilized in this case an automobile that was owned by the DEA, that was outfitted with a hidden camera to take the photographs that were presented to the jury?
A. Correct.
Q. And those photographs showed Mr. Falette and Mr. Soto in the car, correct?
A. Correct.
Q. And they showed Ms. Perez and Mr. Falette shaking hands, correct?
A. Correct.
Q. Okay. So you have the ability to take video recordings when you wish to, is that fair to say?
A. I wouldn't say when I wish to. When the opportunity arises, sir. I mean, there's some situations where I'd love to take video, but I can't. Do you follow me on that, sir?
Q. Yes. What would those situations be, Agent Naylor?

A. When we're worried about counter-surveillance, things of that nature. Worried about informants being patted down. Some of the audio and video equipment goes on their person. Some of it goes in cars. There's a variety of reasons why we don't -- sometimes we'd like to every time. There's a variety of reasons why we don't, sir.
Q. Okay. Now, you also said you like to control the cooperating witness's movements; is that correct?
A. Yes, sir.
Q. Now, why is it important, Agent Naylor, to control the cooperating witness's movements?
A. Are you talking about on a controlled purchase, sir?
Q. Yes, sir.
A. When you're speaking about a controlled purchase, we want to control all the environment so we can tell the officers where they're going; we want to try and know the route in, the route out. Things of that nature, sir. So we try to control all the movements. In this case, we asked him not to get out of the car. If he had to, we had an audio transmitter that he could bring in with him.
Q. So in this case, with Mr. Falette, you attempted to control his movements; is that correct?

A. Yes, sir.
Q. So he had very defined things from you as to what to do in terms of movement?
A. Correct, sir.
Q. And now, with regard to Ms. Perez, you did not control her movements in this case; is that correct?
A. We weren't able to, sir.
Q. Okay. Now, you were unable to control her movements, is that your testimony?
A. Yes, sir.
Q. Okay. Now, let's back up for a minute, Agent Naylor. You utilized Marie Perez in this case to be a confidential informant. I believe you said that; is that right?
A. Correct, sir.
Q. Okay. And you met with her; is that right?
A. Yes, sir.
Q. And now, Marie Perez was working with you on this case to benefit her husband; is that correct?
A. Correct, sir.
Q. Now, her husband, what was his name?
A. His name was Roberto Olivo.
Q. And he was convicted of a drug trafficking offense; isn't that right?
A. Correct, sir.

Q. Okay. And that drug trafficking offense was in connection with which type of narcotic?
A. Heroin, sir.
Q. Okay. And do you recall what his sentence was going to be as a result of that conviction?
A. You know, I don't know the sentences, what the exact sentence was going to be. I don't recall that, sir.
Q. You were a case agent in that case; is that right?
A. Correct, sir.
Q. What's a case agent's role in a case?
A. To conduct -- to make basically most of the decisions in the case, to take the case over to the U.S. Attorney's Office, bring it through the prosecution and into court, sir, if you have to.
Q. And do you recall what the drug was in that case?
A. I believe I said it was heroin, sir.
Q. And it was a kilogram or more of heroin; is that right?
A. Yes, sir.
Q. And a possession with intent to distribute 100 grams or more of heroin; is that right?
A. Yes, sir.
Q. And that was Marie Perez's husband; is that right?
A. Yes, sir.

Q. I believe you've told the jury that you think he got about a 26-month downward departure because of the work of his wife?
A. I thought it was 21 months, but if you're saying -- I believe so.
Q. Twenty-one months. I don't mean to mischaracterize it. I just can't recall.
He was also facing a case in New York; is that right, Agent Naylor?
A. Yes, sir.
Q. What was that case about?
A. That case, I didn't know a lot of the specifics about that case, but I knew it was some kind of a trafficking case out of New York, the Western District of New York, I believe, sir.
Q. It was a drug case?
A. Yes, sir.
Q. Now, so when Marie Perez agreed to work with you, both these things were of concern to her, is that a fair statement, or the defendant Olivo -- strike that. The defendant Olivo would have been facing both these events, sentencing and the case in New York?
A. Again, I don't really remember when we found out about the case in New York, if it was at the beginning or if we found out a couple of weeks after meeting, but

I don't remember the exact time. But he was facing both of them, sir, yes.
Q. So it was in this context that you met Marie Perez; is that correct?
A. Yes, sir.
Q. Okay. And do you know when you met her?
A. Shortly before November. I want to say sometime between October and November.
Q. When you met her, you had no specific plan for how she was going to cooperate; is that correct?
A. Correct, sir.
Q. All right. Now, you knew who she was because you had been the case agent in her husband's case; is that right?
A. Correct, sir.
Q. And Mr. Falette was the undercover informant in that case as well; is that correct?
A. Correct, sir.
Q. He testified against her husband?
A. Correct.
Q. So in that way, you engaged Ms. Perez to undertake certain activities; is that right?
A. I don't understand your question, sir.
Q. Well, how did you bring forward her cooperation, if you will? Did you give her a set of instructions as

to what to do?

A. Something to that effect, sir. We sit down with them. We have a sheet of rules that we go over with them. We go over those rules. We have her initial them that she's been explained them. Then I went into the fact that we wanted drug dealers not -- the terminology I like to use is we don't want couriers; we want dealers bigger than your husband. People of that nature.

Q. So when you send -- strike that. So you sat down with her and you gave her the rules that you just enunciated; is that right?

A. Correct, sir.

Q. And you kept in touch with Marie Perez; is that right?

A. Correct, sir.

Q. On the telephone?

A. Correct.

Q. And predominantly those telephone conversations with her were not recorded; is that fair to say?

A. Correct.

Q. Now, you did the same thing with Mr. Falette when you started working with him, isn't that right?

A. Yes. Similar. Same procedure, if you're saying, sir, yes.

Q. So in terms of following the rules and what he had to do?
A. Correct.
Q. You went over those rules with him?
A. Correct, sir.
Q. With regard to the rules about we want to know your movements, you went over those with Mr. Falette; is that right?
A. I don't believe I ever said to anyone I want to know your movements. I didn't say that, sir.
Q. How would you instruct Mr. Falette so that he would know to stay in the car?
A. On that specific night, we told him that. I thought you were trying to say that we tell them we want to know what they're doing. I don't want to know what they're doing all the time. In that specific deal, the context of that deal, that's when we sat down and said try not to get out of the car. Things to that nature. We tell them not to get out of the car because we don't want them to get in the car and take a ride with somebody else. Things of that nature. So that's why we're trying to control that environment to the best of our ability, sir.
Q. If they took a ride with somebody else, that could be another drug dealer?

A. Again, if we're talking about on the 18th, sir, what I'm saying is we try and tell him because, I'm not sure if you're getting this, the 18th was designed as a rip, not a controlled purchase. So again, we're trying to control all the factors there. We don't want him to leave and go in someone else's car. So that's when I say to him controlling his movements. We're trying to control his movements, sir, yes.
Q. So controlling his movements on a rip was still important to you. You've already said that?
A. Correct, sir. But again, I thought you were saying in general with the informants. I didn't want to mischaracterize that. I'm not saying in general. If say on the 19th the deal was over, I'm not asking him what he's doing every day. I thought you were saying that, sir. I apologize.
Q. So on the same day you said you couldn't control the movements of Marie Perez; is that correct?
A. Correct, sir.
Q. And is that because you lost contact with her?
A. No, sir.
Q. So you had telephone contact with her; is that correct?
A. Would you like me to explain, sir?
Q. I just want you to answer that question.

A. I had telephone contact with her, sir, yes.

Q. Now, I take it that she would meet with you when you wanted to meet with her; is that right?

A. Yes. At that time, she was living in Lawrence, in the Methuen area, so I wouldn't -- most of our conversation was on the telephone, sir.

Q. But you did have meetings in Providence with Marie Perez?

A. Yes, sir, a few.

Q. So if there was some important reason why you needed her in Providence, you could certainly get her there?

A. Sure.

Q. There was no meeting set up with Marie Perez to say how you wanted her to stay in the car or how you wanted her to travel that evening; is that correct?

A. Well, on that evening, I'm not sure if I gave those instructions. This deal was actually supposed to take place on the 12th. I may have given those instructions on the 11th or 12th. I believe on the 12th, sir. Again, because of circumstances that we couldn't control, it didn't happen until the 18th, sir.

Q. I see. So things did not unfold as you had wanted them to?

A. Correct, sir.

Q. Now, I just want to call your attention to another drug technique you were talking about, counter-surveillance. I think you could agree with me, Agent Naylor, that a lot of the physical movements and actions that you characterize in your business as indicative of patterns drug dealers use are just as equally applicable to the general populace in other contexts, isn't that fair to say?
A. I believe so, sir.
Q. So that people who stand outside of McDonald's looking up and down in the middle of the night, that could happen in the general public, isn't that right?
A. It could, sir.
Q. But if it happens anywhere near a drug deal, you imply that that's counter-surveillance?
A. Again, when I say that, I take the totality of the circumstances and the events that are taking place, sir, and the situation that's happening, that's when I say it's indicative of counter-surveillance if I'm there with people meeting in a clandestine way, they're looking back and forth. That's the way I would imply that, sir, to mean.
Q. You're assuming it's clandestine because that's why you went there; is that correct? There wasn't anything clandestine from the physical event of a man

standing outside of McDonald's. He wasn't hidden, was he?
A. If I saw those circumstances outside on a normal street and I didn't know the circumstances, and I saw what was going on there, I would be a little suspicious, sir. So I would assume that given the situation that that would, you know, look indicative of a counter-surveillance, sir.
Q. So when you drive by McDonald's frequently and you see people standing outside of it, you become suspicious?
A. Well, if I see three cars, two cars pull up, then another car pulls up, people come up to that car and bring a package into that car while someone is looking, sir, that's why I would get that feeling. If a person is just standing outside McDonald's looking, I wouldn't feel that. But if you put the totality of the circumstance together, that's where I get that, sir.
Q. But you would agree with me that people could be innocently standing outside of the McDonald's waiting, killing time, looking around. It wouldn't be indicative of anything.
A. Absolutely, sir.
Q. And now I think you said that you arrived at the McDonald's that night after Marie Perez and Enoc Soto's

cars were already there. I think that's what you said on direct?
A. Correct, sir.
Q. And they were already in the McDonald's?
A. Correct, sir.
Q. And so when you got there, just the cars were in the parking lot and people were in McDonald's; is that right?
A. Correct.
Q. Did you see -- you didn't see who went in or how they entered or anything of that nature; is that right?
A. No, sir. But I was getting broadcasts over the radio from the surveillance officers as to what had transpired.
Q. Oh, there was someone else there?
A. Yes, sir.
Q. Who was that?
A. There were other Providence police detectives. Special Agent Schiffer was there, Group Supervisor MacIsaac, there were a litany of other people. Some other Providence police officers assisting us, as well, on that day.
Q. Detective Sergeant Colanduono; is that right?
A. No. Just Task Force Agent. He's a detective, sir. He was with me in the vehicle with Mr. Perez.

Q. He was there?
A. He was with me.
Q. He was with you?
A. Correct, sir.
Q. So he got there after they were already in the McDonald's?
A. Correct, sir.
Q. When they came out of the McDonald's, were you watching them?
A. Yes, sir.
Q. And did you see Mr. Mejia leave the McDonald's before the other people came out of the McDonald's?
A. No, sir.
Q. You don't remember that?
A. I didn't see them come out before.
Q. Did you see him go and get in the Camry and sit down?
A. I never saw him get in the Camry, sir.
Q. Oh, you didn't see that?
A. No, sir.
Q. And then did you subsequently see how it came to be that he left the Camry and joined Ms. Perez in the red car?
A. Well, from what I remember, sir, is they all came out together. First Ms. Perez came out, had an

exchange with the informant, then went back in. Then I believe they all came out. They all walked back and forth in front of the car -- I'm sorry. In front of the red car. Mr. Mejia was standing in that area, sir. He could have gone to maybe the nose of the Camry, that area. But they were all close together.
Q. I see. So you saw Marie Perez on that night go over to the car that was operated by Mr. Falette; is that right?
A. Correct, sir.
Q. And that was the first engagement of these people coming out of McDonald's with Mr. Falette; is that correct?
A. Correct, sir.
Q. She shook hands with him, the tape shows; is that right?
A. Yes, sir.
Q. And they talked about something; is that right?
A. Yes, sir.
Q. Now, let's go to the book, the exhibit that shows what they talked about. If you get there before me, just tell me which one it is.
A. Sir, are you talking about the video recording, sir? That will be 9A.
Q. Yes. Okay. Now, if I'm right, this VM1 is

Mr. Falette?
A. Correct, sir.
Q. And Mr. Falette is talking to VM2. This is the telephone exchange; is that correct, right here what we're looking at?
A. I don't know what you're looking at. I'm looking at 9A on the left-hand side of the book, sir, the actual edition that was put on.
Q. Bear with me one minute. Yes. VM1 is talking to VF1; is that right?
A. Correct, sir.
Q. And there's an exchange there, and we can all read it but, I mean, it gets into her telling him where they are, and he's asking how is she; is that correct?
A. Yes. I believe he's saying, I'm here next to the red car. I remember that being a telephone call, sir, as he was pulling in.
Q. So the video is picking up what he's saying on the telephone?
A. Correct.
Q. I assume he's talking to Mr. Soto; is that correct?
A. No. I believe he's talking to Ms. Perez.
Q. On the telephone?
A. He's trying to tell him to come outside, I

believe. I think that was the conversation that before the recording came on they might have said something to the effect of -- they want you to come inside McDonald's. Something to that effect, sir.
Q. Then the next voice you hear is Marie Perez; is that right?
A. Yes, sir.
Q. Then you hear Mr. Falette again. And we've all heard him talk in Spanish saying this, but he's essentially saying, tell him to come over here so we can pick that up, tell him to call me so we can pick that up. What did he mean by that?
A. I believe he was talking about the cocaine, sir.
Q. He wasn't talking about getting him on tape?
A. I don't know. Maybe he could have, but I'm not sure, sir.
Q. But he was saying to the female, Marie Perez, to have him come over here, and that him was Mr. Soto; is that right?
A. Yes, sir.
Q. And she's wondering, the next line, if he's supposed to follow you. Am I reading that correctly?
A. Again, sir, I don't know what she meant by this, but I know it was said here.
Q. That's what was said. Then Mr. Falette says, Tell

him to come in here so I can pick that up and you guys can follow us so I can pick that up. You guys can follow us. Tell him that I'm alone.

Mr. Falette is asking Marie Perez to have Enoc Soto come over to the car; is that correct?

A. Correct, sir.

Q. Now, Mr. Falette appears to be speaking to the air here. In the next line, he's saying, He's coming alone. Wait. Come over here. Let's go, just you and me. Come and follow us. How are you doing.

A. I don't believe he's speaking to the air. In the beginning, he said he's coming alone. That might have been --

Q. Is that talking to you?

A. That might have been over the KEL trying to say he's coming alone, sir.

Q. So he was alone when he got into the car. He came over to the car alone, is that what your surveillance reveals?

A. Yes.

Q. That's Mr. Soto?

A. Yes.

Q. I'm sorry?

A. When he first walked up to the window, sir, he was alone.

Q. He was alone?
A. When you say "alone," Mr. Mejia is still out there, but he walks up to the side of the car alone.
Q. That's what I'm asking you. He came to the car alone; is that right?
A. Correct, sir.
Q. And he had an exchange with Mr. Falette; is that correct?
A. Correct.
Q. Then he brought over the suitcase; is that correct?
A. Correct, sir.
Q. And where did he get the suitcase from?
A. The passenger side door of the red vehicle, sir, Ms. Perez's vehicle.
Q. So the suitcase came out of Ms. Perez's vehicle; is that right?
A. Correct, sir.
Q. And it was in the back seat, is that what you're saying?
A. Yes, sir.
Q. And now, he went around and he took it out of the back seat; is that correct?
A. Yes, sir.
Q. All right. Now --

MR. WEST: Can I approach that suitcase your Honor, please?

THE COURT: Maybe this would be a good time to take our break. Why don't we do that, ladies and gentlemen. There should be a snack in the jury room for you. Remember my prior instructions. Charlie will show you out.

(Proceedings out of the presence of the jury as follows:)

THE COURT: Mr. West, it might be useful if somebody were to have a diagram drawn in this case, and I think the jury might find that helpful. I don't want to tell you how to do your examination. You might not want to do that. But I do think, given there's three cars, red, green and blue, and different people in different cars, and going to different cars, might be useful. There's a board here. I'll bring down a red and blue marker, and you might think about that.

MR. WEST: Thank you.

THE COURT: All right. Ten minutes or so.

(Short recess.)

(Proceedings in the presence of the jury as follows:)

THE COURT: Welcome back, ladies and gentlemen. Hope you had a good snack. One thing you'll find is

they do feed you well around here.

Mr. West, are you ready to continue?

MR. WEST: I wanted to approach the witness and show him an exhibit.

MS. BECKNER: May we approach?

THE COURT: Okay.

(Side-bar conference.)

THE COURT: What's up?

MR. WEST: These are the exhibits I was going to show him. They're in the exhibit book. This is the indictment and conviction of Ambrioris Falette.

MS. BECKNER: I don't think that the witness is going to deny this individual is convicted. In fact, he's already testified to that. This is what my concern is, is while I've been not making many objections about this, I think the entire cross-examination thus far has focused on impeaching people that are not witnesses in this case. At least not at this point. Certainly, if Mr. Falette were to take the stand admitting this type of stuff --

THE COURT: Well, you brought this up. I don't see a problem. If you have an issue on a question, you've got to object.

(End of side-bar conference)

Q. Now, Agent Naylor, I just wanted to take care of

some documents. I'm going to show you a document.

MR. WEST: Can Exhibit I, Defendant's I, be shown to the witness.

THE COURT: Yes.

Q. Can you see that document?

A. No, sir.

THE CLERK: You have to put it on the ELMO.

Q. Do you see that, sir?

A. Yes, sir.

Q. And do you know what that document is?

A. I believe it's the indictment against Ambrioris Falette, sir.

Q. And this is the indictment that he pleaded guilty to; is that correct, that you testified to before?

A. Correct, sir.

MR. WEST: I'm asking this be a full exhibit, your Honor, Exhibit A for defendants.

THE COURT: Any objection?

MS. BECKNER: Yes, your Honor, for the reasons stated up at side bar.

THE COURT: All right. Objection is overruled. This will be Exhibit A, Defendant's A. It will be full.

(Defendant's Exhibit A admitted full.)

MR. WEST: Your Honor, for clarification, I'm

departing from the enumeration of exhibits in the book.

THE COURT: I notice that. I assumed you were doing that for a reason. So that's fine.

Q. I'm also going to show you another document. I'll ask you if you recognize this.

A. I believe it's a court document related to Mr. Falette, sir.

Q. Can you see the title of it?

A. United States of America versus Ambrioris Falette, sir.

Q. And I'm going to point you in the direction of this caption right here.

A. Could you move it over a little bit more, sir? Yes. For offense committed on or after --

Q. Don't read it out loud. Do you see the words there?

A. Yes, sir.

Q. Do you recognize this document?

A. Yes, sir. This is the first time I've seen it, sir.

Q. Is it fair to say that you're familiar with these documents in general?

A. In general, not this document, but in general, sir, yes.

Q. So you're not familiar at all with this document?

A. No, sir.
Q. Very well. Thank you. Now, I want to return your attention back to the scene of the incident at the McDonald's, if you will. Would you please, with the Court's permission, go over to the blackboard and sketch out the scene as you encountered it at the McDonald's when you arrived.
A. Yes, sir.
Q. Now, you've just sketched a block there, Agent Naylor, what is that?
A. That's the McDonald's. That's the door when you come out of the McDonald's.
Q. Okay.
A. This is the parking lot area. There's a line of cement or trees, or something to that effect there, sir.
Q. Some buffer zone there; is that right?
A. Correct. Separating the parking lot. This is Broad Street. That would be the Camry, Perez's vehicle. And the Government car, sir.
Q. Where were you located? Could you just write in Broad Street and the cross street name, please?
A. Sure. This is Washington where the arrest takes place, sir. I'm not sure -- I believe this street is a different name than Washington but they coincide pretty

much. I'm not sure if that's actually Washington or a different name, sir.

So somewhere over here there's like an island, I believe, in this area, separating. This starts the turnoff this way. Originally, we were at different points throughout that as he pulled up. I don't know exactly where I was when I saw everything, but at one point I was here, another point I was in this area. Another point -- I'm not sure -- I believe the parking spaces go this way, sir. I'm not sure if we pulled into a space here or pulled around the street here, but another time we were over here, as well.

Q. Now, were you in one of those DEA vans that you can see out of but no one can see in?

A. No, sir. I was in an unmarked regular vehicle. I believe I had tinted windows in that vehicle.

Q. Where's north, and south, and east, and west, on this map?

A. I believe north is this way. South is this way. This is inbound towards Providence, and that's outbound towards Cranston.

Q. So you were in an automobile on Broad Street heading -- it looks like you were following over into Washington Street at one point in time; is that right?

A. Correct. I'm driving slow. Like these are

parking spaces, so I might have been pulling in and out of parking spaces or in the street, sir, coming this way.

Q. You were driving the car, you personally?

A. Correct, sir. And I had stopped at several different points.

Q. There was other traffic on the road, I take it?

A. Again, somewhere here where it turns off of it so I was in that area. These are parking spaces. It's a pretty busy road over here.

Q. So it's a pretty busy road and you pulled off to the side there and you parked for how long?

A. I don't know, sir. Like I said, at different points, so I could have been here for 30 seconds, a minute, then here. Eventually, I ended up in this area here.

Q. Okay. So at some point in time, you swung around onto Washington Street and went back up. You must have turned around somewhere?

A. Actually, the road is wide enough so you can move around here, so I'm assuming that's what I did, sir.

Q. So you came through Broad Street, and you somehow looped around and ended up over on Washington Street and that side street there; is that right?

A. Correct, sir.

Q. Now, which way was your car facing? Were you facing toward the city or were you facing toward Broad Street when you ended up over there?
A. As I'm coming this way, I would have been facing this way, coming along this way here. That's why I say I think I turned around, I don't know, I don't know if I pulled into this space or pulled onto that street.
Q. So if you pulled in nose first, you'd be looking --
A. I would have turned around, sir.
Q. You would have backed into the space?
A. I would have spun around and backed in.
Q. What time of the night, again, when you first came on the scene?
A. Around 9:15, 9:30.
Q. It was dark?
A. Correct. But this area is lit up.
Q. How many floodlights are over there in the parking lot?
A. In McDonald's?
Q. Yeah.
A. I don't know, but it's quite lit.
Q. It's lit?
A. Yes, sir.
Q. So when you drove up, you first encountered --

were the people inside the McDonald's still?
A. When I first pulled up, I believe they were, sir, yes.
Q. You can't be sure about that, right?
A. Again, I don't know exactly where I was where I saw these things. I could have been here; I could have been here.
Q. Because you were driving and doing a multitude of things at the same time, right?
A. Correct, sir.
Q. So they could have come out separately or at --
A. No. They all came out -- when I said they came out, I saw Marie Perez come out singular, then go back in, then I saw all three of them come out together. That's what I saw. Before I got there, maybe someone stepped in or out. What I saw is what I saw.
Q. You saw Marie Perez come out of the McDonald's first and then go back into the McDonald's?
A. Correct.
Q. When she came out of McDonald's, did she go right over to the Falette's car? And Falette is which color? I can't see that from here.
A. This one.
Q. Could you just mark that as Falette.
A. (Indicating.)

Q. She went right over to the Falette car?
A. Again, I think she comes right over to the side of it, sir.
Q. She talks in through that window there; is that right?
A. Correct, sir.
Q. And then she went back into McDonald's; is that right?
THE COURT: Hold up a minute. Don't say anything, but can you all hear the witness? Okay. Can you all see that diagram? It's a little small? Move it up a little bit.
Q. When you were in your car over there, there were other officers around the area; is that right?
A. Correct.
Q. Where would they be?
A. There's a parking lot over here. This is like a bank, sir, Citizens Bank. There's a parking lot. Some were in this area; some were on the street. Providence police detectives, I'm not sure of their cars, but they're in the area, as well.
Q. The only video from this scene was the car camera, correct?
A. Correct, sir.
Q. No pictures, no still photography, no shots

observing a buy or anything like that were taken?
A. No, sir.
Q. The DEA still had its cameras back at the office, video equipment; is that fair to say?
A. Yes.
Q. No reason why you couldn't have taken them with you if you wanted to, right?
A. No, sir.
Q. You can take pictures at night, too. You have that capability; is that right?
A. To some degree, sir.
THE COURT: Are you done with the diagram?
MR. WEST: Can I have just one more second?
THE COURT: You can, sure. That's fine.
Q. Agent Naylor, when the people came out of McDonald's, you don't recall Mr. Mejia going over to the blue car, is that the Camry, the blue car, at the top of the diagram?
A. Correct.
Q. Can you mark that as Camry?
A. I did, a "C."
Q. Oh, okay, a "C." So you don't recall him going up to that car?
A. Mr. Mejia, sir?
Q. Yes.

A. No, I don't.
Q. It's fair to say that he never got into the red car at that point in time; is that right?
A. He did get into the red car. I did state that. He doesn't get right in. He looks around the area. Looks to the left, right. Then at some point he walks over, gets in the passenger's side. I believe it's just after or just as Soto is getting into the blue car, sir.
Q. That would have been after Soto had removed this suitcase and put it into the Falette car; is that right?
A. Correct, sir.
Q. Now, the entire time that they were at the McDonald's, this black suitcase was in the back of the red car; is that right?
A. Correct, sir.
MR. WEST: I think I'm done with the diagram for now, your Honor.
THE COURT: Now, before you get to that, I'm going to have this diagram, either I'll have a photograph of it made and it will be an exhibit, court exhibit, or I'll have the witness redraw all of that on a sheet of paper so that it will be made an exhibit, one way or the other. You can take it into the jury

room with you.
MR. WEST: Fair enough, your Honor. Let's move on to the suitcase.
Q. Now, this is the suitcase, Agent Naylor; is that right, that you found in that vehicle, the Falette car, after the arrest?
A. Yes, sir.
Q. And you've already testified it's in pretty much the same condition except the panel is not bolted in?
A. And I believe they took the railings apart to do the fingerprinting, sir. So when you take the panel off, the railings appear to be broken off, sir.
Q. Inside the suitcase is a shirt and tie in a plastic cover, correct?
A. That's correct, sir.
Q. Another shirt and tie with a plastic cover?
A. Correct, sir.
Q. Another shirt and tie with a plastic cover, right?
A. Correct, sir.
Q. These were all in the suitcase at the time you seized it?
A. Correct.
Q. Now, see this black here, is that some type of lining?
A. That is the lining that goes on top of the hidden

compartment, sir.
Q. I see. So when we're looking at this suitcase, from here, I'm going to show you it, the lining would have been over this whole area; is that right?
A. Yes, sir.
Q. So it would have been like that?
A. Correct, sir.
Q. And it was all completely assembled, as any suitcase would be; is that fair to say?
A. Correct, sir.
Q. Okay. Now, at the bottom of the suitcase --
A. It will help you if you take it from the middle, sir. It pops out easier from the middle.
MR. WEST: May I approach the witness, your Honor?
THE COURT: Yes.
Q. Thank you, Agent Naylor. So this bottom piece, would that have been under the lining or on top of the lining?
A. That's under the lining, and the lining, I believe, snaps right into those four snaps.
Q. So the lining snaps onto it?
A. Correct, sir.
Q. And now, inside the suitcase, there's a frame; is that right?

A. Correct, sir.
Q. And these metal bars, correct?
A. Correct.
Q. Now, I notice there's some black material on the metal -- black material on my hands and on the metal bars. That's from fingerprinting, right?
A. Correct.
Q. So this was so-called dusted?
A. Correct, sir.
Q. Our first smattering of forensics in this case; is that right?
A. Correct, sir.
Q. Now, if I remember the pictures correctly, one of these two sides were stuffed in what you described as suspected kilograms of cocaine; is that right?
A. Correct, sir.
Q. Which side?
A. I believe it was the left side, sir.
Q. So it would have been right in here; is that correct?
A. I believe so, sir, yes.
Q. Okay. And you said that you had to remove the frame for some reason.
A. I didn't remove it. I believe the BCI unit removed it.

Q. You don't know why?
A. I believe for fingerprinting, sir.
Q. So there was no reason to move it to get at the materials, was there?
A. No, sir.
Q. They weren't bolted in?
A. No, sir.
Q. This panel here was bolted down inside this on two screws, is that at the base of each side of the frame; is that right?
A. When you say bolted, sir, they were attached. They were finger loose. They weren't like tight tight?
Q. When I say bolts, I mean these right here inside the suitcase. See these right here?
THE COURT: You may walk over and -- so the jury can see what you're referring to. I think it's better.
MS. BECKNER: May I approach?
THE COURT: Yes.
Q. Do you see these bolts sticking up right here and right there? Now, this cover right here has four holes in it, correct?
A. Correct, sir.
Q. If you slide into those four bolts and you push down over them like that; is that right?
A. Correct.

Q. Okay. And that's how you found it?
A. Correct, sir.
Q. Except the lining was on top of it?
A. Correct, sir.
Q. And then there's another exhibit. These bolts right here, which has been marked Government's 7, these are the bolts that were on the four interior screws; is that correct?
A. Correct, sir.
Q. This Allen wrench you surmise was used to remove them; is that right?
A. I moved them with my fingers. Like I said, they were finger tight. So I was able to twist them open. I later checked that it fit, sir.
Q. It also fits a multitude of other things; is that right?
A. Yes, sir. It's a common Allen wrench.
Q. It's a common Allen wrench with multiple sides. It's not one Allen wrench, I should say, to fit to a specific size. It's a multi-task tool?
A. Correct, sir.
Q. So when you were saying Allen wrench before, you meant this entire unit of Allen wrenches that are in various sizes?
A. Correct, sir.

Q. Detective Naylor, I want to ask you something about this construction here. This suitcase has the four bolts that are in here and they appear to be screwed in with screws; is that right?
A. I don't know what you mean. You mean there's little rivets there, sir?
Q. On the actual bolts that were used to hold down the top?
A. They appear to be some type of screw or a rivet, sir, yes.
Q. A rivet or a screw. So those certainly had been purposely installed there; is that fair to say?
A. I would believe so.
Q. There's some other hardware here, what's this?
A. Those look like screws and washers, sir.
Q. Were they in there, in this unit, when you seized it?
A. I believe so, sir.
Q. Did you remove them in any way?
A. I don't think so. I'm not sure, sir.
Q. Do you know if anyone else removed them?
A. I don't think so. I'm not sure, sir. They might have removed them from the other things, but I'm not sure.
Q. You don't know what these are?

A. No, sir.
Q. There's no evidence tag on these; is that fair to say?
A. Correct, sir. I didn't disassemble the rails, sir.
Q. Just going over the outside of the bag, there's a pocket that's unzipped. Was that unzipped when you seized it?
A. I don't remember if it was zipped or unzipped.
Q. There was nothing in it; is that right?
A. Correct, sir.
Q. There's also another zipper compartment around the outside of it, there was nothing in that; is that fair to say?
A. Correct, sir.
Q. Okay. And I see another zipper, nothing in that; is that right?
A. Correct, sir.
Q. Other than the shirts, there was nothing in this bag that was visible until you got inside and removed the housing?
A. Correct, sir.
Q. So when it came out of the red Chevrolet that was operated by Marie Perez, there was nothing to give it away as having cocaine inside of it; is that a fair

statement?
A. Correct.
Q. Anybody observing it would not be able to tell that it had cocaine inside of it; is that correct?
A. Correct, sir.
Q. Okay. Now, you told me that the bag was sent to the BCI. What is that?
A. That's a -- Providence PD has a Bureau of Criminal Investigation unit and they check for fingerprints, forensics, stuff like that, sir.
Q. Did you get a report back from them?
A. I think Ms. Beckner did. I may have gotten one, as well, sir.
Q. They were all checked for fingerprints; is that correct?
A. Correct, sir.
Q. As far as you know, these were checked for fingerprints; is that right?
A. I'm not sure if those were or not, sir.
Q. You don't know?
A. I don't know. I know the bag was and the cocaine was. I'm not sure if they checked -- what they checked individually. That's somebody else's job, sir.
Q. So the contents you're not sure, these clear glassine plastic cases you don't know if they checked

those for fingerprints?
A. I couldn't tell you, sir.
Q. Okay. And as far as you can tell, Agent Naylor, this bag was never opened in the entire time you watched the McDonald's inside the red Chevrolet -- is it a Chevy?
A. Yes, sir.
Q. And all the time it was brought over to the blue car operated by Falette, or I should say the car operated by Mr. Falette?
A. Correct, sir. It was not opened.
Q. It was not opened?
A. Correct.
THE COURT: Would you get the other piece there. Back there.
MR. WEST: I'm sorry. Yes.
Q. Agent Naylor, I'm going to call your attention to the evidence that you seized as number 3, the handgun, and I'm going to ask you to --
MR. WEST: I'm going to ask the Court to have that put before the agent. I'm not going to handle it. I just want him to handle it.
THE COURT: That's fine.
Q. Now, this -- will you pick it up and show it to the jury, please? This firearm has been rendered

inoperative right now; is that right?
A. Correct, sir.
Q. And you saw it first in the red Chevrolet; is that right?
A. Correct, sir.
Q. You never saw it in your observation of the McDonald's prior to going and examining the red Chevrolet; is that right?
A. Correct.
Q. And you saw it on the floor in the red Chevrolet; is that right?
A. Correct.
Q. Now, this is the clip. Could you pick that up and show it again? Okay. That clip has a metal housing; is that right?
MR. WEST: May I hold that, your Honor?
THE COURT: Yes.
Q. This is the metal housing; is that correct?
A. I believe it's some type of metal, sir.
Q. All right. Now, to load the clip you have to push down on this plastic piece putting the hand right on the metal, isn't that right, sir?
A. Correct, sir.
Q. You have to slide your hand down one at a time; isn't that right?

A. Correct, sir.
Q. Now, these are the bullets, right?
A. Correct, sir.
Q. So these bullets would be slid into the clip; is that correct?
A. Correct, sir.
Q. They don't come pre-loaded in there?
A. No, sir.
Q. So they have to be loaded manually. Okay. So when you seized the gun, the clip had a bullet in it?
A. I believe it was two bullets, sir.
Q. It had two bullets in it. And they were inside this orange thing which is pressed down; is that right?
A. Correct, sir.
Q. So, in other words, the bullet goes in the top much like a Pez?
A. Correct, sir.
Q. Everybody knows a Pez dispenser. Much like a Pez dispenser. You'd probably have to grasp it, pull it down, and put the bullet in; is that right?
A. Very good, sir.
Q. The firearm is made of metal, is that right?
A. It seems like a plastic and metal, as well, sir.
Q. I was always trained to look and see if there is a bullet. I don't know how to do that.

A. It's inoperable, sir.
Q. This barrel appears all metal; is that correct?
A. That's correct.
Q. It has several smooth surfaces including the handle?
A. The handle is not smooth. The handle's got that like a serrated type of thing.
Q. So the handle has got the serrated type of thing but the top is metal; is that right?
A. The top, again, is that type of metal that's like kind of, I would say like kind of weird coarse, sir. Do you follow what I'm saying?
Q. Yes. It's not to say same as the handle; is that fair to say?
A. No. It's a harder material, sir.
Q. It's a harder material. The trigger housing, is that metal?
A. I can't tell you if it's a hard plastic or a metal, sir.
Q. Okay. And when you operate this gun, I'm really not sure about it, but I think you have to cock it back; is that right?
A. Well, to put a round in here, you would put the clip in, press this button-down here, and this would slide forward automatically.

Q. Okay. And it would trigger and reset each time it was discharged?
A. Correct, sir.
Q. And it has been test-fired so it's not in exactly the same condition it was in?
A. Correct.
Q. Where is the serial number that you're referring to on this gun?
A. The serial number was right down here. It's actually been lifted. When we got there it was obliterated.
Q. I see the serial number on the metal. It's etched into the metal; is that correct?
A. Correct, sir. Somehow what they do is they file it down. I'm not an expert on this. They file it down so you can see the number. But when we got it, you couldn't see the number.
Q. For some reason it's now visible; is that right?
A. Correct, sir.
Q. Parts of this seem to be melted away or chipped away or something?
A. No, sir. They had to take it apart and I said to get to the serial number, and that's something the BCI unit did.
Q. Somebody else will tell us about that?

A. Yes, sir.
Q. Okay.
MR. WEST: Your Honor, can I approach the jury? Can they see the difference, or are they going to get to see this in the jury room?
THE COURT: They'll see it in the jury room.
Q. I notice there's a piece of metal in here. What is that piece of metal?
A. I have no idea. That could be a piece that went inside the gun. I'm not --
Q. Now, this gun was sent to BCI; is that right?
A. Correct, sir.
Q. And I notice I got the same black residue on my fingers again. What does that indicate to you?
A. That it was checked for fingerprints, sir.
Q. Okay. You never saw the gun anyplace else except in the back seat of the car when you searched the car; is that right?
A. Correct, sir.
Q. Okay. Now, you saw Mr. Mejia and Mrs. Perez get in the front seat of the red Chevrolet; is that right?
A. Correct, sir.
Q. Okay. And at some point in time, Ms. Perez was operating; is that right?
A. Correct, sir.

Q. At some point in time, she drove off following Mr. Falette; is that right?
A. Correct, sir.
Q. Now, did you tell Mr. Falette to have her follow or did that just unfold?
A. That just unfolded, sir.
Q. So you didn't give that instruction that we heard him say to her?
A. Correct.
Q. It wasn't part of your plan?
A. No, sir.
Q. I want to go to -- return to, if you will, with me, to the documents that you seized. And I think they're contained in the exhibits, the Government's 8 with various letters following 8. If I could have that set of documents. Now, this 8D, Agent Naylor, is a business card, and it's from Crystal Motors. Do you see that?
A. Yes, sir.
Q. And it has writing on the back; is that right?
A. Correct, sir.
Q. Looks like a phone number possibly, is that -- at least in that sequence; is that correct?
A. On the top it does look like a phone number, sir, yes.

Q. And the name of an individual; is that right?
A. Correct.
THE COURT: Mr. West, it might be helpful, this is a full exhibit, it might be useful if you use the projector, that way everybody can see what you're referring to. You can blow it up, if you need to.
Q. Now, at the top here, you can see what I was just referring to, the word "Wilson" and the phone number; is that right?
A. Correct, sir.
Q. And then there's some minor notations at the bottom, and some words and numbers just above that. Do you see that?
A. Yes, sir.
Q. That was inside Mr. Mejia's wallet; is that right?
A. Correct, sir.
Q. Mr. Mejia, do you know what he did for employment?
A. I don't recall, sir.
Q. You don't remember?
A. No, sir.
Q. Was that with any other cards?
A. There were numerous cards and papers, sir, together.
Q. So are all the cards that you have brought to court today the sum total of everything that was in the

wallet or were there, for example, other things in the wallet, perhaps credit cards or things of that nature?
A. There were some other things, as well. I believe there's a registration, stuff like that, sir.
Q. So this is just the one you particularly wanted to call to the jury's attention; is that right?
A. Correct, sir.
Q. This was in the wallet, this was on his person; is that right?
A. Correct, sir.
Q. Okay. Now, this card here, it's marked as Exhibit 8 -- I don't know if it's A. Doesn't say A, but --
THE COURT: Slide that down a little, please.
Q. I guess it's just 8. This is, again, some writing here that you, I believe, pointed to before, and it's got 31, 84, 14 next to perhaps some names of individuals; is that right?
A. Correct, sir.
Q. And on the side it's got some asterisks and some other numbers; is that right?
A. Correct, sir.
Q. Now, this card was in his wallet, as well; is that right?
A. Correct, sir.
Q. It wasn't in a pants pocket. It was tucked inside

of a wallet; is that right?
A. Correct, sir.
Q. Now, from the physical condition of this card, it looks a bit old to me. Would you agree with that?
A. I don't know if -- I couldn't tell you how old it is, sir. I had cards in my wallet for three years. I couldn't tell you.
Q. Okay. Now, you've got a napkin here. You've got some notations on it, along the same lines with dollars or numbers, or amounts and names. That's what you've characterized them as; is that right?
A. Correct, sir.
Q. Okay. Now, where was this napkin?
A. That was folded up inside his pocket. I believe it was inside his wallet, as well, sir.
Q. It was in his wallet?
A. Yes, sir.
Q. And it was all folded up; is that right?
A. Yes, sir.
Q. One thing I noticed about this, Agent Naylor, I think about a ledger in terms of something people make entries to on a daily basis, or on a weekly basis, or on a monthly basis; is that fair to say?
A. No, sir. What I consider for a drug ledger, a business ledger might be different like that. A drug

ledger, each one, perhaps on one person they got their kilo of cocaine, they want to keep track of that kilo, so they may just keep it on that area, on one piece of paper, and they'll know specific to that kilo. Same thing if he was an ounce dealer, he would break up the ounces that way, to that effect. So each transaction, each ledger, could go with a separate transaction. The only person that really could definitively come up with the exact date and time of what that stood for would be the person himself.

Q. I see. Agent Naylor, it's fair to say that these are not individual entries. These look like someone may have entered several of these numbers at one time. Is that fair to say?

A. It looks that way. That's what I was saying, sir.

Q. It's not like a memory tool that you would write down what you just did?

A. I don't know what you're getting at.

Q. A ledger typically reflects ongoing activity? That's what a ledger is.

A. That's what this appears to be, sir.

Q. This appears to be a set of entries that were made at one time; is that fair to say?

A. Again, I can't tell you when he made them or what specific time. Do you follow what I'm saying? I know

that, you know, these are written here, and they stopped, and he wrote other ones, sir.

Q. Okay. So I notice that one thing that's common between these pieces of paper is that they all have various names of perhaps individuals, or things and various numbers. They're not just about one name or one number?

A. Correct, sir. That's one of the things in common. There are other things in common, as well, sir.

Q. Well, I understand what you said. The fact of the matter is they don't reflect one entry going into one particular name. They reflect a number of entries going to different names or corresponding to different names; is that right?

A. Correct, sir.

Q. Okay. Up at the top of this napkin, there seems to be the mark T equals popy or pupy, or --

A. Can you turn that over a little bit? I really can't see the whole thing. Yes, sir. It says T equals P-U-P-Y, I believe.

Q. And is that of any significance to you?

A. That doesn't mean anything to me, sir.

Q. It doesn't mean anything. That's not a drug code?

A. Again, I don't know who the party is referring to. That could be a name that he refers to someone by. It

could mean anything, sir. You do it in code, sir.
Q. Isn't that the truth, Agent Naylor, it could mean anything?
A. That name could mean anything, sir, yes.
Q. Now, Government's Exhibit C was put in as a packet of cards, and they have an elastic band around them. You didn't go through these cards individually; is that right?
A. I believe I did, sir. I went through every card.
Q. Is there a significance about these cards that you've yet to speak to?
A. If you'd let me see them so I can refresh my memory. I believe they're of the same nature, sir. Again, sir, some of them are similar, exactly like the other ones, same types of names, same types of amounts. Some of them are similar; some just have a couple of different things on them. Some have just numbers, sir.
Q. Okay. Don't put them back away. I'm going to show them to the jury.
MR. WEST: I will show them on the ELMO as the most efficient way, your Honor.
Q. So this card is VIP; is that right?
A. Correct, sir.
Q. It has nothing on it. It's a card, looks like music. Some club, perhaps?

A. Yes, sir.
Q. No particular significance to the drug trade; is that right?
A. Correct.
Q. Maximo Transportation. Just a card, right?
A. Double-sided card, sir, yes.
Q. Sequence of numbers here?
A. Looks like it might be a phone number, sir, and a name or something. I can't tell.
Q. Perhaps a code to put into a phone or something?
A. Rafelito with a number, sir, I believe.
Q. This seems to be a little address card or phone number card; is that right?
A. Correct, sir.
Q. Do you do that, Agent Naylor, do you write phone numbers down on cards and stick them in your wallet if you have to hang onto them?
A. Sometimes I do, sir.
Q. Not very unusual, is it?
A. No, sir.
Q. On the front, there seems to be another phone number; is that right?
A. Correct, sir.
Q. Business card, nothing on the back?
A. Correct, sir.

Q. Lawyer's card. Looks like an appointment, correct?
A. Correct, sir.
Q. Transportation service card.
MR. WEST: Is the jury seeing -- yes.
Q. Some kind of a number on the back with a name; is that right?
A. Correct, sir.
Q. Looks like a jeweler?
A. Yes, sir.
Q. Tailor; is that right?
A. Correct, sir.
Q. Travel card and a name?
A. Correct, sir.
Q. There's some names and numbers?
A. Correct, sir.
Q. Or words and numbers. We can say that much. And that's written on the back of a business card?
A. Correct, sir.
Q. Phone number. I'm not good with Spanish, vitamina. Is that vitamins?
A. I don't know, sir.
Q. That's on a business card. Business card for an oil yard with phone numbers?
A. Correct.

Q. Business card, handwritten numbers, phone number?
A. Correct.
Q. Business card. Looks like phone numbers again, right?
A. Correct, sir.
Q. Business card. Again, names and numbers?
A. Correct, sir.
Q. There is some handwritten numbers having to do with auto cleaning, and there's some handwritten numbers on the back, as well?
A. Correct, sir.
Q. Air-conditioning service. Business card, and numbers and names?
A. Correct, sir.
Q. Corporation Express, Inc., some sort of a service, business card and number. Fish and chips, business card, names and numbers. Restaurant card, names and phone numbers. Phone numbers and names. Seems like a business card for immigration. Felix barber shop, phone number, perhaps the barber. Names and numbers, correct?
A. Correct sir.
Q. We've gone through the entire packet of cards in 8C. Did you personally observe any transaction that corresponds to any of the entries on these cards?

A. Me personally, no, sir.
Q. You did not witness any drug sales that correspond to any of these business cards; is that right?
A. Correct, sir.
Q. 8B, now this page was in the wallet?
A. Yes, sir.
Q. Okay. It was folded up in the wallet?
A. Correct, sir.
Q. And it's much like what we've been looking at; is that right?
A. Yes, sir.
Q. All individual names, individual amounts, some calculations maybe, or other designations?
A. Correct, sir.
Q. Some math on the back, I believe?
A. Correct, sir.
Q. Agent Naylor, did you witness any transactions personally that were evidenced by these entries?
A. No, sir.
Q. That's true of all the exhibits in 8 that we've just gone through, isn't that fair to say?
A. Correct, sir.
Q. We talked a lot about phone records, phones today. And you've said, and the Government has argued or said, asked you questions that tend to indicate that using

cell phones is a tool of the trade for drug trafficking; is that fair to say?
A. Yes, sir.
Q. And you'll agree with me that use of cell phones is ubiquitous in American society, everyone uses cell phones?
A. Correct, sir.
Q. And especially younger people use cell phones probably exclusive of any land lines. Would that be a fair statement, in your opinion?
A. That's a fair statement, sir.
Q. Especially people of a certain age, young people will be using the NEXTEL version or similar radio walkie-talkie type phones quite a lot; isn't that fair to say?
A. The NEXTEL seems to have gone out now. I think that's a past. Now they're going into texting younger people.
Q. I'm behind the times. But the NEXTEL feature, didn't they use to call hitting them up on the NEXTEL?
A. Correct, sir.
Q. Isn't that the way they speak of it?
A. Correct, sir.
Q. So now, it's also true that people are on the cell phones nowadays constantly, wouldn't you say that,

especially young people?
A. Yes, sir.
Q. Any visit to any mall or any public place we'll see cell phones being used even while people are having dinner or in a meeting; isn't that fair to say?
A. Correct, sir.
Q. So that's different from when you started out in your work; isn't that right?
A. Yes, sir.
Q. Because cell phones weren't in vogue back when you first started investigating the drug trade; isn't that right?
A. Correct, sir.
Q. So isn't it fair to say that modes of communication are adopted -- whatever is prevalent in society is adopted by people who are doing the drug trade?
A. I'd say that's fair, sir.
Q. So if people are active into e-mail, you might find e-mail traffic, for example, as being a tool that people would use to perpetuate this; is that right?
A. Can you rephrase that, sir?
Q. Let me ask you about texting. Let's focus on phones. Texting is used nowadays to communicate between the drug world and drug trade?

A. That's a good example. Texting is coming in now.
Q. And you track texting when you have to; is that right?
A. Yes, sir.
Q. And there's quite a lot of texting that's done between people nowadays; is that right?
A. Between regular people or drug people, sir?
Q. Between all people.
A. Correct.
Q. Okay. So there are real parallels in society with the use of the cell phone and in the drug trade and in the world in general. Isn't that a fair statement?
A. That's a fair statement, sir.
Q. All right. Now, the Disney cell phone, Exhibit 5 --
MR. WEST: Can we have that for a moment, please?
Q. Disney cell phone with Disney on it. That's a Disney telephone; is that correct?
A. Correct.
Q. This cell phone was in the possession of Enoc Soto; is that correct?
A. Correct, sir.
Q. And you seized it from him?
A. Correct, sir.

Q. You checked the phone number of it; is that right?
A. Correct, sir.
Q. That's 5A that was admitted. Am I right? Can you look at that?
A. Correct, sir.
Q. All right. 5A, something we can all look at.
THE COURT: Are you asking for that to be published or what?
MR. WEST: Yes, your Honor. I think it came up automatically when the Government was doing it. Perhaps not. I don't remember which ones are in the computer and not.
Q. So this is a full exhibit. I'm going to show it to you on the ELMO. I'm removing the exhibit, and I'm just going to go page by page here. I think you said before, and I wasn't quite able to find it myself but there's a name on here that refers to Enoc Soto; is that right?
A. Correct, sir. I believe it's the last page in that bunch. It will say subscriber information, and it will be on the bottom, just below it.
Q. The last page?
A. The last page, yes, sir.
Q. That would be this page?
A. Correct, sir.

Q. Okay. And you checked the phone and the phone number, and they match, right?
A. Correct, sir.
Q. Okay. And you said these are tools of the trade to get these phones. Is this one of these phones, the type they get, that you said, the prepaid phones?
A. No, sir. That's not. That's an actual phone in his name. I don't know the actual billing process of it. That was actually in his name.
Q. Oh, this is not a prepaid phone?
A. I'm not sure if it's prepaid or not, but that's an actual -- he actually put his name in that, sir.
Q. Okay. But when you were talking about prepaid phones being used in the drug trade, you were talking generalities; is that right, sir?
A. Correct, sir.
Q. There's not one in this case that you know of?
A. Correct.
Q. This was just another phone the man happened to have. Is that the only significance we can take from that?
A. I believe so, sir. Another phone that was on his person.
Q. Okay. And this particular phone had a phone record with it; is that right?

A. Yes, sir.
Q. That's a picture of it right there on the ELMO?
A. Correct, sir.
Q. And you know Mr. Mejia's phone number, correct?
A. Yes, sir.
Q. And it's not on this list; is that right?
A. If you say it's not, sir. I haven't checked it, but I can check it if you'd like now.
Q. I was just wondering if you knew. I don't believe it is. I'm not trying to trick you.
A. Okay. I don't remember offhand. I believe you.
Q. So he wasn't using it to call Mr. Mejia?
A. Correct.
Q. But you said that cell phones are used to keep in touch with the drug trade; is that right?
A. That's one of the tools, sir.
Q. All right. So no Mr. Mejia on the Disney phone. We can agree to that?
A. Yes, sir.
Q. Okay.
MR. WEST: If I could have 16, please.
Q. Now, this is the pad that you said was in the glove compartment of the Camry; is that right?
A. Correct, sir.
Q. And it was not on Mr. Mejia's person?

A. Correct.
Q. And it's got, let's see, one, two, three, four, five pages of writing on it; is that fair to say?
A. That's fair to say, sir.
Q. You've looked at it?
A. Yes, I have.
Q. It's got some entries on here, seems like a series of numbers. Is it your contention that these are in dollars?
A. Sir, could you back that up a little bit. I can't see the whole thing.
Q. Hold on. How's that?
A. That's good. Actually, a little bit more so I can see the bottom.
Q. Can you see that?
A. That's good, sir.
Q. Okay. So you've got these numbers here. The first one seems to -- are you saying these are dollars?
A. Would you like me to interpret what I feel this is?
Q. The column of numbers on the right-hand side, are you saying those are dollars; is that right?
A. I would say those are dollars and the middle column it would be weights.
Q. You're saying these things are separated by some

kind of space; is that right? They're not run together?
A. Correct, sir. I would say that would be like the top would be 150, 150 grams, 3600. Twenty would be 600 grams. To that effect, sir.
Q. And they're all individual entries again; is that right?
A. Correct, sir.
Q. The same with the next page, all different entries, different amounts, different calculations?
A. Correct, sir.
Q. Same on the next page, no calculations, just names and various entries; is that right?
A. Correct, sir.
Q. The same again?
A. Correct, sir.
Q. There's nothing different in this booklet?
A. I don't know what you mean by "different," sir.
Q. I mean, that's the same types of things we've been looking at; is that correct?
A. Well, that's not a fair question. Some of the other things we were looking at were just plain business cards but this appears to be a drug ledger.
Q. I stand corrected. You're absolutely right. This stands to look like the other papers that had numbers

on it and amounts on it; is that right?
A. Correct, sir. Which appear to be drug ledgers.
Q. You think they're drug ledgers based on other things you've seen? Okay.
A. Correct, sir.
Q. Now, did you see any transactions that you witnessed that correspond to the entries in this pad?
A. No, sir.
Q. Never did?
A. No, sir.
Q. And this pad was not out in the open in the car. It was put away; is that correct?
A. Correct. In the glove box.
Q. In the glove box. The glove box wasn't locked, right?
A. No, sir.
Q. It was just in the glove box?
A. Correct.
Q. I want to go to audio transcript 10, Government's 10, 10A. Now, this is the first recorded phone call between Falette and Enoc Soto, am I right about that?
A. Yes, sir.
Q. And you recorded it?
A. Yes, sir.
Q. Okay. Now, if we go over this carefully, the call

starts out with VF1. Now, just refresh my memory. Who is VF1?
A. That's Marie Perez.
Q. So that's Marie Perez. And she's on the phone for what reason, do you remember?
A. To put the cooperator, Jose, I mean Ambrioris Falette, in touch with Mr. Soto.
Q. So she was facilitating contact between Soto and Falette?
A. Correct.
Q. She was with Soto?
A. Correct.
Q. Where were they, do you know?
A. Up in Methuen or Lawrence somewhere, sir.
Q. You knew that because she had your DEA issued phone; isn't that right?
A. Correct, sir.
Q. And you had a GPS device in that phone; isn't that right?
A. Yes, sir. I did. I didn't check it on that night. So I'm assuming. She told me she was up there. So that's how I believe she was up there.
Q. So she was up there with Enoc Soto, correct?
A. Correct, sir.
Q. And were they using her phone or his phone?

A. Using her phone, sir.
Q. Okay. Was it the phone you gave her or was it a personal phone, do you remember?
A. I believe that was her phone I had given her.
Q. The NEXTEL? The Sprint/NEXTEL?
A. Actually, I believe so, sir. Yes.
Q. You're not sure?
A. I'm not sure. I shouldn't say which phone. I'm assuming it was that phone, sir.
Q. Okay. But nevertheless, it was Marie who is VF1?
A. Correct, sir.
Q. She says the guy is here, singular, correct?
A. Correct.
Q. And VM1, remind me, who is VM1?
A. That's Ambrioris Falette, sir.
Q. That's the cooperator, right?
A. Correct.
Q. VM1 is Mr. Falette. He said to her, (Reading:) You told him about, about what I was talking about, what I was interested, more or less, what I was interested about, you know. And he says, Exactly.
So this presumes they had a prior conversation, wouldn't you say that's fair?
A. Correct, sir.
Q. So Mr. Falette and Ms. Perez spoke before this

time?
A. Correct, sir.
Q. And that's not recorded anywhere?
A. Correct.
Q. Okay. You don't know what they talked about?
A. Actually, I'm not sure -- I believe they might have met with me once, or I might have three-way called them again at one point. But I couldn't be exact. Their only contact was facilitated by me, sir.
Q. Okay. But he doesn't mention you in this comment. He just says himself?
A. Correct.
Q. He's not referring to something you told him. He's referring to something he and she discussed; isn't that fair to say?
A. Again, I'm not sure what you're saying. Any conduct that they had, I was there or I facilitated. I don't know what he was meaning, sir. I couldn't tell you.
Q. So you can't be sure that you were in party to this conversation; isn't that fair to say?
A. I don't know what you mean by that, in party?
Q. The one that's presumed by this answer. The conversation they had before this answer was given.
THE COURT: Which answer are you referring to?

MR. WEST: The second one, your Honor. I will put it up on the ELMO and refer to it that way.

THE COURT: That would be good.

MR. WEST: Could I have Exhibit 10A, please.

Q. Now, do you see this answer right here, VM1. It's the second sequence on this page. (Reading:) You told him about, about what I was talking about, what I was interested, more or less, what is what I am most interested about, you know. Exactly.

So this seems to be that, if I'm understanding this correctly, Marie Perez and Mr. Falette had a meeting of the minds as to what they were trying to tell Mr. Soto; is that fair?

A. Actually, what I'm thinking about on this one here is I don't think they actually had even met on the 11th at this point. So I don't really know -- I couldn't tell you what he's referring to because now that I'm thinking about it, they met shortly thereafter, on the 11th. Up until the 11th, that was only through the telephone. That was, I believe, their first contact.

Q. Mr. Falette and Ms. Perez?

A. Correct. I believe I was facilitating the information about he's looking to get six kilograms of cocaine to Ms. Perez and telling her the price. I think I was the facilitator of what information was

being relayed back and forth. I think that's what he might be talking about, sir.
Q. So he's talking about what you would have told Ms. Perez?
A. To tell Mr. Soto. Correct, sir. Again, I shouldn't be testifying on what he meant but what I'm saying is that's what I can infer from that, sir.
Q. Very well. Okay. But now it's clear, though, that the guy we're talking about here is Enoc Soto; isn't that right?
A. Correct.
Q. You weren't telling her to relate any information to Ricardo Mejia; is that right?
A. No, sir.
Q. Because you didn't know about Mr. Mejia at that point in time, is that right?
A. On the 11th, I did not -- on the 11th, I may have known about him but I knew we were conducting the deal through Mr. Soto at that point, but I believe I did know about him, sir.
Q. But you weren't working between Marie Perez and Ricardo Mejia?
A. Correct.
Q. You were working with Enoc Soto; is that right?
A. Correct, sir.

Q. And you did not personally observe any dealings between Ms. Perez and Mr. Mejia?
A. Correct.
Q. Or Mr. Falette and Mr. Mejia?
A. Correct.
Q. Okay. So when they say, The guy's here, we're all clear, that's Enoc Soto?
A. Correct, sir.
Q. And then Mr. Falette says to Ms. Perez, (Reading:) You, what I wanted him -- you, what I wanted him is to come here, to come here for us to talk here.
And then she says, (Reading:) No, but I told him, but let me pass him over, he's here. Hold on.
So clearly she had been conveying information from Mr. Falette to Mr. Mejia -- I mean, Mr. Soto; is that correct?
A. Correct, sir.
Q. And then she gives the phone to Mr. Soto; is that right?
A. Correct, sir.
Q. And we can see that they start to converse. Is this the first time Soto and Falette speak?
A. Correct, sir.
Q. And Mr. Soto, to be clear, met Mr. Falette orally through the telephone by the assistance of Marie Perez?

A. Correct, sir.
Q. Mr. Falette didn't know Mr. Soto prior to that time, that you're aware of?
A. Correct.
Q. Okay. So this is the first time. And they start their sequence of discussions. And you'll follow along with me, (Reading:) Hello, how are you doing, buddy? Cool. Oh, that, look, so that, so that -- not saying much on the phone. I was, I was with a friend of mine, was on my way to the park. The thing has turned in, in, in, the way I, the way I do it, you know, my thing, (static).
Now that's Mr. Falette, right?
A. Correct.
Q. And then the next -- VM2 is Mr. Soto, and he's saying, (Reading:) What are you saying? Yeah.
Then there's some overlapping and static. We heard it in Spanish but this is Marie Perez now speaking, VF1.
A. Correct.
Q. Can't hear him. And then Mr. Falette says --
A. Sorry, sir. I'm missing the top. Thank you.
Q. I'm alone here. You know. And basically he made most of the contacts?
A. You said Mr. Soto. That's Mr. Falette, sir, at

that point.
Q. That's Mr. Falette referring to he made most of the contacts?
A. Correct.
Q. Do you know who he's referring to, the "he"?
A. Yes. We had told him, I had told him specifically to say that his supplier was out of the area, going back to the DR or something to that effect. I think he says it further on down there, as well. So he was portraying to Mr. Soto that his supplier was away and he had most of the contacts. That's what he was saying to that.
Q. I see. Marie Perez says something apparently, but we can't hear what it is?
A. Correct.
Q. Then Enoc Soto says, Exactly. Then we have Mr. Falette again, (Reading:) But I have, I have six P, a pac, I'll get it for you. (Background noises.) I got like six pesos for the rent, you know, but I want you to come over here for us to talk.
Then VM1 and VM2 and VF1, they're all overlapping in their voices. But those overlapping voices would include the voices of Marie Perez, Enoc Soto and Mr. Falette; is that right?
A. Correct.

Q. If you keep going, (Reading:) What's that? You want me to go down there with her?

And apparently Mr. Soto takes from that, that Mr. Falette wanted him to come down with Ms. Perez?

A. Correct.

Q. To wherever Mr. Falette was?

A. The Providence area, sir.

Q. Then Mr. Falette confirms, (Reading:) Yes, you can come down so we can talk here, you know, so we talk. If we come to, if we agree to something, we go into, if not -- no problem. So I'll tell you, I think it will be six, you know. And then VM2, Mr. Soto says, Exactly.

And then, Mr. Falette says, (Reading:) I got for six, If you want it, ah, ah, ah, if we agree in what we agree, I'll give you, you know -- that's fine.

Then Mr. Soto, Exactly.

Then we have Mr. Falette, (Reading:) If you want to agree on a price. Okay, we're done.

Now, that "Okay, we're done," after an agreement on a price came from Ms. Perez?

A. Correct.

Q. Now, the next voice we hear is Mr. Soto, (Reading:) Exactly. I want us to agree on a price. Mr. Falette, for -- I don't know, there's a notation

around the R, for, for, for, the mileage that we've been talking about, you know, exactly.

And then VM1. (Reading:) When could you, eh, eh, how, when, what's that starting at, what's it at (inaudible).

So that's Mr. Falette. And then VM2 is, (Reading:) Well -- VM1, Mr. Falette again, Exactly, listen to me, right now, since I came here, they are talking them as -- sorry. Taking them as, taking them like pancakes. Now that's Mr. Falette.

Then we go to Mr. Soto: Okay. Mr. Falette: Exactly. Then again overlapping voices between the two men.

A. Sir, could you move that up again? Thank you.

Q. Then the two men again. (Reading:) When it gets like that, you know, everybody wants to get yours, you know.

Yes, I get you.

Exactly. So -- and then inaudible.

Then they start talking, and I won't read every single page of this for everyone's benefit, but they start talking, they talk about a couple of eight's. I'm sure you would think those are eight-balls, is that --

A. No. Again, I never understood what he meant by

that. I didn't know if he meant two 16,000, referring to 16,000, a couple of eights. Sixteen thousand. I have no idea what he meant at that point. Then he goes down to the next line and says 20-and-a-half.
Q. A couple of eights is not drug code, apparently, not one you know, in other words?
A. Again, sir, a couple of these are. It depends on what people are talking about. If they're talking about, you know --
Q. We don't know.
A. Well, I do.
Q. So then we get into (Reading:) 20, 20, 20 what? And-a-half. And then if you give it in 20, then we're taking -- even. And so on.
This whole corresponding conversation is between Mr. Soto and Mr. Falette, and it's all in the singular sense. They're talking to each other about each other's business. There's nobody else mentioned in this sequence, or do I need to go through each line?
A. I'm not sure, sir. You don't have to read through every line, but basically in all the calls he talks about himself, singular. At one point he talks about the guy, talking about his supplier.
Q. Yes. We'll get to that in a minute. (Reading:) Yes, but I told the girl -- if you look at VM2 -- yes,

but I told the girl that I would take it in 20-and-a-half, so that I could make some.

So the girl he's referring to there is Marie Perez?

A. Correct.

Q. Is he implying that she should have told Falette that? Is that what the implication is?

A. Correct. He's probably telling her that she should have told him it was going to be 20,500, and Mr. Falette is trying to negotiate here, so he's trying not to negotiate. That's what I would get from that. I already told her it's 20-and-a-half.

Q. So this presumes that Falette and Marie Perez spoke because Soto was under the impression he'd already told her that?

A. Correct. And everything Ms. Perez was supposedly going back and telling Mr. Falette she was telling me, sir.

Q. So Ms. Perez was in contact with you while she was working on Soto; is that right?

A. Correct, sir.

Q. But not Falette?

A. I believe that was the first contact that they had was on the 11th through me, sir.

Q. And then they talk about the next sequence is them

getting together. If you come here to pick it up. In other words, Mr. Falette wanted Soto to come to Providence, Soto wanted Falette to go to wherever he was?
A. Correct.
Q. Falette holds out to have him come to Providence; is that fair to say?
A. Yes, sir.
Q. And this part right up here where you see VM1, the guy left me on my own, left for Santo Domingo, do you see that?
A. Yes, sir.
Q. That's Mr. Falette referring to his fictional supplier?
A. Correct, sir.
Q. So we don't get confused, that's not a real person?
A. Correct, sir.
Q. And so forth, throughout the balance of this page, there is additional discussion but no indication of anybody else getting involved in this affair other than Mr. Falette and Mr. Soto; is that correct, on this page?
A. I believe so, sir, yes.
Q. Now, on the next page, they're still talking about

the price; is that right? Do you see that? VM1?
A. Correct, sir.
Q. VM1 again is Mr. Falette, VM2 is Mr. Soto. They say, (Reading:) You can leave tomorrow. Exactly. Come tomorrow. You know, with all the guys, all the dudes -- duds, you know. I don't know what that is given to mean, whether there are going to be other people with Mr. Falette?
A. I have no idea, sir. I don't really remember.
Q. Okay. Then they talk about what time tomorrow, because she's taking me. If you look at VM2, and what I'm pointing to right now on this transcript, do you see that?
A. Yes, sir.
Q. It says, Because she's taking me. Now, we're talking about Marie Perez, right?
A. Correct. She'd be bringing him down to introduce him.
Q. So Marie Perez was going to drive down Enoc Soto or take him down; is that right?
A. Correct, sir.
Q. We're still on December 11th. Am I right about that?
A. Yes, sir.
Q. (Reading:) The earlier the better, at 8:30, we

leave, I get there by 11:30. There's no problem. At 11:30, talk to Maria.

That's Marie Perez; is that right?

A. Correct, sir.

Q. And so forth. Get there tomorrow at 11:30.

Now, Lawrence, Massachusetts is up north of Boston; is that right?

A. Correct.

Q. Do you know how long it takes to get from Lawrence to Providence?

A. Sometimes about an hour, hour-and-a-half, sir, an hour and 20 minutes.

Q. Depending on traffic?

A. Correct.

Q. So they say it's not a problem, then there's some music playing. Mr. Soto says goodbye, and then VF1 is back on the phone. This is Marie Perez, right?

A. Correct.

Q. Now she's talking to Falette, right, Mr. Falette? (Reading:) Hello. Hello. Hello, tell me, Jose.

Maria, fine at 9:30.

I'll be leaving from here tomorrow at 9:30.

That's Marie Perez; is that right?

A. Correct.

Q. Yes, yes, you leaving from there -- Get to an

agreement. So what does that mean?
A. I believe that was on the time.
Q. The time?
A. Yes, sir.
Q. Okay. So, Falette is telling her to get to an agreement on what time she's coming?
A. Correct.
Q. What, and then something is unintelligible. (Reading:) Wait, hold on, Jose.
Yes.
You told me five or six.
She's asking Jose, you told me five or six. This is referencing how much quantity he wants; is that right.
A. I believe so, yes, sir.
Q. So she's trying to get squared away on how much quantity she needs to bring with her; is that right?
A. What Mr. Soto is going to bring with him, yes.
Q. That if I said five or what, is what he responds; is that right?
A. Correct.
Q. And then she says that if it were five or six because you told me six?
A. Correct. I believe, like I said before, we originally had told him to try and purchase six

kilograms of cocaine, sir.

Q. What we're talking about right now is that she's telling Mr. Falette that, you told me six. Now, when would he have told her six?

MS. BECKNER: Can we approach?

(Side-bar conference.)

THE COURT: All right.

MS. BECKNER: I have let this go on for a very long time without objecting but, obviously, it's speculation to have a witness testifying to what other people are saying, and the defense attorney is for like the last half hour reading the transcript to the witness.

THE COURT: You put all these transcripts in. You had him interpret them. It's completely open to cross-examination. You opened the door.

(End of side-bar conference.)

MR. WEST: Was there a question pending, your Honor?

THE COURT: I'm not sure, but how much more do you have on this transcript? I'm trying to get to a good breaking point.

MR. WEST: I'm going to go right to the end of this transcript, your Honor.

THE COURT: All right. I don't know if there

was a question.

MR. WEST: I'll start another one.

THE COURT: All right. Just ask a new question. I think you had a question, because we originally told him to try and purchase six kilograms -- I'm sorry, that was the answer. There was no question pending. The answer was given to your last question so ask a new question.

Q. The female informant, (Reading:) 'Cause you told me six. That me refers to something that he told her?

A. Correct, sir.

Q. Mr. Falette. Are you aware of any conversation that would have been between Mr. Falette and Ms. Perez where she would have -- you said you monitor all these, that's why I'm asking, where she would have been told six?

A. Correct. What we did was when I originally called Ambrioris Falette to do a three-way, I did an introduction to Marie, this is going to be Ambrioris. This is what we're trying to get. Six kilograms. So I said you guys get a story together. Something to that effect of how you know each other, something like that. Then he spoke in Spanish and English a little bit, back and forth.

Q. You can't understand Spanish?

A. No, sir. That's when they probably said, you know, my friend is in Santo Domingo. I told them that story to say. So there's a little pre-conversation. So that's probably what they're referring to, sir.
Q. Okay. So there's some conversation that was in Spanish that was not recorded between the two cooperating informants, and we don't know what it was about?
A. Correct, sir.
Q. But there does seem to be some indication that she thought that there was going to be six?
A. Correct.
Q. So now she's straightening that out with him. He says to her, there's six, there's six. And she says, There's six. And then he says, Six, that's fine. And that's with the five when he tells you. (Unintelligible). And with the five, is what he said. Now, is it six or is it five?
A. I couldn't tell you, sir. It went back and forth. Again, it went from six all the way down to two, so --
Q. She's negotiating with Falette about how much it's going to be, six or five?
A. The VM2 is Enoc Soto again. He gets back on the phone. So again, I don't know if you're hearing this, and if they're all next to each other and you're

hearing the other people talk. I'm not sure, sir.
Q. And VF1, "That with the five when he tells you," that's the comment she's making?
A. Correct.
Q. Then Mr. Falette says, "With the five," am I right?
A. Correct, sir.
Q. Okay. So one's left to wonder is that six and five or eleven?
A. I believe the numbers were always five or six, sir. It was never 11.
Q. "With the five" is some phrase, grammar or something?
A. Correct, sir.
Q. And then Marie Perez says, yes. So she confirms with the five. And then Mr. Falette says, (Reading:) Because now, six. Still not quite settled on what we're doing here. Okay. So that's fine then; is that right?
A. Correct.
Q. So she's agreeing, I guess, with the six. Is that a fair interpretation of this?
A. That sounds fair to me, sir.
Q. Then we'll walk tomorrow?
A. We'll talk tomorrow, sir.

Q. I'm sorry. Talk tomorrow. (Reading:) So what time is that you get there?

Then they go again with the time that they're going to meet. That's the sequence between Mr. Falette and Ms. Perez, correct?

A. Correct.

Q. Then he says, Or maybe earlier. We'll keep in touch. And she says, Yes, that's fine. And then he says, So it's fine, honey. And she says, Okay, bye.

Now, Mr. Falette and Ms. Perez, did they speak after this recorded conversation?

A. Not at that time. They both hung up, and then I called them both back separately, sir.

Q. You called them both back separately?

A. Correct.

Q. That was not recorded?

A. Correct, sir.

THE COURT: Okay. Mr. West?

MR. WEST: Yes, your Honor.

THE COURT: What page were you on on this transcript?

MR. WEST: I was on the last page of that conversation, your Honor, page 10.

THE COURT: All right. So you're done with the transcript?

MR. WEST: I'm done with that page, your Honor. And I just have two more questions left on this transcript.

THE COURT: All right. Ask your two more questions.

Q. Mr. Naylor, you have just been through this entire transcript with me of this call on the 11th of December. There's no mention of Ricardo Mejia in it; is that fair to say?

A. Yes, sir.

Q. And there's no mention of Mr. Soto working with Ricardo Mejia?

A. Correct.

Q. So at some later point, you're not going to say that this transcript has anything to do with Ricardo Mejia; is that fair to say?

A. Correct.

THE COURT: Okay. This is a good breaking point. I know Mr. West has more with this witness, but I think we'll call it a day at this point.

So I'm going to let you go for the day, ladies and gentlemen. I just want to remind you of my instructions to not do any investigation, not do any research particularly with respect to any computer or anything like that. We've had problems with that

before in this court. So you're not to do any independent investigation of any kind related to this case, anything about this case.

Now, in addition to that, you've heard me say over and over not to talk about this case with anyone. I want to reemphasize that at this point because you're all going to go home, or go see friends, or go back to work, or wherever you're going to go from here, and people are going to ask you what you were doing today, how was that thing at court, what was the case about, and before you know it you're into a conversation. And then someone is going to tell you what they think, because they always do. People always want to tell you what they think about something that they know nothing about. And so the best way to deal with that, I'm telling you, is just don't let the conversation get started. So when they say what were you doing today, say I can't talk about it. I was at court, I can't talk about it. Immediately say I can't talk about it, otherwise you are going to expose yourself to someone's unsolicited opinion. I get a lot of unsolicited opinions about things, and I know you will, too. So just cut it off at the pass. All right? And I will see you tomorrow morning.

I'd like to start tomorrow morning at nine

o'clock. So we're moving not at a very fast pace at the moment, and that's fine, that's just the way it goes, but I want to start a little earlier and see if we can get a real full day in tomorrow. So we'll start at nine o'clock. Charlie will ask you to be here a little earlier and he'll tell you about that.

So have a good evening, and we'll see you in the morning.

(Jury excused)

JANUARY 29, 2008

(Proceedings in the presence of the jury as follows:)

MICHAEL NAYLOR, resumes stand.

THE COURT: Good morning, everyone. Welcome back, ladies and gentlemen of the jury. Ready to recommence with the trial of the United States versus Mejia. Agent Naylor is still on the stand.

Mr. West, are you ready to go forward with your cross-examination?

MR. WEST: Yes, your Honor.

THE COURT: Okay.

CONTINUATION OF CROSS-EXAMINATION BY MR. WEST

Q. Agent Naylor, yesterday you drew a diagram on the board. Do you recall doing that?

A. Yes, sir.

Q. At the conclusion of the trial yesterday, you drew a second diagram that approximates fairly well that diagram; is that correct?

A. I believe so, yes.

Q. I'm going to show you this document. Is this the second diagram that you drew? Just let me try to get that all in front of you. I'll just have to move it up. Is that the second diagram that you drew?

A. Correct, sir.

Q. And it fairly and accurately depicts what you drew on the board yesterday; is that right?
A. Yes, sir.
MR. WEST: Your Honor, for purposes of the jury having access to this depiction, I'm asking that this diagram be Defendant's Exhibit B.
MS. BECKNER: No objection.
THE COURT: No objection to that? All right. We'll make that an exhibit.
(Defendant's Exhibit B admitted full.)
THE COURT: Just so you know, ladies and gentlemen, I had promised to have a flip chart brought down and have this replicated. I forgot to do it. This may be sufficient to show the layout, so that may do it.
MR. WEST: I'd like to have Exhibit 4, please, and 4A, while you're at it.
Q. Now, Exhibit 4, Agent Naylor, is the cell phone you seized from the defendant Enoc Soto; is that correct?
A. I believe so, sir, yes.
Q. Okay. Now, you seized it yourself; is that right?
A. Correct, sir.
Q. By checking that, you can verify that it is?
A. Yes, sir.

Q. Is that one of those types of NEXTEL phones, or is that a regular cell phone?
A. That's a NEXTEL, sir.
Q. So that has that walkie-talkie feature?
A. Correct, sir.
Q. Did you seize the records or you subpoenaed the records for that telephone; is that correct, and that's 4A?
A. The records were subpoenaed, sir. I didn't do it but they were subpoenaed, sir.
Q. Did you review those records?
A. To a degree, sir.
Q. There were numerous contacts between Marie Perez and the defendant on those records, correct?
A. Correct.
Q. They span from December 11th through December 18th at the very least; is that right?
A. Correct, sir.
Q. Agent Naylor, with respect to Mr. Falette, were there contacts between -- direct contacts between Mr. Falette and Mr. Soto on these records?
A. I believe there was just one on the 18th, sir.
Q. On the 18th. Okay. That was the only time that he spoke directly with Mr. Falette; is that correct?
A. I believe so, sir.

Q. Okay. And the other contacts with Mr. Falette were through the three-way or -- not really a three-way, Marie Perez called and she handed the phone to Soto; is that right?
A. On occasion, sir, yes.
Q. Was there other ways --
A. On that one occasion, on the 11th, there was the three-way call.
Q. The three-way call that you conducted; is that right?
A. Correct.
Q. All right.
MR. WEST: Now I'd like to see Exhibit 6 and 6A.
Q. This is a telephone that you've identified as having been on the person of Mr. Mejia; is that right?
A. Correct, sir.
Q. I just want to check it and make sure I've got the right one.
A. Correct, sir.
Q. You seized the telephone records, or someone subpoenaed the telephone records they've introduced as 6A from the Government, right?
A. Correct, sir.
Q. And you've had an opportunity to review these records; is that right?

A. To a degree, sir, yes.
Q. And it's your understanding there were no telephone calls between Marie Perez and Mr. Mejia in these records; is that correct?
A. None whatsoever.
Q. And no direct-connects either?
A. Correct.
Q. Walkie-talkie feature?
A. Correct, sir.
Q. And this is a walkie-talkie featured phone?
A. Correct.
Q. And you've checked these records with respect to contacts between Mr. Falette and Mr. Mejia; is that right?
A. Correct, sir.
Q. And there's no contacts between Mr. Falette and Mr. Mejia in these records; is that right?
A. Correct.
Q. I just want to return to an item of evidence we worked with yesterday, the firearm. Where was the firearm located in the vehicle again, if you'd refresh my memory?
A. It was located in the back seat directly under the driver's seat. I could use an example. If you were sitting behind the driver of the vehicle and your feet

were there, it would be in that area where your feet would be, sir.
Q. Did you take a picture of it as it sat?
A. No, sir.
Q. Did anyone?
A. No, sir. Not that I remember.
Q. Was it tucked under the seat?
A. I'm going to say it was like with the handle of it facing outward a little bit, sir. So, not under the seat but where your feet would be. So it could have been a little bit under the seat, depending on what angle you're at. Do you get that, sir?
Q. So the handle would have been the part that you could see at your feet, basically is what you're saying, and the barrel would --
A. The barrel pointing out.
Q. Pointing out.
A. Yes, sir.
Q. Now, the way you're talking about it, the handle would have been toward the door. Is that the way you're talking about it?
A. No. The handle would have been coming down on an angle towards the middle of the car. The bottom of the handle where the clip is, that would be towards the middle of the car, sir.

Q. The barrel would face the passenger's side?
A. No. The barrel would face like directly under the driver going towards her feet, sir, that way.
Q. So the barrel was tucked directly in. Just the butt of the gun, the back of the gun was visible?
A. When you say the back of the gun, when I look, I'm looking at an angle in, and I can see the entire gun from where I'm sitting. So I don't know, if you're looking straight in, maybe just the handle is visible. But from my angle when we had opened the door, I could see the whole gun, sir.
Q. Because you're looking in the car like that?
A. Correct, sir.
Q. All right. I don't see any real way to reproduce that on a blackboard. Do you think you could draw how that looks?
A. I think I could do it to a degree, sir.
THE COURT: Could you come back to this in just a minute, and I'll have the flip chart brought down.
MR. WEST: Yes, your Honor.
Q. Just asking you a couple more questions about this firearm. What was the distance -- I suppose you're saying it's in the middle of the driver's seat; is that correct, in the middle area of the driver's seat?
A. No. Again, I wouldn't say to the middle. I'm

going to say if I'm sitting in the rear seat, in the back seat behind the driver, right where my feet would be, so just tucked under a little bit. My feet don't go all the way to the middle. Do you understand what I'm saying? Towards the back, sir.
Q. I'm going to let you draw it in a minute, if you can do that. What would you say the finish of that firearm was, the finish coating on it?
A. It's that black type of metal, I don't know the actual firearm. The handles are a plastic type material, and the other is like a, I don't know how to explain it, but it's like a hard finish.
Q. It's harder than the handle finish?
A. Correct.
Q. Is the barrel that juts out, is that blue steel or stainless steel?
A. It's a dark steel. I'm not sure, sir, what you consider blue steel. I'm not sure.
Q. That blue finish would pick up any marks that were on it; is that fair to say?
A. What do you mean by marks? Scratches?
Q. Fingerprints, scratches?
A. I'm not a fingerprint expert. I'm not sure if it would have marks or not, sir. I mean, I've never had a reason to touch a barrel. When we see it like that,

cocked back, I don't think I touched a barrel unless I was taking it apart, sir.
Q. What do you mean "cocked back"?
A. When we see the firearm, it's cocked all the way back, locked back, when we have it locked in that position. When it was found in that location, the barrel would be forward, and that barrel wasn't exposed, sir.
Q. But it is exposed at some point during that gun's usage, that barrel, that front barrel? It could be cocked back for cleaning or repairing?
A. If you disassemble it, you would take that. Like I said, on my gun, other than to assemble or disassemble it, I don't think I've ever touched that barrel. Like in the operation of it, I would never touch it.
Q. How would you go about wiping fingerprints off a gun if you wanted to clean up a gun? Do you have any knowledge about that?
A. Sure.
Q. How would you do it?
A. I would wipe it with my shirt if I wanted to, sir.
Q. Would you have to use a solution to be certain it was cleaned off?
A. No, sir. You could just use a rag. You could use

anything, sir.
Q. Did you have any occasion to check the suspects, what they had on them at the time you arrested them?
A. Yes, sir.
Q. Did the suspects have any gloves?
A. Gloves? No, sir.
Q. So there was no gloves used that night; is that correct?
A. Correct, sir.
Q. Have you ever tried to load a firearm with gloves on?
A. Yes, sir.
Q. Is that an easy thing to do?
A. Depends on the type of gloves, sir. I actually trained with gloves on, on some occasions. In the winter months you have to use gloves, so I've used, you know, the tight-fitting gloves, like Isotoner, sir.
Q. Is it fair to say that people who don't wear gloves in stressful situations their hands could be moist and more susceptible to leaving behind the fact that they touched something?
MS. BECKNER: Objection. Foundation.
THE COURT: Sustained. Lay a foundation for that.
Q. Have you had occasion to use a firearm in a

stressful situation?
A. Yes, sir.
Q. And does your hand get more sweaty or more moist at that point in time?
A. I don't have any knowledge of what my hands were doing at that time, sir. I really couldn't tell you.
Q. Now, did you -- the firearm that was seized, do you know if it was checked for any hairs, fibers, or anything of that nature?
A. Hairs, fibers? I don't think so, sir.
Q. No forensics was done on the firearm to check it for any kind of hair or fiber from any of the suspects?
A. I don't ever remember that being done on any case that I've worked, so I don't think it was done on this case, sir.
Q. Now, I think it was your testimony that you never saw the defendant in possession -- you never saw Mr. Mejia in possession, I should say, of the firearm at the scene of the incident that you responded to?
A. I never saw it in his hands or on his person, sir.
Q. You never saw him touching it either, did you?
A. Correct, sir.
Q. Okay. We'll come back to the firearm when the board is ready for that.
MR. WEST: I'd like Exhibit 11, please, and the

transcript, which would be Exhibit 11A.
Q. This is a full exhibit, Agent Naylor. You remember it being played to the jury yesterday?
MR. WEST: Is the jury able to see that, Madam Clerk? Thank you.
Q. Going through this conversation, this is the conversation on December 12th; is that correct?
A. Correct, sir.
Q. This conversation is between VF1 and VM. A little different nomenclature than the last transcript we went through. Who is this between again, please?
A. Marie Perez and Ambrioris Falette, sir.
Q. This was a conversation between these two on December 12th?
A. Correct.
Q. (Reading:) It's okay, I'll call you from inside there with him.
That's Marie Perez?
A. Yes, sir.
Q. And again, she's talking about "him" being Enoc Soto; is that correct?
A. I believe so, sir.
Q. The singular?
A. Correct, sir.
Q. And VM, (Reading:) But okay, okay, stay with the

phone like that, right there, and go in and give it to him.

So is that Mr. Falette telling Marie Perez what to do?

A. Correct.

Q. And what he wants her to do is to go into someplace and give Mr. Soto the phone, singular?

A. Correct, sir.

Q. Now, Marie Perez says, (Reading:) No, I have to, no, let me call you from there because I'm going to tell him that I'm talking to you because I'm going to go in, it's a restaurant and a club, too, it's crazy, I'm going to tell him to come out and I'm going to call him on the phone.

So it's safe to say she's with Mr. Falette at a restaurant or discotheque; is that correct?

A. No, sir. She's with --

Q. Mr. Soto?

A. Correct, sir.

Q. At a restaurant or discotheque; is that right?

A. Correct, sir.

Q. That would have been up in Massachusetts?

A. Correct, sir.

Q. (Reading:) Okay, it's crazy then.

That's Mr. Falette?

A. Correct.
Q. And, "Okay." That's Marie Perez. And Mr. Falette says, "Okay." And then Mr. Falette says, (Reading:) She's going to call me back, is a restaurant, a club, he's inside drinking, she's going to go and get him.
This last line is said to you; is that fair to say?
A. Yes, sir.
Q. That's Mr. Falette talking to you?
A. Correct.
Q. Coming back now to this conversation, the last line is something that Mr. Falette is saying to you. He's confirming that Marie Perez is at a restaurant, and apparently Mr. Soto's there and he's drinking, and that's where they are; is that right?
A. Correct, sir.
Q. And this is up in Massachusetts; is that right?
A. Correct, sir.
Q. Now, were you surveilling Marie Perez and Mr. Soto at that time?
A. I was not.
Q. Did you have any agents watching the two of them at that time?
A. At that time, I'm really not sure, sir. What happened was I was in communication with the CBI group,

which is a group in the Lawrence/Methuen area, Cross-Border Initiative Task Force. So on different occasions --
Q. Can I stop you for one second, Mr. Naylor. Were you surveilling that club?
A. I was not, sir.
Q. Okay. And were any of your agents from the DEA in Providence surveilling that club?
A. In DEA in Providence, no, sir.
Q. So your team was not conducting any active surveillance of this location; is that right?
A. To answer your specific question, no. My team in Providence --
Q. All I want you to do is answer my specific question.
A. Okay, sir.
Q. You never filed any report about any surveillance that was going on at that location; is that right?
A. Correct, sir.
Q. Nobody wrote up any kind of a statement that they observed X, Y or Z at that location; is that correct?
A. Nobody that I know of, sir, no.
Q. You never read one, either, is that right?
A. Correct, sir.
Q. In other words, no brother officer or sister

officer sent you a report detailing anything they observed at that location?

A. Correct, sir.

Q. That's not part of the case file; is that right?

A. Correct, sir.

Q. No mention of Mr. Mejia at all in this transaction; is that correct?

A. No, sir.

MR. WEST: Now, I'd like to have Exhibit 12 and 12A.

Q. Now, Exhibit 12 and 12A are full exhibits, and we heard them yesterday. And this is the transcription of that conversation; is that correct?

A. Correct, sir.

Q. And could you just lay out the factual time frame on that again? Was this following that call we just went through?

A. Correct, sir.

Q. Okay. And why was there another call that day, do you remember?

A. I believe she said she was going to go into the club and get him. She went into the club, and there was a subsequent phone call.

Q. Once she got him out of the club, there was this phone call, the follow-up phone call?

A. Correct, sir.
Q. VM1 now in this one is Mr. Falette?
A. Correct, sir.
Q. (Reading:) Tell me, how you're doing my buddy? It's Jose talking to you.
VM2 is Mr. Soto?
A. Correct, sir.
Q. (Reading:) Tell me, how -- are you okay?
VM1, come on, my brother! Talk to me, what's going on? Because you, you did me wrong, my friend.
That's Mr. Falette saying that Mr. Soto had done him wrong?
A. Correct, sir.
Q. That's the end of the conversation; is that right?
A. No. I believe it continues onto the next page, sir.
Q. You're right about that. So we move to the next page. Actually, it's a long conversation. We move to the next page.
And VM2, this is Mr. Soto, (Reading:) No, no, no, I didn't do you wrong, not me, because my girl had a little problem with one of the kids, and I, and those people were there waiting -- they are with me waiting the whole day.
Now, the girl that's referenced in this line, is

that Marie Perez?
A. I believe so, sir, yes.
Q. And then Mr. Falette says, Uh-hum. And Mr. Soto says, they got restless and they left, referring to some unknown parties, I take it?
A. Correct, sir.
Q. And VM1, Mr. Falette, "Well" --
Mr. Soto: (Reading:) And when I called back after she came, they told me they got rid of the three, you know.
Mr. Soto is talking about three of something; is that correct?
A. Correct, sir.
Q. And VM1, Mr. Falette, (Reading:) What, what do you have now? Let me know because I have --
Mr. Soto: They have, they have three there, but they'll do the work to get me two or three by tomorrow.
This is, again, a reference to some unknown parties; is that correct?
A. Correct, sir.
Q. And we don't have any report or statement suggesting who those parties are; is that correct?
A. No, we don't, sir.
Q. Nothing in the case file; is that right?
A. Correct, sir.

Q. No surveillance documenting who they are; is that right?

A. No surveillance notes, correct, sir.

Q. And VM1, Mr. Falette, (Reading:) No, listen, but those three, are they for sure? And Soto says: Yes, for sure. Then give it to me. Mr. Falette: Give it to me. Is that, I have people waiting. I have people sitting in my house, my brother, you don't understand that I, I have not even eaten in two days, I've been so busy.

So a little bit of puffing going on there by Mr. Falette; is that right?

A. Correct, sir.

Q. This is all fictional; it's not real?

A. Correct.

Q. (Reading:) Okay, but listen, this is the thing, they don't work at night.

That's Mr. Soto referring to, again, some unknown parties, am I right?

A. Correct, sir.

Q. (Reading:) Oh, they don't work at night? That's what Mr. Falette says.

No, they don't work at night. So I asked the girl what time she can go there with me tomorrow to bring that, you get me? That I could, I could get the

two or three that are missing.

Now, that girl he's referring to is Marie Perez; is that right?

A. Yes, sir.

Q. He wants her to go there with him to bring the three, the two or three that are missing; is that a fair statement?

A. I believe so, sir. He's saying there was a total of six. Three were gotten rid of, and two or three that are missing.

Q. Next, (Reading:) Oh, you're saying tomorrow?

Of course.

So there'll be six?

The six.

That's Soto and Falette talking.

What time? Because that's what you said yesterday.

Let's be clear here, this is Mr. Falette saying that's what you said yesterday, and the start of his call started out, if you look at page one of it, it starts out, "You did me wrong." He was supposed to show up -- Mr. Soto was supposed to show up on the 11th.

A. The 12th.

Q. The 12th. Is this conversation from the 12th or

the 11th?
A. This conversation is from the 12th.
Q. He's saying he did me wrong.
A. That's what you said yesterday, you said you're coming down today.
Q. I follow you now. All right. So he was supposed to show up with these drugs on the 12th, and he didn't do it?
A. Correct, sir.
Q. And Marie Perez had something to do with it. A child -- she had difficulty with a child, and she was supposed to take him there in some way; is that right?
A. I believe that's what he's saying in the call, sir.
Q. (Reading:) What time, because that's what you said yesterday.
Then Mr. Soto: Ah, ah, but I had it for sure, she's the one that didn't come.
So Marie Perez he's blaming for not being there to take him; is that right?
A. He's being blamed, sir, is what you're saying, sir, right.
Q. And then Mr. Falette, (Reading:) Oh, my God.
Then Mr. Soto: I don't know how to get there.
Mr. Falette: So you mean she didn't get there?

You had it for sure and she didn't get there?
Now, this is Soto saying he doesn't know how to get somewhere; is that fair to say?
A. Correct, sir.
Q. And then he's saying, again, Falette's confirming basically that she didn't get there. That means Marie Perez, am I right?
A. Correct.
Q. So Soto appears to be relying on Marie Perez to get him perhaps to Providence?
A. I'm sure.
Q. (Reading:) And I'm telling you that, um, she's here with me.
So now Marie Perez is with Soto on the 12th; is that right?
A. Correct, sir.
Q. And she was with Soto on the 11th; is that right?
A. Correct, sir.
Q. And they were --
A. Yes, sir.
Q. They were up together in Massachusetts, am I right?
A. Correct.
Q. Do you think it was Lawrence?
A. I think it was Lawrence, Mass.

Q. Did you check your GPS on her that day?
A. I'm not sure if I did or didn't on that day.
Q. You didn't make a habit of constantly checking that GPS to watch her movements, is that fair?
A. In the beginning when I first got it I made sure it was working right and checking it and things of that nature. And then only on days that I anticipated something happening did I check it, sir.
Q. Did you check it on the 11th?
A. I don't believe I checked it on the 11th.
Q. Did you check it on the 12th?
A. I believe I may have checked it in the morning when I couldn't get in touch with her. In the morning hours, sir.
Q. (Reading:) VM2, I'm telling you that, um, she is here with me.
And VM1, no, you can't do business with women, no.
Now, that's Mr. Falette; is that right?
A. Correct, sir.
Q. And he's making a general remark about Marie Perez and other women; is that fair to say?
A. Fair to say, sir.
Q. Mr. Soto: She's here with me because she came, but she came late, and the people had left by the time

she called because her son got lost, you get me?

Now, this is referring to some unknown people again, correct?

A. I'm not sure. He's referring to her. He got lost. Saying the people, I don't know who the people are, sir.

Q. You don't know who the people are?

A. Correct, sir.

Q. No reports indicating who the people are?

A. Correct, sir.

Q. No surveillance documenting who the people are?

A. No, sir.

Q. That's Marie Perez he's talking about; is that right?

A. Correct, sir.

Q. (Reading:) Okay. So you have three but you can't bring it now?

No, because I have this -- that's Mr. Falette, and then Mr. Soto: I could bring it to you tomorrow, or I'll bring you six. That's Mr. Soto. What time? You bring it to me tomorrow at what time? And then Mr. Soto: But that, that, she's the one who knows what time she could go with me.

Now he's referring again to Marie Perez; is that right?

A. Correct, sir.
Q. And then Mr. Falette: (Reading:) Talk to her, man, so we can end this without, you know -- because we ain't talking about two bucks.
So stressing to Mr. Soto the importance of the money involved in this transaction; is that right?
A. Correct, sir.
Q. The person he's telling to talk to her is Marie Perez?
A. Correct.
Q. (Reading:) Exactly, because -- exactly because I told her that, that shouldn't be like that, that it should go bang, bang, and done.
Now that's Mr. Soto telling Mr. Falette that he talked to Ms. Perez about the need to expedite this transaction; is that correct?
A. I believe so, sir.
Q. And then the next line, (Reading:) Exactly, we are not talking about, about, you know, two cents. Talk to her to see what time she'll be available because, if not I'll just take off and go to New York and get my thing, my stuff over there.
So this is Mr. Falette making it appear that he'll go to somebody else; is that correct?
A. Correct, sir.

Q. He's referring to talk to her, that's Marie Perez; is that right?
A. Correct, sir.
Q. And then Mr. Soto: (Reading:) Exactly.
And Mr. Falette: No, because you are -- and then the next page. Let me talk to her to see when she can go, so she can call you and tell you what time we can go there. Okay.
So that's Mr. Soto saying he needs to talk to Marie Perez to find out when she can go and that she can call you. So he's referring to Mrs. Perez will call Mr. Falette, is that a fair interpretation?
A. Yes, sir.
Q. And tell you what time they can go. So Marie Perez and Mr. Falette were supposed to confirm times with each other, according to this statement; is that right?
A. Correct, sir.
Q. Then Mr. Falette says: Okay. And Mr. Soto says: Okay. Take care. Then he had the -- I assume this is Mr. Falette talking to you again, sir?
A. Correct, sir.
Q. But that was cut off for some reason?
A. Correct. I ended the recording, sir.
Q. You ended the recording at that point in time?

A. Yes, sir.
Q. There's no reference in here to Mr. Mejia?
A. None by name.
Q. None in any surveillance report that indicates that he was referred to in this report, is that correct?
A. Correct, sir.
Q. There's no report in your police file that indicates that Mr. Mejia was connected to this conversation; is that correct?
A. Correct, sir.
MR. WEST: I'd like to look at 13 and 13A, please.
Q. This is a full exhibit that was introduced yesterday. This was from the -- I want to just back up a minute. The last recording we spoke about was from the 12th; is that right?
A. Correct, sir.
Q. And they were preparing for a delivery on the 13th; is that correct?
A. That's what they said, sir, yes.
Q. And that delivery never happened, is that right, sir?
A. Correct, sir.
Q. Was there any other conversations recorded on the

13th to get into what happened or why it didn't happen like there was on the 12th?
A. No, sir.
Q. Were there conversations?
A. I believe there were conversations between Mr. Soto and Ms. Perez, and then Ms. Perez would relay things to me, things of that nature, sir.
Q. But they weren't recorded?
A. Correct, sir.
Q. Was Mr. Falette in contact with Mr. Soto on that day?
A. I don't think he had any more contact, but I couldn't be exactly sure.
Q. If he did have contact, it wasn't recorded?
A. Correct.
Q. On the 14th, there were no recordings made; is that right?
A. Correct, sir.
Q. And on the 15th, there were no recordings made?
A. Correct, sir.
Q. On the course of the 14th and 15th, was there contact with Marie Perez and Mr. Soto?
A. There could have been, sir. There probably was contact. She was relaying stuff to me that was going on in the case, so I'm sure she was making contact with

him, sir.
Q. Was she up there in Massachusetts, in the Lawrence area?
A. For the most part, sir.
Q. Did you check your GPS on those days to see if she was there?
A. I may have, sir. I may not have.
Q. You don't recall doing it?
A. I don't recall, sir.
Q. So no recordings from the 13th, 14th, the 15th. How about the 16th?
A. No, sir.
Q. No recordings on the 16th. The same kind of sequence was probably still in play. She was in contact with Mr. Soto; is that right?
A. She may have been in contact up there in that area with him and then calling me. What I specifically remember is on the day after, I believe it was the 13th, she called me specifically to say he got rid of the stuff, something to that effect. And then it went on. I said, well, when he has it, give us a call. So she may have called back and forth to me about that, sir.
Q. There's no record of that call in your report; is that right?

A. The call between them two? No, sir.
Q. And there's no recording of that call; is that right?
A. Correct, sir.
Q. The she and he referred to on the 15th was Mr. Soto and Ms. Perez; is that correct?
A. Correct, sir.
Q. So the 17th, there was no taped conversations; is that right?
A. Correct, sir.
Q. And you don't know if Mr. Falette was in touch with Mrs. Perez, do you?
A. Again, I don't know exactly if they were. I tried to conduct all the contact between the two informants. So it would be through me. So I don't think there was any direct contact, sir, that I remember.
Q. You can't be sure.
A. I can't be sure.
Q. The next contact was the 18th; is that right?
A. Yes, sir.
Q. All right. I just want to focus on this again. Now, this happened at various points over the day, am I right?
A. I'm sorry, sir?
Q. This conversation three, this happened over

different times, or is it one call?
A. No. This is one call, sir.
Q. Let's just go through this now.
(Reading:) VM1, that it wasn't enough, but at least to take care of my people, you know.
Now, that's Mr. Falette, correct?
A. Correct, sir.
Q. And there's an acknowledgment, and then they go into the price at the end. We did some of this yesterday, am I right?
A. I'm not sure if we did any of this call yesterday, sir. This was the 18th, sir.
Q. This is the 18th. I'm sorry. So we're going into the price again.
(Reading:) So what are you, you, you going to do? Because I don't, you know, I, because the price, ah, the way you're giving it to me makes it more comfortable, there's no problem with me. So, but now she's telling me that you, that you were coming up with this now, you know, like you don't want to come with, with, with all, with that. Come with that, I have papers for that. So --
That's what it says, right?
A. Yes, sir.
Q. And the "she" is Marie Perez; am I right?

A. Correct, sir.

Q. And there seems to be some part of this conversation that Mr. Falette knows about between he and the she that's not reflected on this page; is that right?

A. Correct, sir.

Q. So there must have been another conversation about what was going to come down, what Soto was willing to be delivering; is that right?

A. Correct, sir.

Q. We don't have a record of that?

A. No, sir. I believe that was relayed through me. What he's saying, what he was told by her might have been told through me, sir.

Q. Do you remember doing that?

A. I remember getting a phone call from her saying that they didn't have all the material, they wanted to bring two and come back with two. I got that information. I relayed it to him. I could have put the two of them in touch, but I don't remember doing that specifically.

Q. You didn't make a record of it in your police report; is that right, of this call you're talking about?

A. No, sir. But I believe I said something to the

effect that we received information that the transaction would be taking place at that time, sir.
Q. There's no recording of that conversation, am I right?
A. No, sir.
Q. Okay. Then Mr. Soto says, (Reading:) Exactly. I'll come back, I'll come back and get you two more.
So you, you, what time you leaving?
What was that?
That's Soto and Falette. So if I understand this correctly, the scenario is bringing two and going to go back for two more?
A. Correct, sir.
Q. Then (Reading:) What time are you leaving? Because I have to --
No, we are already heading over there.
Oh, you're already on your way here?
Yes.
Okay. So how, how was it, the baseball game, how was it to the fifth base?
Exactly, I told you that with --
Two bucks with the fifth base?
I suppose this is some kind of a reference to the two kilograms he's supposed to be delivering; is that right?

A. I believe so, sir.
Q. (Reading:) And, um --
Oh, okay. So --
And I am doing that, that because I don't want to mess around, but really, because for real, man, that's how I do it here but I am just being nice.
I get you.
That's Mr. Falette. That's an exchange between Soto and Falette, I should say.
(Reading:) So how should I say this? So we can open new doors and get to know, so it's easier.
I guess that's Mr. Soto's way of saying he was forming a relationship with Mr. Falette?
A. Correct, sir.
Q. (Reading:) I know, you know, you know, that, you know?
That's Mr. Falette. Mr. Soto is unintelligible at that point.
I know we do business.
He's referring to himself and Mr. Falette?
A. Correct, sir.
Q. Then (Reading:) Exactly.
What you should not --
That's Mr. Falette. Unintelligible sound.
Exactly. When the stuff is mine, I make it

easier when my people come.

He's referring to some people; is that right?

A. Correct, sir.

Q. That's Mr. Soto?

A. Correct, sir.

Q. (Reading:) Exactly. What I don't want is for you to bring me weird people, you know.

No, no, no. I'm going with a girl and myself.

That's Mr. Soto. He's referring to the girl and himself. That's Marie Perez; is that right?

A. Correct.

Q. And Mr. Falette was concerned about weird people. So Mr. Soto is confirming it's him and the girl; is that right?

A. That's what he said, sir.

Q. (Reading:) Well, so you come, you come, ah, well nothing. You come with her, ah, ah, and you come with that, I'll be ready.

Yes.

I have the papers for that, I see.

Okay.

I see my stuff.

Exactly, exactly.

I see that and you, well, I'll send you, ah, ah, you know, to my car, and you go and you pick your stuff

yourself.

That's Mr. Falette.

Then Mr. Soto: Okay.

Get it.

Yes.

Falette: Not to make a big deal, you know, because the other day I had a little trouble with this guy that tried to give me a one-and-a-half, fake.

No, no, no.

So this is more of Mr. Falette's ruse to try to say that someone was trying to sell him some fake drugs, and he didn't want Mr. Soto to sell him fake drugs; is that right?

A. Trying to tell him that he's being a little more cautious, yes.

Q. (Reading:) I bought four.

No, it's cool.

So you're on your way already, for sure?

Yes, yes.

Let me call the guys then -- these guys are Mr. Falette's fictitious guys; is that right?

A. Correct, sir.

Q. (Reading:) Because they wanted, ah, ah, they were asking me for four --

No, but I can bring you two later.

That's Mr. Soto telling Mr. Falette that he would bring him two later; is that right?
A. Correct, sir.
Q. (Reading:) And so you'll come and --
Did you hear?
So you --
I'll leave you that there, and then we'll go back to get you two more.
Okay, so you bring me that and we do business and then you leave, you leave and you bring me that again.
Okay.
Okay, you heard?
Okay.
Okay.
Then he says to you, "He's coming down right now." Am I right?
A. Correct, sir.
Q. Okay. He made it clear to Mr. Falette in this call that it was he and Marie Perez that were coming down to meet with Mr. Falette; is that correct?
A. That's what he said, sir.
Q. Now, that happened on the 18th. On the 18th, did you have surveillance in place watching Marie Perez in Massachusetts?

A. No, sir.

Q. And did you have surveillance on the highways or checkpoints along various places where she would have traveled from Massachusetts?

A. No, sir.

Q. And you know she -- do you know, or can you confirm, I should put it this way, that she arrived alone in her vehicle at the place where you saw her at the McDonald's?

A. Yes, sir.

Q. So from the time that she left Lawrence, Massachusetts and she arrived at the McDonald's, you had no surveillance on her; is that correct?

A. No, sir. Other than the GPS that was in her phone, sir.

Q. Were you checking that GPS during that time frame?

A. I checked it on a couple of occasions that night, sir.

Q. You didn't have constant contact with it; is that fair to say?

A. No, sir. I'd go periodically and check the location so I'd have an estimate of what time they'd arrive.

Q. When they arrived, we went over yesterday the transcript of the videotape of how Enoc Soto -- I'm

sorry, Marie Perez first went to the car and engaged in conversation. She had the telephone in her hand and she shook hands with Ambrioris Falette and spoke to him about the unfolding transaction; is that correct?
A. Correct, sir.
Q. And the next person who made contact with Mr. Falette was Mr. Soto; is that correct?
A. Correct, sir.
Q. And he spoke with him briefly, then went and got the bag and he put the bag in Mr. Falette's car and they drove away?
A. Correct, sir.
Q. Mr. Soto was seen looking in the back of Mr. Falette's car and doing something with that bag, correct?
A. Correct, sir.
Q. Marie Perez, did you watch her after she left Mr. Falette's car? Did you watch where she went, or were you concentrating on Mr. Falette's car at that point?
A. Well, I mean they both backed out like --
Q. When she physically walked away, were you watching her?
A. I was, but I don't remember specifically if she got right into the car or walked around. I'm not sure

exactly what she did, sir.
Q. You don't know if she walked over and spoke to Mr. Mejia?
A. I really couldn't tell you, sir. I don't remember if she did or not.
Q. I want to just break here. I'm done with that transaction. I want to have you draw, if you will, for the jury's benefit, the location of the gun.
A. If this is the steering wheel, sir, and the front driver's seat, and this is the back seat, I would say it's like to this degree, sir, and the gun would have been underneath the seat like that, sir. Does that make sense?
Q. Okay.
THE INTERPRETER: May the interpreter have that last answer read back? I couldn't hear it.
THE COURT: Yes.
(Answer read by the reporter.)
Q. If it's the correct place, it makes sense. Could you draw in the foot pad for people in the back seat to put their feet on?
A. They're not foot pads, sir.
Q. There were no rugs there?
A. There might have been a mat here. I'm not sure.
Q. You can't recall?

A. I don't recall.
Q. This bottom square here is the back seat?
A. The back seat, sir.
Q. This is the front seat?
A. Front seat. I believe there was a console.
Q. Would you draw the console in, please? Okay. What was on the console?
A. It might have been an armrest or something. I really don't recall.
Q. An armrest? Okay. Where was Ms. Perez sitting when you observed her in the car?
A. Right here, sir.
Q. Can you just mark that "Ms. Perez." Where was defendant -- I should say Mr. Mejia sitting?
A. Right here, sir.
Q. Okay. Now, when you saw him enter the car with Ms. Perez, the red car --
A. Correct, sir.
Q. -- did he come in from the passenger side this way in?
A. I don't remember. Like I said, I was moving, so at one point he's here and another point he's getting into the car. I don't remember if he went here, if he went around the car, but at one point I remember seeing him get into the car, sir.

Q. You saw him get into the car; is that right?
A. Yes, sir.
Q. Just to bring this diagram forward a little more. The cars were parked one, two, three; is that correct?
A. Correct.
Q. The Perez car being in the middle. And this, I think, was the exit from McDonald's?
A. Yes, sir.
Q. He came out this door from McDonald's, stood in front of the Perez car, and somehow got around into the passenger front seat; is that correct?
A. Correct, sir.
Q. That's the only movement you saw him do?
A. I remember him standing around here, walking back and forth in front of that car on that sidewalk area. I think I remember seeing him walk a little bit one way or another. Again, I was moving, but I don't remember seeing him get into the car, sir.
Q. Very well.
MR. WEST: Could I just have one moment?
Q. Now, you talked yesterday about talking to Mr. Mejia at the police station. And you had first talked with Mr. Soto at the police station, isn't that correct?
A. Correct, sir.

Q. And when you spoke to Mr. Soto, you spoke to him in Spanish; is that right?
A. I don't speak Spanish, sir. I spoke in English.
Q. You don't speak Spanish. Detective Perez was with you; is that right?
A. Correct, sir.
Q. And I believe you said -- first of all, let's just go back. All of the conversations that were recorded between Marie Perez and Mr. Soto and Mr. Falette were entirely in Spanish; isn't that right?
A. Correct, sir.
Q. There was never any use of English; is that correct?
A. Correct, sir.
Q. Okay. And at the scene of the arrest, you had Detective Perez present there because he's a Spanish-speaking officer; is that right?
A. Yes, sir.
Q. And you needed him to be able to understand what these people were saying at various points during the unfolding incident; is that right?
A. Yeah. I wanted him there to listen while we made the arrest so he could interpret what was going on over the KEL, sir. That was the main reason I wanted him there.

Q. So the people he interpreted over the KEL were Marie Perez, Ambrioris Falette and Enoc Soto; is that correct?
A. Correct.
Q. And he'd relate whatever they said to you?
A. Correct, sir.
Q. Okay. And then you took these people into custody, and you went to the Providence police station; is that right?
A. Correct, sir.
Q. And we know that you didn't record any of your conversations with these people that you arrested on that night; is that right?
A. Correct, sir.
Q. And you could have, if you wanted to, because you have used various types of recording equipment in this case, such as a mini-digital recorder; is that right?
A. Correct.
Q. You had a digital recorder that produced a storage medium about the size of a match book, maybe; isn't that fair to say?
A. I don't know what you mean by that.
Q. Maybe a little bit bigger?
A. I'm sorry, sir?
Q. The VHS recording that we all watched yesterday

was a copy of a recording you made from a machine that stored it on a mini-DVD disc; isn't that right?
A. Correct, sir. That was the component that was in the vehicle, sir, yes.
Q. Okay. That works with that particular camera that was secreted in the vehicle; is that right?
A. Correct.
Q. It's pretty high-tech stuff, that kind of equipment?
A. I believe so, sir.
Q. It's small, it's compact, and you can't see it?
A. The unit itself is a big boxy unit that actually records that, sir. The camera itself is tiny.
Q. The camera is in the vehicle?
A. It's a hidden camera, sir. Yes, sir.
Q. And the recording device is not in the vehicle?
A. No.
Q. That's remote?
A. That's a remote, yes, sir.
Q. So the camera is transmitting --
A. Correct.
Q. -- its images to the recording device. It all ends up on this little compact disc, and that was transferred to the VHS we all watched?
A. Correct, sir.

Q. So you've got that kind of equipment?
A. Yes, sir.
Q. You also used a three-way transmitter from your own home, we talked about that yesterday, the NEXTEL feature where you were able to record that sequence of events; is that right?
A. Correct.
Q. And then you were able to download it to a wave file on the computer and play it later. You made the wave file part of your paperless case file, correct?
A. Correct, sir.
Q. Downloaded it to the computer in the office?
A. Correct, sir.
Q. Then you used a digital recording device at the office that you let Mr. Falette use; is that correct?
A. Correct, sir.
Q. And you were able to record the telephone calls that took place at your office between Ambrioris Falette and Enoc Soto and Marie Perez?
A. Correct, sir.
Q. Then you also had this body wire or -- what was the name of that thing?
A. KEL.
Q. A KEL. A body wire, a KEL, that was on Mr. Falette the night of the incident that recorded --

well, it picked up and I suppose transmitted, is that how it works?
A. Correct.
Q. It doesn't have an internal recording device, does it?
A. Correct.
Q. So it's transmitting to a piece of equipment that you have in your car or truck?
A. Correct.
Q. Everything that he said was recorded. We all heard it.
A. Correct.
Q. So you have numerous types of recording devices at your disposal; is that fair to say?
A. Correct.
Q. When you want to record something, you told us yesterday that you like to record things that happen between informants and suspects because it adds corroboration, correct?
A. Correct, sir.
Q. And it can be verified later what transpired; is that right?
A. Correct.
Q. So at those times when it's important for you to record things, you record them; is that right?

A. For the most part.
Q. But only you decide what gets recorded and what doesn't get recorded; is that right, when you're conducting the examination?
A. The circumstances dictate what gets recorded and what doesn't, sir.
Q. Well, conscious decisions dictate what gets recorded and what doesn't, isn't that fair to say?
A. Along with circumstances.
Q. Whatever the case may be, at this point you did not record the statements of Mr. Soto and Mr. Mejia that took place at the Providence police station; is that fair to say?
A. No, I didn't, sir.
Q. Okay. And you've been to the Providence police station before. You've conducted other investigations there in collaboration with your brother officers at the Providence police station; isn't that right?
A. Yes, sir.
Q. And they provided you resources in the past, haven't they?
A. Yes, they have, sir.
Q. They provided you personnel. Detective Colanduono's a Providence policeman, right? He worked with you on this case?

A. Correct, sir.
Q. Detective Perez was not a Providence policeman, or he was?
A. He is a policeman, sir.
Q. He's a Providence policeman?
A. Yes, sir.
Q. Is he a patrol officer or detective?
A. Detective.
Q. I'm not familiar with the new public safety building, the brand new building up on the highway in Providence, but the old building used to have a whole floor dedicated to the detective squad. What's it look like nowadays?
A. They have a large room. I'm not sure exactly. I primarily stay in the narcotics unit.
Q. You're primarily in the narcotics unit. So I assume that the new building has been outfitted with all sorts of new equipment to help the Providence police accomplish their mission; is that right?
A. I believe so, sir.
Q. And I assume that you've utilized some of their resources to do that; is that correct?
A. On occasion, sir.
Q. Providence police have been the spearhead agency on some of your investigations; is that right?

A. To a degree, sir, yeah.
Q. And they provide you perhaps with some logistical support, surveillance equipment, body wires, recording devices?
A. No, sir. We more or less would supply them with stuff. I don't utilize their equipment. Probably on any occasion -- I think one time I've used their equipment. Most of the time we bring our own equipment, sir.
Q. Most of the time?
A. Yes, sir.
Q. So you're responsible for supplying the necessary equipment to perform your job; is that right?
A. Correct, sir.
Q. Okay. But have you ever been refused by the Providence police to provide assistance if you wanted it?
A. No, sir.
Q. Okay. So, Agent Naylor, you've testified before about what happened with regard to your conversations with the two people you arrested that night, isn't that correct?
A. Correct, sir.
Q. In your prior conversations with defense attorneys about what happened with specifically Mr. Mejia, do you

remember doing that?
A. I remember it, sir.
Q. And I think you were examined by Ms. McElroy; is that correct?
A. Yes, sir.
Q. And when you were examined by Ms. McElroy, you were telling the whole truth, isn't that correct?
A. Yes, sir.
Q. Because you would have been sworn in, in that particular setting; is that correct?
A. Correct, sir.
Q. And at that time, when you were sworn in, did you tell her that the conversation with Mr. Mejia was mainly in Spanish?
A. Something to that degree. I believe I said it was more -- I believe some type of my wording was it was more in Spanish than English, sir, and not as fluid as the other conversation with Mr. Soto.
Q. So I think your exact answer, and you can tell me if you don't agree with this, was that (Reading:) The interview went, this was in more so in Spanish than Mr. Soto's, we asked him some questions, he started being evasive, and again, I believe I told him that the other guy was a cooperator. I'm going to say this was more in Spanish being interpreted through Detective

Perez than Mr. Soto.

Isn't that fair to say?

MS. BECKNER: Objection, your Honor. Improper impeachment. I would like to know what page.

(Side-bar conference.)

THE COURT: This stuff happens all the time. I think the way you're supposed to do this is you ask him a question, whatever it is, was the interview in Spanish, was it in English, he says whatever he says. Then if it's inconsistent with the prior statement, go through the prior statement. Were you under oath? Were you asked this question; did you give this answer? Okay?

MR. WEST: I know, your Honor. I just jumped ahead.

THE COURT: Okay. Just do it methodically the right way.

MS. BECKNER: What page?

THE COURT: I want to know if you're going to use a prior statement, I want the statement to look at. She may have a context. She might want to put it in a context.

MS. BECKNER: If I can also ask, your Honor, until it's been established there's any inconsistency, I think it's improper to show it to the jury unless

it's actually established.

THE COURT: Right. That's why I want to look at it. She has the opportunity to look at it. It happens all the time. People want to put in prior testimony that's not really inconsistent.

(End of side-bar conference.)

BY MR. WEST: (Continuing)

Q. Well, Agent Naylor, did you tell -- do you recall telling Ms. McElroy whether you spoke to the defendant in English, in part?

A. Yes.

Q. What did you tell her about that?

A. I believe telling her that I spoke mainly in -- I don't know the exact verbiage I used, sir, but I know I told her that I would speak in English, and if it was a simple question he would answer. If it was a more complicated question, he would ask Detective Perez. Something to that effect, sir.

Q. Did you give any recounting when you've spoken previously about this, about the questions you posed to the defendant about going to Chicago, to Ms. McElroy?

A. I don't believe I did, sir.

Q. You didn't tell her about that when you were being examined previously about this?

A. Again, I don't know if, when I was asked that

question on direct, I don't know if he understood that. That's why I had to have it interpreted. So I thought I was only allowed to say what I remembered specifically, sir. It was like a -- it was a ten-minute conversation, and I asked a few other questions, if you understand? But when she was asking those questions, she didn't say give me everything you asked in that interview. I don't believe she did every question. So that's what I meant.
Q. So if she didn't ask you a question, you didn't tell her everything the defendant said at that ten-minute interview that you had with him?
A. I tried to answer all her questions, but if she didn't ask me that question like specifically, you know, did you ask him any other questions, I couldn't answer it, sir, no. I couldn't just blurt out what I wanted to say.
Q. Now, you said yesterday, if I heard you correctly, that Mr. Mejia said something about being there to make a deal. Do you remember saying that?
A. I don't believe I said he was there to make a deal. He was there to make a deal, sir. Do you understand?
Q. I don't understand. Could you explain that?
A. When I'm saying "he," are you referring to

Mr. Mejia was there?
Q. Mr. Mejia. You had, what I believe you uttered yesterday was Mr. Mejia had said to you that he was there to make a deal.
A. I'm sorry, sir. I don't believe I said he was there to make a deal. When I said "he," I think I was referring to Mr. Soto, sir.
Q. Mr. Soto was there to make a deal?
A. To make a deal. I think something to the effect, he assumed he was making a deal. Something to that effect, sir.
Q. You're clear that he said that to you in English?
A. I believe so, sir. Yes.
Q. When you say you believe so, is it true that he said it in English or you just don't really remember?
A. Well, I do remember some things in English, sir, and some things in Spanish, and it gets kind of a little bit confusing because I trust so much what Mr. Perez says that if he says that Mr. Mejia said it, it kind of gets in my memory that it was said, sir. Does that make sense to you?
Q. So you don't have an accurate memory, as you sit here today, as to what Mr. Mejia actually said to you in English. Is that what that explanation means?
A. No. What I'm saying is the things I specifically

remember on direct like protect, assume, watch his back, those are the things I specifically remember. There are a lot of other things, but again, as I was asked on direct, I don't want to say that I remember the things because there's a lot that I remember, sir, but again, those are the specific things I specifically remember that I stated on direct.
Q. This part about the deal, you can't remember that as actually having been said to you in English?
A. I do believe that was in English, sir, at that time.
Q. Well, that would have been a critical inquiry Ms. McElroy would have made to you at the prior hearing; isn't it fair to say?
A. I think it's fair to say. I think she said something -- I think I said the words "assumed he was here to make a deal."
Q. You assumed he was there to make a deal.
A. I believe he said "assumed." I remember the word "assumed," and I looked to see if that was the actual word, something to effect, sir.
Q. All right. Now, Agent Naylor, when you prepare to testify at any proceeding, you go over everything you said before; isn't that fair to say?
A. I try to, sir.

Q. You read over what you said to Ms. McElroy; is that right?
A. At one point. Yes, sir.
Q. You read over your police report, isn't that right?
A. Yes, sir.
Q. Okay. Now, it's fair to say that in this statement you gave to Ms. McElroy that you did not say that the defendant told you he was there to make a deal, or that he said anything about a deal; isn't that fair to say, that you didn't say that in this transcript?
A. I really couldn't say. You'd have to let me see the whole transcript, sir.
MR. WEST: Let me let you see it. I'm going to see if I can provide a copy to the Court, as well. Your Honor, would it be satisfactory if I put it on the screen and you can view what I have?
MS. BECKNER: I understand, your Honor, that at this point this won't be published.
THE COURT: Right.
Q. I'm not asking you to read this to the jury. I'm asking you to read it to yourself. If you can see it, okay. If you want me to move it up or down, just let me know.

MR. WEST: We're looking at page 13.
A. Is that the top, sir? Okay. Move it up a little bit, sir. I've read up to line 15 it looks like, sir.
Q. I may have the wrong page, Agent Naylor. Hold on a moment. I'm going to take that away for a moment, Agent Naylor, while I get my pages straightened out here.
I believe I was on the right page. If you could just have a look at it again.
A. Could you move that up a little, sir? I have that, sir.
Q. Now, I'm going to show you the next page. When you want me to push it up, let me know.
A. You can move it up a little bit, sir. I've got that part. Is there anymore?
Q. I think that's about it. Would you like to see more to refresh your memory?
A. If there's a couple more pages on her direct, sir.
Q. I'll just give you the next page.
A. Could you move it up a little bit more, sir? I've got that part, sir. Is there another page? Is this the direct --
THE COURT: We're not going to have a dialogue here on this. At this point, ladies and gentlemen, we're very close to when I want to take a morning

break. I'm going to have you take your break now. The snacks should be here very shortly, I hope. Ron, are they on the way?

MR. FORTES: Eleven.

THE COURT: Eleven? Let's see if we can get them right away. I meant for 10:30. I should have said that. If not, you're just going to go hungry this morning. Sorry about that. I'm going to send you out for 15 minutes. All right?

Charlie, take them out.

(Proceedings out of the presence of the jury as follows:)

THE COURT: What are you doing here? This is not appropriate what you're doing. It's just not appropriate. I can't understand what you're trying to do.

MR. WEST: Your Honor, I'm trying to go over a prior inconsistent statement, and he's asked to read the transcript to see if he can refresh his memory about what he said before.

THE COURT: Those are two different things. This always happens. Prior inconsistent statement is different from refreshing recollection. What is inconsistent about this statement?

MR. WEST: The statement previously in this

transcript, in the Spanish version that he was talking about, does not talk about the deal. Just said he was there to protect him. Nothing about the deal.

MS. BECKNER: Your Honor, I object because I don't think Agent Naylor testified that the defendant said he was in a deal. So I don't see --

THE COURT: I agree. That's what I'm trying to get at. So my question for you is, what is the inconsistency that you believe this prior testimony impeaches?

MR. WEST: Yesterday he said that Mr. Mejia was there because he was protecting Mr. Soto because he was making a deal.

THE COURT: You just asked him that question, and he said, I don't believe I said that yesterday, and if I did I was mistaken. I don't think he ever said anything of that nature. I think he said, this is Agent Naylor, I think he said he was there to watch his back, watch out. Made some references to terms like that. He corrected -- he said he didn't believe he said it, and if he did, he certainly didn't mean to say it, so he corrected that.

MR. WEST: If that's what he said, I'm satisfied, your Honor, but that's --

THE COURT: There's no inconsistency there

between what he just testified to and what you're putting up on the screen in this transcript.

MR. WEST: Your Honor, I thought he was maintaining what he said yesterday. He was explaining it to me. If I'm mistaken, then I don't need to go through this exercise, but I'm still operating under the assumption that yesterday he made an inference to the jury that the man was there to protect because he knew about a deal. And, of course, that's an element of this offense, a critical element.

THE COURT: You can clarify that with the witness when the jury comes back on and ask him that question. But from the bigger picture, the way this is supposed to happen is you ask a question, if you think his testimony is inconsistent with something he said previously, then I should have the transcript of whatever it is you think you will be referring to, as should the Government's counsel, refer me to the page and the lines, let me read it. If I agree that it's inconsistent, I then will allow you to ask the question which goes: In a prior proceeding, did I, or did Ms. McElroy ask you the following question and did you give the following answer. Then read the questions and answers. And if he says yes, then it's yes. And that's it.

MR. WEST: I understand that, your Honor. But the witness told me he couldn't remember what he said to Ms. McElroy and he wanted to see what he said. So I let him.

THE COURT: Well, you kind of skipped over it. You didn't do the ask the question, give the answer. And if he says, I don't remember, then you can show him the cover of the transcript and ask him if he remembers being in that place at that time and giving that testimony, and go through the whole drill with him, but you're kind of sliding through all these things, refreshing recollection and impeaching at the same time, and it's getting messy. And it's not -- it's not appropriate, but it's also -- I think the jury is getting frustrated with it. So that's why I wanted to send them out and deal with this.

MR. WEST: Yes, your Honor.

THE COURT: The second thing I want to deal with on this break is the issue of Officer Perez, and you had suggested about a Daubert hearing on that. Is he available, Officer Perez available?

MS. BECKNER: Your Honor, I think he'll be here at lunchtime is what I told them, just in the hopes we might be able to do whatever the defense counsel wanted to do at lunch.

THE COURT: Well, my thinking on this, I had the opportunity to go back over his testimony from the suppression hearing, and I think all of this was really covered in the suppression hearing. I doubt there's any more that you would cover. And I think I know what my conclusion is going to be about the admissibility of his testimony. And it seems to me that the way to deal with this is to allow him to testify and then also -- and then you will cross-examine him on his translation skills, and then I think it may be appropriate for you to call in your case the expert translator that you have suggested to talk about issues of translation and the difference between casual -- whatever it is she's going to testify to, casual translation versus, you know, court-trained translators, because it seems to me all of this really goes to the weight that the jury gives to the quality of the translation.

MR. WEST: I'm satisfied to do it that way, your Honor.

THE COURT: I think that's the appropriate way to do it. If the Government wants to challenge the qualifications of the person you put on, then they can challenge it, but it sounds like from what you've described that she's a qualified translator, trained.

MS. BECKNER: I have Ms. Torres' resume. I

don't think I'd be very successful in challenging her qualifications.

THE COURT: You probably wouldn't be. All right. I think that's the way to handle it. I don't think we really need another Daubert hearing. Consider the motion to suppress as the Daubert hearing on that. When Agent Naylor is done, if the Government wants to put Perez on, then we'll deal with it in your case-in-chief. You put your expert on.

MR. WEST: Yes, your Honor. I agree, it should have been in a motion to suppress would have been the better place to do that sort of work. But you covered --

THE COURT: It all got covered, I mean, just looking back over the transcript. So we'll take -- we're going to take a few extra minutes because I'm sure they're trying to find those snacks.

They're on their way? All right. Good. Probably another ten minutes or so.

(Short recess.)

(Proceedings in the presence of the jury as follows:)

THE COURT: Mr. West.

Q. So Agent Naylor, just to go back where we were a moment ago, I believe that I may have misheard you.

You were not saying that the defendant stated to you that he was there to make a deal?
A. Correct.
Q. Okay. Agent Naylor, I want to call your attention to the statements that were given to you about the gun that you've related to the jury. Now, do you recall whether those were in English or in Spanish, precisely?
A. Again, some were in Spanish and some were in English, sir.
Q. Okay. And you've been clear that the Spanish was translated to you by Mr. or Detective Perez?
A. Correct, sir.
Q. You can't recall quite which is which; is that fair to say or not fair to say?
A. Well, some I can recall and some I can't, sir. Some things I can recall.
Q. Okay. So, for instance, with the transaction about -- I should say the conversation about where he got the gun from, was that in Spanish?
A. I remember some of that being in English, sir.
Q. Okay. So was the question put to him in Spanish or was it put to him in English?
A. Again, I would put the question to him, and if he appeared to understand it he would answer it right away. So I remember posing the question, where did you

get the gun, something to that effect. Where did you get the gun, or we found the gun in the car. Where did you get it. He said Enoc, something to that effect, sir, gave it to him at McDonald's, something to that effect, sir.
Q. That was in English?
A. That was in English. The shorter questions that I would ask, he might have responded right away. Then if I asked a longer question, I think then it would be interpreted. Sometimes he would answer the question before Andres Perez could start the interpretation. Do you understand what I mean?
Q. Okay. Now, you didn't know anything about the defendant's educational background, his ability to speak English, or anything of that kind; is that right?
A. No, sir.
Q. This is the first time you've ever spoke to him, right?
A. Right, sir.
Q. You just asked him straight out in English where did you get the gun, and he said Enoc?
A. Something to that effect, sir.
Q. But he didn't elaborate on that? He didn't get into if he personally had the gun in his possession, in English, did he?

A. Well, again --
Q. That would have been a longer answer, is my point?
A. No. I don't understand that question. Could you rephrase that, please?
Q. Yes. You said where did you get the gun; he said Enoc?
A. Correct.
Q. That's a short answer?
A. Correct, sir.
Q. You said prior to that, that they found the gun in the car, where did you get the gun, and you said he said Enoc; is that right?
A. Something to that effect, sir, yes. I don't know if it was directly in that order. I think it was -- there was a different order of the conversation but it was something about, you know, the gun, where did you get it, was a question. When did he give it to you was a question. He said at the McDonald's. That was a specific question that I remember in English, him saying at the McDonald's.
Q. Okay. How about the physical holding of the gun, that was done in Spanish?
A. Again, I don't know if I asked a physical question were you holding the gun. I don't think I asked him that specific question, sir.

Q. You didn't ask him that?
A. No, sir.
Q. And you didn't ask -- you were asking the questions, Detective Perez was just translating?
A. Yes, sir.
Q. Okay. So the short answer he gave was Enoc, and you didn't ask him if he was holding it? I'm just trying to get it straight in my mind.
A. I believe so, sir. That's a fair summary.
Q. Okay. Now, Detective Perez -- Detective Naylor, when you met with Mr. Mejia in the police station, you had come from the scene where he was arrested; is that right?
A. Yes, sir.
Q. And you went down to the Providence police station in one of the interview rooms, I take it; is that right?
A. Correct, sir.
Q. And how long was he in that interview room?
A. Roughly about -- he was in there. I don't know how long he was in there. How long that I was there with him, is that what you mean?
Q. If you know how long he was in there?
A. He could have been sitting there maybe 15, 20 minutes, a half hour before I got there, sir.

Q. You were in there for how long with him? I think you said ten minutes?
A. About ten minutes.
Q. Now, you didn't write your report about what he said to you until about December 20th, isn't that right?
A. I believe so.
Q. You didn't take a verbatim account of what he said on the day that he said it; is that right?
A. Correct, sir.
Q. So you made your report from memory; is that right?
A. Correct, sir.
Q. And Detective Perez, the best you know, didn't take any written documentation of what he said that night, either?
A. No, sir.
Q. Thank you, Detective. Now I want to turn your attention to compensation for Marie Perez. For her actions, activities in this investigation -- first of all, Ms. Perez was cooperating to assist her husband; is that correct?
A. Correct, sir.
Q. And she was what you had described previously as a third-party cooperator; is that correct?

A. Correct, sir.
Q. Okay. And up until that time, she had never cooperated before that you know about; is that right?
A. Correct, sir.
Q. And it appears that she was operating under the impression -- strike that.
At some point in time, you had to have a discussion with her about what she could expect from her cooperation; is that correct?
A. I had, yes, I had several discussions with her, sir.
Q. And one of those discussions was after the arrests were made; is that correct?
A. Correct, sir.
Q. In this case?
A. Correct, sir.
Q. That discussion was on January 20th, 2007, right?
A. Correct, sir.
Q. What did you have to tell her about what she could expect as a result of her cooperation on that date after she had already cooperated in this arrest?
A. I had to tell her a number of things, but the one thing I wanted to get across to her was the specifics of what she was getting, either a reduced sentence in her husband's case here, or the case in New York would

have been removed, sir. I believe that's what it was.
Q. And did you have to emphasize with her anything about her husband? Did you have to go over any material with her about her husband getting out of jail?
A. Yes. I had to let her know that her husband wasn't getting out of jail. The way that conversation -- the reason that conversation took place is the day before she had called me and said, do you think my husband is going to get out now, or something to that effect. It was so contrary to what I had ever told her before, I had told her to come into the office, we'll talk about it the next day.
Q. Okay. And when you did see her the next day, you explained to her how things work; isn't that right?
A. Correct.
Q. What were the two benefits that you outlined were possible for her husband as a result of her actions?
A. Either I believe it was called a 5K, a downward departure on her husband's sentence here, or the dismissal on the charge up in the Western District of New York, sir.
Q. And now, the Western District of New York, that's where the other case was pending; is that right?
A. Correct, sir.

Q. Okay. And did you have any contact with prosecutors in the Western District of New York?
A. None, sir.
Q. How was that going to take place that she would get that benefit?
A. I explained to her that the U.S. Attorney would contact them. I believe at some point, I don't know if it was on the 20th, I said they weren't getting back to the U.S. Attorney, so I'm not sure. I'm not sure if that was the day I said that or not, sir.
Q. And if she did not see that as a result in her husband's case, you explained the part about the 5K; is that right?
A. Correct, sir.
Q. What is a 5K, Agent Naylor, to the best of your knowledge?
A. It's a downward departure from whatever your sentence would be by the sentencing guidelines, sir.
Q. So the sentence that her husband would get, the Government would bring a motion, for example, to have that sentence reduced?
A. I believe so. And they bring it in front of the judge, sir.
Q. Now, this was in January 20th of 2007, which would have followed -- you had that discussion with her which

would have followed her cooperation in this case with Mr. Mejia, Mr. Tejeda; is that right?

A. I'm not sure -- you mean it was after the cooperation?

Q. Yes.

A. It was after the cooperation.

Q. So it's fair to say that she was still laboring under some apprehension or some conviction that her husband was going to be released as a result of what she said?

MS. BECKNER: Objection. Calls for speculation.

THE COURT: He may answer it, if he knows.

A. Yes, sir. I believe that some in the -- the secretary in the law office where her husband was had told her that -- or maybe he'll get out on bail, or something to that effect. And that totally threw me off because I never assumed anything like that would happen. I never told her that. From what I got from the conversation was that was the first time she had heard that, and she had some false hopes that he would get out. I corrected those on the first chance I got, sir.

Q. I understand.

MR. WEST: Your Honor, may we approach at this point?

(Side-bar conference)

THE COURT: Yes. I've got to regain control over the music.

MR. WEST: Would this be an appropriate point for me to inquire, or I guess I'm up here telling you I intend to inquire about what other material he covered with Marie Perez at this point, and would get into rules he set down for her activities, vis-a-vis her contact with Ms. Torres.

THE COURT: I'm really struggling to see the relevance of that and how it has been brought up, and how anything that was done on direct could get you in the door for that. I just don't see it. I mean, obviously, you can cover within whatever else she was instructed as far as her conduct as a cooperator. That's all fair game, it seems to me, but then it's that next step that I just don't see it.

MR. WEST: I may ask a question just to preserve a record here that I tried to go down that road. Is that fair?

THE COURT: You can make an offer of proof right now.

MR. WEST: So that's what this is, your Honor, that I would offer as an offer of proof I would show that this detective used specific instructions to Marie

Perez that she should not have contact with the woman who introduced her to Detective Naylor, Lisa Torres; that she should not have contact with her regarding her actions in this case, and that we know from the telephone logs that have been produced by the Government that she was in daily contact with Ms. Torres at times and dates when important events were unfolding in this case in terms of arrangements for the sale of cocaine, the time and place of meetings, and the critical arrest period. So I would offer that as proof of its relevancy and ask to be able to ask those questions.

THE COURT: Okay.

MS. BECKNER: Can I, just for the record, just put something on there, too, your Honor?

THE COURT: Go ahead.

MS. BECKNER: And maybe Mr. West made this clear, however, the prior testimony in this case has been not that Detective Naylor has said that she couldn't have contact with Lisa Torres. Simply that he did not want Lisa Torres involved in this case. So maybe Mr. West said that. If not, I want to make it clear for the record.

MR. WEST: In the August 27th transcript, I believe he says no contact. I can go get that if you

want to see it.

THE COURT: All right. There's been more than enough record about this, and you can refer to it as needed, either of you can, but I'm ruling that you're not going to be allowed to go there.

MR. WEST: Thank you.

(End of side-bar conference.)

Q. Now, Agent Naylor, just referring your memory back to what was paid to Ms. Torres, do you have a memory of what payments were made to her?

A. I'm sorry. Ms. Torres, sir?

Q. I'm sorry. Ms. Perez.

A. I believe she was given an amount of money, and I'm not sure if it was 2,500 or $3,000 for relocation in this case, sir.

Q. Did she receive any payments for cooperation?

A. Not in this case, sir, no.

Q. When was the cooperation payment made to Ms. Torres, the one you just referred to? Ms. Perez. I'm sorry, again.

A. I believe that was on the 20th, sir.

Q. That would have been the 20th of December?

A. No. That would be the 20th of January, I believe, sir.

Q. 2007. So that follows the date --

A. The relocation money, sir.
Q. And when was the sentencing conducted for her husband wherein he received the benefit that you spoke of, do you remember?
A. I don't remember, sir.
Q. It was in 2007 though; is that right?
A. I believe so, sir.
Q. Sometime following that?
A. I believe so, sir.
Q. Was it -- just to be clear on how that unfolds, that's a situation where the judge has to listen to the Government's motion; is that correct?
A. I believe so, sir, yes.
Q. Were you present for the sentencing?
A. Actually, I don't recall if I was there or not. I usually go to all the sentencings so I probably was, but I don't specifically recall it, sir.
Q. At any rate, it was sometime in 2007; is that fair to say?
A. Correct, sir.
Q. And your memory is that she received only 2,500 for cooperating in this case?
A. Well, again, that was not for cooperating. That was for relocation, sir.
Q. What's the difference?

A. The difference is the Drug Enforcement Administration, if someone is working on a reduced sentence, they don't pay people for their cooperation in that case, but her expenses, we had to move her, so they gave us money to move her, to relocate her, sir.
Q. Are you familiar with all the payments made to her or could someone else have made payments to her?
A. I'm familiar with most of the payments. Someone else could have made payments, sir, but I'm familiar with most of the payments. We only pay for expenses or relocation, sir, on this specific case.
Q. So you did not pay, for example, services, information or services; is that right?
A. Not on this case, sir. She wasn't paid for information services on this case, sir.
Q. Following this case or -- strike that. Prior to this case, had she worked as an informant for the DEA?
A. No, sir.
Q. Following this case, she's subsequently worked as an informant; is that right?
A. Yes, she has, sir.
Q. Okay. And that's not to benefit her husband, is it?
A. No, sir.
Q. She's just doing this now for money; is that

right?
A. To a degree, sir, yes.
Q. Well, is she getting paid?
A. Yes, sir.
Q. And how much has she been paid for her services now?
A. I couldn't tell you the exact amount, sir, but I'm not sure.
Q. But you know that she's received some payments subsequently?
A. Yes, sir.
Q. And she's still performing that kind of work now for the DEA?
A. She's attempting to, sir.
Q. She's not expecting now to receive any benefit for her husband; is that fair to say?
A. That's fair to say, sir. She's been made quite clear that her husband will get no more consideration for anything she does, sir.
Q. Okay. Now, with regard to Ambrioris Falette, he's received compensation, isn't that right?
A. Yes, sir.
Q. Do you know how much compensation he's received?
A. In total, sir?
Q. Yes.

A. I believe since he's been cooperating, he's been cooperating for several years now, it's over $60,000, sir.
Q. Did you provide a table showing the payments made to Mr. Falette over time in this case?
A. I didn't provide a table, sir, but I provided the amounts at one time, sir.
Q. Okay. And it's fair to say that -- so you didn't work on preparing a table of his compensation; is that right?
A. I didn't myself, sir.
Q. But you do know that he's been compensated over $65,000; is that fair to say?
A. I knew it was over 60. If you say 65, sir, I believe that sounds right.
Q. Let's just say over 64,500. That's the last figure I have in front of me. It's more than that; isn't that correct?
A. Correct, sir.
Q. And those payments were made over time, correct?
A. Correct, sir.
Q. Do you recall when he first started?
A. I don't recall the exact time when he first started, sir. Shortly after I got to DEA.
Q. Could it have been March of 2005? Does that sound

right, or could it be before that?
A. Sounds fair, sir.
Q. He would generally be compensated in smaller amounts; is that right, like 300 one time, 500 next time, that sort of thing?
A. It depends on the actual deal. It depends on what's going on, what type of information services he provides, if he's an active participant. There's numerous different ways of how we calculate a payment.
Q. It depends on the level of work that he's doing in that particular job?
A. And the level of the case.
Q. Does he have other employment or is this his job, basically?
A. He's had other employment at some time, sir, but I'm not sure of his current employment situation.
Q. He hasn't received that visa to stay in the country yet, has he, that he's looking to get?
A. No, sir.
Q. He still wants to, though?
A. I believe so, sir, yes.
Q. Also, on -- just bear with me one second, Agent Naylor. He's also worked for the ATF; is that right?
A. Correct, sir.
Q. And are you familiar with their compensation

policy?
A. To a degree, sir.
Q. Okay. You know he's received payments from the ATF; is that right?
A. Yes, sir. There's an agent assigned to the DEA and that agent works with us and he's paid him, sir.
Q. What's his name?
A. Jaime Schiffer, sir.
Q. Jaime Schiffer would be in charge of paying Mr. Falette for his work with the ATF?
A. Correct, sir.
Q. Would he be familiar, likely, with the compensation program that they use?
A. Correct, sir.
Q. It's not the same as the DEA; isn't that fair to say?
A. I couldn't tell you their policies, sir.
MR. WEST: May I have a moment, your Honor, please?
THE COURT: Yes.
MR. WEST: Thank you, your Honor. I have no further questions for Agent Naylor.
THE COURT: Okay. Thank you very much. Ms. Beckner, redirect.

REDIRECT EXAMINATION BY MS. BECKNER

Q. Agent Naylor, several times in the transcript, the name Jose appeared. Who was Jose?

A. That was the name we had told Ambrioris Falette to give. That was the name he had given out, that his name was Jose.

Q. Why did you instruct him to use an alias?

A. His name isn't that quite common so I didn't want someone to put that name on the street that it was him, ma'am.

Q. Agent Naylor, in your exhibit book, could you turn to transcript 13A, page six? And the pages begin on page five, so it's really the second page. Do you see in there that the third time that the informant VM1 speaks he says something about a baseball game, and then to the fifth base, and the next time the informant speaks he says two bucks with the fifth base. What is your understanding based on your experience that that code means?

A. Again, I'm not sure if he's saying 20,500 at that one to the fifth base. I'm really not sure but that's what I would assume by the text of that conversation, 20,500 as the price, because prior conversations that was the price. That's what I would get out of that, ma'am.

Q. If you could turn to the next page, page seven. You see in the middle of the page once again the informant speaking to Soto and saying, "I don't want for you to bring weird people." Do you know what that is a reference to?
A. Yes. We try and have the informants see if they're bringing anyone else, if they're bringing more people so we can let surveillance know.
Q. Why?
A. Because we don't want them to show up with extra people, counter-surveillance, things of that nature, ma'am.
Q. Why is that a concern for you?
A. Again, as we're trying to control all the elements, we want to know what to expect and what to tell surveillance agents on the scene. So we try and get them to get as much information, so if we tell them at that point, yeah, bring in a friend, or something to that effect, ma'am.
Q. Now I want to direct your attention to the night of the 18th on the scene at McDonald's in the parking lot. You testified that you observed Mr. Soto speaking to the informant, the male informant, in the DEA car and then leaving to get the black suitcase; is that right?

A. Correct, ma'am.
Q. During that period of time, between the time he left the informant's car and returned to it with the black suitcase, did you observe any contact between Mr. Soto and the defendant?
MR. WEST: Objection.
THE COURT: Grounds?
MR. WEST: Exceeds the scope, your Honor.
THE COURT: Overruled.
A. I didn't see any contact directly, ma'am, no.
Q. Now, you've drawn a picture up there of where the firearm would be located. If you remember, where was the handle of the gun, on your drawing?
A. That would be known as the grip, would be hanging outside of the seat, just below -- if you're looking straight down, you can almost see it that way, ma'am.
Q. Could you draw where the handle would be?
A. Yes, I think I did in a small degree right here on the board.
Q. Could you tell which direction the handle was pointing?
A. The gun itself was pointing towards the front of the vehicle. And the handle would be pointing, you know, towards the passenger seat side, ma'am.
Q. Mr. West asked you a lot of questions about the

recording equipment that you have available and whether or not you recorded your interview with the defendant. Why did you not record that interview, Agent Naylor?
A. On that day? He started to get evasive. We went down to actually try and take a written statement from him and document the statement, and he started getting evasive and again talking about how he wanted to cooperate and things of that nature, and steering the conversation, so we ended the interview, ma'am.
Q. Is it your practice to start off your interviews with a recording device in the room?
A. No, ma'am.
Q. Why is that?
A. My practice is to normally get in, speak to the people, get a flow, see if they are willing to give a statement and trying and get the facts together in order, then I can come back and later on take a statement.
Q. Why is that your practice as opposed to just putting a recording device out on the table right from the beginning?
A. A lot of times if you put a recording device on, numerous times the interview will end right away. People won't speak to you if they know you're being recorded immediately. Usually you want to get a flow

going.
Q. Now, I notice that in asking you about your conversation with Marie Perez, the female informant, on January 20th, you explained that you clarified for her what type of benefit she might receive, and you testified that you did this because she had heard from a secretary at a law office. Could you explain when it is you think she heard from that secretary?
A. Well, I believe it was either the day before that she had gotten -- she called me and said something to the effect of, Is my husband getting out. And something to that effect. I said, Where would you hear that? I think she said, The girl at the law office, the secretary. And I later learned that it was the secretary.
Q. And you learned that it was the day before your actual conversation with her about it on January 20th?
A. Correct. It could have been the day before or two days before, ma'am, I'm not sure, but it was shortly thereafter.
Q. In other words, this secretary, from what you could gather, made this comment to Marie Perez in January '07?
A. Yes, ma'am.
MS. BECKNER: If I could have just a moment,

your Honor?

THE COURT: Yes.

MS. BECKNER: No further questions.

THE COURT: Thank you. Recross?

RECROSS EXAMINATION BY MR. WEST

Q. Detective Naylor, you said that when you put a tape recorder on the table, it ends the conversation; is that right?

A. In some cases it does, sir, yes.

Q. Is it fair to say that's because everything that's said in that room that's on the tape recorder could be corroborated and played back to a jury or in a courtroom; is that right?

MS. BECKNER: Objection. Calls for speculation.

THE COURT: Overruled.

A. Yes, sir.

Q. So you don't want to -- but the truth of the matter is that anything defendants say to you is going to be repeated back from that conversation; is that right?

A. Correct, sir.

Q. Okay. But it's easier for you to get information out if they don't really think that they're going to have the information played back?

A. Sometimes. It depends, sir. Sometimes after

you've got a rapport with someone, there's absolutely no problem getting a recording. Sometimes there is, sir.

MR. WEST: No further questions.

MS. BECKNER: No further redirect.

THE COURT: Okay. Agent Naylor, your testimony is complete. You may step down. Thank you.

MR. WEST: Your Honor, I've asked the Government to reserve Agent Naylor for recall as a defense witness if I choose to do so.

THE COURT: That's fine.

C E R T I F I C A T I O N

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Anne M. Clayton

______________________________________

Anne M. Clayton, RPR

June 9, 2008

________________________________________

Date