IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
* * * * * * * * * * * * * * * *  CRIMINAL ACTION
USA                            *  07-005S
                               *
VS.                            *  JANUARY 29, 2008
                               *  JANUARY 30, 2008
                               *
RICARDO MEJIA                  *  PROVIDENCE, RI
* * * * * * * * * * * * * * * *
```

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH
DISTRICT JUDGE
(TESTIMONY OF ANDRES PEREZ)

APPEARANCES:

FOR THE GOVERNMENT: SANDRA BECKNER, ATTY.
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

FOR THE DEFENDANT: GEORGE J. WEST, ESQ.
One Turks Head Place
Suite 312
Providence, RI 02903
(401) 861-9042

Court Reporter: Anne M. Clayton, RPR
One Exchange Terrace
Providence, RI 02903

Proceeding reported and produced by computer-aided stenography

I N D E X


| WITNESS | PAGE |
| --- | --- |
| ANDRES PEREZ | |
| Direct Examination by Ms. Beckner: | 3 |
| Cross-Examination by Mr. West: | 25 |
| Continuation of Cross-Examination by Mr. West: | 81 |
| Redirect Examination by Ms. Beckner: | 85 |

GOVERNMENT EXHIBITS

| | | |
| --- | --- | --- |
| 19 | - | 21 |
| 20 | - | 22 |

DEFENDANT'S EXHIBITS

| | | |
| --- | --- | --- |
| E | - | 47 |


___________________________

ANDRES PEREZ, first having been duly sworn, testified as follows:

THE CLERK: Please state your name and spell your last name for the record.

THE WITNESS: My name is Andres, A-N-D-R-E-S, Perez, P-E-R-E-Z.

THE COURT: Good afternoon, Detective Perez.

THE WITNESS: Good afternoon, your Honor.

THE COURT: You may inquire, Ms. Beckner.

DIRECT EXAMINATION BY MS. BECKNER

Q. Detective Perez, who do you work for?

A. I work for the Providence Police Department.

Q. How long have you been a Providence police officer?

A. Five years.

Q. Now, sir, what languages do you speak?

A. I speak English and Spanish.

Q. Where were you born?

A. I was born in Medellin, Colombia.

Q. How long did you live in Colombia?

A. Four years.

Q. Where did you live after you left Colombia?

A. United States.

Q. Have you returned to Colombia after you left to the age of four?

A. The only time I returned back to Colombia was when I was eight years old.
Q. How long did you stay down in Colombia?
A. Two months.
Q. How old are you now, sir?
A. I'm twenty-nine.
Q. Now, what's your native language?
A. Spanish.
Q. That was the first language you learned?
A. Yes, ma'am.
Q. When did you learn English?
A. I learned English when I came to the United States.
Q. How did you learn English?
A. By going to school.
Q. Where did you start off school?
A. At Mary Fogarty Elementary in South Providence.
Q. Did you finish your schooling there?
A. No.
Q. Why not?
A. We moved to Central Falls.
Q. Did you continue to speak Spanish after you left Colombia?
A. Yes.
Q. Now, where do your parents live?

A. My parents right now are in Colombia. They just retired, so they do six months there and six months in the United States.
Q. What language do they speak?
A. They only speak Spanish.
Q. And when you talk to them, do you speak in Spanish?
A. Yes, I do.
Q. How about your wife, what language does she speak?
A. My wife is -- she speaks Spanish. She's Puerto Rican.
Q. Is that a different dialect from Colombian?
A. Yes, it is.
Q. How about other relatives of yours. Do you have any other relatives that are Spanish speaking?
A. Yes, I do. I have Dominican.
Q. What relation is that to you?
A. I have two brother-in-laws that are married to my sisters. They're both Dominican.
Q. Do you have any siblings?
A. Yes, I do. I have two brothers and sisters.
Q. What language do they speak?
A. Spanish and English.
Q. What language do you converse with them in?
A. In Spanish.

Q. How about your wife, what language do you converse with her in?
A. Both Spanish and English.
Q. And how about, you said your brother-in-laws, what language do you converse with them in?
A. Both my brother-in-laws, they don't speak English so we talk more in Spanish.
Q. Do you have any Spanish-speaking friends.
A. Yes. I have all different kinds of nationalities, Bolivian, Guatemalan, Puerto Rican, Dominican, Mexican.
Q. What language do you speak with your friends?
A. Both Spanish and English. Pretty much when we're all together, we speak more Spanish than English.
Q. You said you were first living in the Providence area when you moved here; is that correct?
A. Yes, ma'am. In South Providence.
Q. And what kind of neighborhood is that as far as what type of language is spoken there?
A. Predominantly Spanish.
Q. What kind of dialect of Spanish?
A. Dominican and Puerto Rican.
Q. Now, you said you moved to Central Falls. What kind of neighborhood did you move to in terms of the language spoken in the neighborhood?
A. Same. Predominantly Spanish speaking, different

nationalities though, Mexican, Guatemalan, Puerto Rican, Dominican, Colombian.
Q. What high school did you attend?
A. Central Falls Junior/Senior High.
Q. And any of the people you associated with growing up, what language did they speak?
A. Spanish.
Q. Have you ever taken any Spanish classes?
A. The only Spanish class that I took was Introduction to Spanish. I thought it would be an easy class to get an A.
Q. And can you read in Spanish?
A. I read it well. I'm not great at it. My grandmother home-schooled me when I was a little boy. She wanted me to learn it. But as far as educationwise, I'm not good at it, but I can read it.
Q. What language do you speak with your children?
A. Both. Well, in the beginning, it's English. But me and my wife decided that they should learn Spanish, so now we're trying to teach them Spanish.
Q. Prior to joining the Providence Police Department, who did you work for?
A. The Adult Correctional Institution. I was a correctional officer.
Q. Were you ever called upon to speak Spanish as a

correctional officer?
A. Yes, ma'am. Often. Very often I would be called upon to translate with inmates that come in that would only speak Spanish.
Q. Was this an extra duty of yours as a correctional officer?
A. Yes. You can say that, yeah.
Q. I mean, at least was it something that you would get paid extra for?
A. Yes. If you get called upon once, you get paid $30 for the whole week no matter how many times they called you to speak.
Q. So how often do you think you were called upon to speak Spanish to inmates?
A. I don't remember how often. It was often though. Sometimes I wouldn't get paid. And then they would talk to me, they'd see I speak the language. They'd come, ask me questions, ask if they can go to the bathroom, or if they can go to the infirmary, things like that.
Q. Did you ever have any difficulty speaking with any of these individuals?
A. No. My whole life nobody's ever told me they couldn't understand me when I was speaking Spanish to them. Never had a problem, no.

Q. What was your first job at the Providence Police Department?
A. I was assigned to the patrol bureau.
Q. How long were you in patrol?
A. Four years.
Q. What neighborhoods did you work while assigned to patrol?
A. I worked in South Providence and Olneyville.
Q. What kind of neighborhood is Olneyville in terms of the language that was predominantly spoken?
A. Spanish. Again, different nationalities.
Q. When you were working as a patrol officer, were you ever called upon to speak Spanish?
A. Yes, ma'am.
Q. How often?
A. Often. I would help detectives out with robberies, victims, regular calls for service as far as me being in the corner, people coming up asking me for directions. A lot of people from the Spanish culture, they feel more comfortable talking to a Spanish police officer because they can understand. They don't have a hard time trying to make sense of what they're saying because a lot of police officers don't speak Spanish in my department.
Q. How long have you been assigned to narcotics?

A. Two years.
Q. And are you ever required to speak Spanish as a narcotics detective?
A. Yes, ma'am. With my own informants, I have a lot of informants that speak Spanish, as well as some other detectives that I work with, they trust me when it comes to interviewing prisoners because when I asked them the same questions so nobody gets misunderstood.
Q. Have you ever had to work undercover in Spanish?
A. Yes, ma'am.
Q. And what does that mean to work undercover?
A. To work undercover, pretty much you're playing a role as a drug dealer, a drug buyer.
Q. So when you were working undercover, you've had to speak Spanish before?
A. Yes. A couple of occasions, one was a Mexican dealer, two colleagues of mine, they arrested a subject with three kilos of cocaine. He was Dominican. I went in there to interview them. He was trying to help himself out. He again made connections where I can contact his supplier who was Mexican. We talked on the phone several times. Again, the conversation --
MR. WEST: Objection. Move to strike at this point. It's narrative.
THE COURT: Overruled. It's just background.

It's all right.
Q. If you could just explain what role in that case you were describing you filled as a Spanish-speaking undercover.
A. I was just acting as a dealer looking to buy drugs.
Q. And so this is over the phone you were required to speak Spanish?
A. Yes, ma'am.
Q. Now, what other situations, aside from that case you just described, have you been required to pose undercover as a Spanish speaker?
A. I bought drugs from a Puerto Rican gentleman in the west end. I was a street dealer though, $20 worth of crack cocaine, nothing big.
Q. Now, have you ever -- let me rephrase. What other agencies besides Providence Police Department have you had to assist in terms of your ability to speak Spanish?
A. I've worked with the U.S. Attorney's Office, Cranston Police, Johnston, my department, and DEA.
Q. Let's start with the U.S. Attorney's Office. What type of Spanish work have you done with the U.S. Attorney's Office?
A. They did a federal wiretap. They called me to

come in. They needed some recording devices -- some recorders where people were speaking Spanish, they wanted me to translate it into English.
Q. Did you do that?
A. Yes, I did.
Q. Now, you said that you've assisted Cranston. How did you assist Cranston in terms of your abilities as a Spanish speaker?
A. Another wiretap, they had a live long wiretap where I would work in the office. One of the dealers only spoke Spanish, and they wanted me to translate and to listen if there was any criminal activity that he was going to do so we could translate it into English.
Q. So were you listening to the conversations live then when you were assisting Cranston?
A. Yes, ma'am.
Q. You said that you've assisted Johnson. How did you assist the Johnston Police Department?
A. I was assigned to them for two months. There was a murder that happened. I don't remember what year it was. I want to say 2004. And we interviewed witnesses, went to New York, picked up potential witnesses, suspects. Things to that matter.
Q. How many witnesses do you think you interviewed in that investigation?

A. I can't give you an estimate. I want to say more than 30.
Q. Have you ever participated in any debriefings where you were required to speak Spanish?
A. Yes. I conducted several proffers with the U.S. Attorney's Office.
Q. What's a proffer?
A. I conducted several proffers with the U.S. Attorney's Office, and a proffer is pretty much as well as an interview where you go in with a subject that was just arrested. He's admitted to what he's done, and he wants to tell you the whole truth to get a lighter sentence.
Q. Now, what other departments within the Providence Police Department besides just the narcotics unit have you assisted with speaking Spanish?
A. When I was in patrol, the detective bureau, again with robbery victims. On the west end, we have a big problem where a lot of gentlemen from Guatemala get robbed and actually they're targeted victims because they don't speak English and a lot of the suspects know that they won't -- be afraid to go to the police department and talk to the police because some of them are illegal, so I have assisted with that. Again, a lot of Spanish people feel more comfortable speaking

with a Spanish-speaking officer.
Q. How many robbery investigations do you think you've assisted on?
A. A lot, ma'am. I can't give you the exact amount.
Q. What other types of investigations have you assisted the detective bureau with?
A. Murders. I assisted them with murders, stolen cars, domestics, my own domestics where I've been the arresting officer, of that nature.
Q. What about home invasions? Have you ever worked on any of those?
A. Yes.
Q. How many home invasions do you think you've assisted by speaking Spanish with either the witnesses or the suspect?
A. Through the course of my career, I can't give you an estimate. When I worked at south side, many times I was the first responding officer to the scene where people were tied up and were there witnessing, take them to the detective bureau, help them interview, ask them the specific questions they wanted me to ask them.
Q. How about in terms of domestics, how many?
A. A lot. Again, I can't give you the exact amount. Again, me being the first responding officer, my own arrest, translating in court.

Q. How often do you think you speak Spanish?
A. Every day. Whether I would come to work or speaking with my friends or just -- definitely talking every day.
Q. All right. Now, I want to direct your attention to December 18th of 2006. Do you remember that day, sir?
A. Yes, I do.
Q. Were you assisting the DEA with an investigation?
A. Yes, ma'am.
Q. Now, I want to direct your attention to the evening of December 18th, 2006. Were you asked to listen to what's called a KEL, or an audio transmitter?
A. Yes, ma'am.
Q. Tell me how it was you were set up with this audio transmitter, or at least the receiving end of the audio transmitter?
A. When I got there, it was already implemented in the informant's vehicle, just to listen to the device. You can hear what's going on in the car, conversationwise. There's no audio but much very clear. And whatever conversation is happening inside there, we can hear it.
Q. So this is allowing you to listen to the conversation live?

A. Yes, ma'am.
Q. And who were you with that evening as you were monitoring this KEL or audio transmitter?
A. I was with Detective Naylor and Detective Colanduono.
Q. And were you positioned in the vicinity of McDonald's?
A. Yes.
Q. Tell me what you were able to observe that night once you got in the position where you could see McDonald's.
A. We first got there and we parked in front of the McDonald's. The informant hasn't arrived yet. Seconds later -- moments later, I should say, the informant arrived. I observed the female coming out of McDonald's, come to the passenger side of the vehicle from the informant's car, have a brief conversation with the informant, go in, and seconds later the same female came out with two gentlemen.
Q. Do you see any of those gentlemen in the courtroom here today?
A. Yes. Mr. Mejia.
Q. Could you please describe what that individual is wearing.
A. Mr. Mejia is wearing a blue shirt.

MS. BECKNER: May the record reflect that the witness has identified the defendant.

THE COURT: The record will so reflect.

Q. All right. Once you saw these two gentlemen leave McDonald's with the female, once you saw them leave the building, what did you next observe?

A. I observed one gentleman, I believe his name is Mr. Soto, approach the passenger side of the window of the informant's car, short conversation --

Q. Let me stop you right there. While the one individual that you have identified as Mr. Soto was speaking, or was at the informant's car, what was the defendant doing?

A. He was standing right in front of the door of the McDonald's just looking up and down the street.

Q. All right. What did you see next?

A. Mr. Soto stopped talking with the informant, went back to his vehicle, which I believe it was a green Camry, opened up the passenger door, retrieved a black suitcase, then went back to the informant's car, opened the back right rear passenger door and placed the suitcase inside.

Q. Now, let me ask you, was it the green car that Mr. Soto retrieved the suitcase from or was it the red car?

A. The green car. No. Correction. I'm sorry. It was a red car.
Q. Now, while Mr. Soto placed the suitcase in the informant's car, what were you -- what did you see the defendant do?
A. After that, I saw Mr. Mejia go briefly into the -- open the door of the green car, lean in with his body, exit out shortly after, and then got in the passenger seat of the red vehicle. I don't remember what kind of car it was.
Q. Who else did you see get into the red vehicle?
A. The female.
Q. What did Mr. Soto do?
A. He then get in the passenger seat of the informant's car, and him and the informant drove off, and Mr. Mejia and the female followed behind in the red vehicle.
Q. All this time were you listening to the audio transmitter?
A. Yes, ma'am.
Q. At some point what happened?
A. I'm listening to the device into the KEL, and I hear the informant saying he's going to stop the car. He wants to see the material. At that time he said, Oh, okay, it's there. That's nice. And then at that

moment Detective Naylor made a decision to move in, several subjects, move in, and made the arrest.

Q. And what was done with the defendant once you ended up on the scene?

A. When I got there, I responded to the first defendant.

Q. Who do you mean?

A. Mr. Soto.

Q. Mr. Soto.

A. Gave him his constitutional rights in Spanish, and I told him that I would talk to him at the station. I don't want to talk right there. After that, I went to Mr. Mejia. He was already sitting inside of the undercover police car. I opened the door, read him his rights. He asked me what's going on. I told him we'll talk at the police station. And that was the end of the conversation I had with both of them there at the scene.

Q. When you spoke to the defendant on the scene, did you read him his rights in Spanish or English?

A. They were both read in Spanish.

Q. Did you do this from memory?

A. Yes, ma'am.

Q. All right. Once you got back to the police station, did you have an opportunity to interview the

defendant?
A. Yes.
Q. How did -- first of all, who was in the interview room with you?
A. Myself and Detective Naylor.
Q. And was the defendant in there?
A. Yes.
Q. How did you start off this interview?
A. I first came in. I had a Spanish rights form. I read it to the gentleman line by line. I asked him if he could understand, if he could read and write Spanish. He told me yes. I asked him if he understood what I just read, gave it to him again, he said yes. I told him I would want him to read it line by line. If he understands it, initial every line, after every sentence, initial. At the end say he signed that he understands it. Signature if he wants to talk to the police, and we can begin an interview.
MS. BECKNER: May I show an exhibit to the witness alone?
THE COURT: Yes.
Q. Detective Perez, can you see what -- Government Exhibit 19 that I've placed on the screen?
A. Yes, ma'am.
Q. Do you recognize that, sir?

A. Yes. That's the rights form that I gave Mr. Mejia in Spanish.
Q. How do you recognize that this is the one that you gave to the defendant?
A. My name and my badge number is on the bottom of it.
Q. And what's along the side here next to the numbers?
A. Those are Mr. Mejia's initials. RMC.
MS. BECKNER: At this time, I'd offer Government's Exhibit 19 into evidence.
THE COURT: Any objection?
MR. WEST: No objection.
THE COURT: 19 will be full then.
(Government's Exhibit 19 admitted full.)
MS. BECKNER: May I publish it for the jury?
THE COURT: Yes.
Q. Detective Perez, where my pen is, are these the initials you're referring to?
A. That is correct, ma'am.
Q. Is this your signature right here?
A. Yes, ma'am.
Q. And your badge?
A. Yes. My badge number.
Q. What time is indicated here?

A. 10:48 p.m.
Q. Is that the time of the interview?
A. Yes.
Q. What does "firma" mean right here?
A. Firma, signature.
Q. And what does "dirreccion" mean?
A. Dirreccion is address.
MS. BECKNER: May I show the witness another exhibit?
THE COURT: Yes.
Q. Detective Perez, I'm showing you what has been marked as Government Exhibit 20. Are you able to read that, sir?
A. Yes.
Q. Do you recognize it?
A. It is the same rights form but it is in English.
MS. BECKNER: At this time, I would offer Government Exhibit 20 into evidence.
THE COURT: Any objection?
MR. WEST: No objection.
THE COURT: 20 will be full then.
(Government Exhibit 20 admitted full.)
MS. BECKNER: I'm going to zoom in on this, your Honor, if I may.
Q. After you advised the defendant of his rights, did

you begin to interview him?
A. Yes. Myself and Detective Naylor did.
Q. And how did the interview -- how did the interview work? Who was asking the questions?
A. Detective Naylor.
Q. And how was the defendant responding?
A. Some questions that Detective Naylor would say in English he would respond in English, and the rest were in Spanish. When he couldn't understand, or if he couldn't answer back in English, he would look at me, tell me in Spanish, and I in return would give the questions back to Mr. Naylor in English or vice versa.
Q. Now, at some point, did Agent Naylor ask the defendant about the firearm that had been seized from the red car?
A. Yes.
Q. What did the defendant say about where he got this firearm?
A. He answered in Spanish. He said he got the -- he received the firearm from Mr. Soto at the McDonald's.
Q. And what did he say he did with the firearm after he received it from Mr. Soto?
A. He said when he saw the police approaching him, he reached into his waistband and put it underneath the driver's seat, front driver's seat.

Q. Did Agent Naylor at any point ask him about what he was doing down there at McDonald's?
A. He did. At first he was being a little bit evasive. He would say, you know, you know what we're doing here. And I'm assuming -- assuming he came and do a drug deal. One question I do remember he said in English, he said, I was here to protect him, to watch his back.
Q. What did the defendant offer to do with law enforcement during this interview?
A. Once he found out more that we had a cooperating informant, he wanted to be more of an informant. He wanted to work for the police. He wanted to do anything he could to get out of this incident. He said he can be our eyes and ears on the street. He knows a lot of people in Massachusetts. He said, I could be a good introduction. You can introduce me as a drug buyer. He can have people bring a load of drugs and we can make an arrest.
Q. At any point during this interview, did the defendant ever say to you he didn't understand?
A. No. He never did.
Q. At some point, did you attempt to do a written statement with the defendant?
A. Yes, we did. After we spoke to him, we tried to

take a written statement from him, but he was still being too evasive. He wanted to concentrate more on helping us be an informant than to answer our questions. So -- and at that time, Detective Naylor and myself decided to end the interview.

MS. BECKNER: If I could have just a moment, your Honor?

THE COURT: Yes.

MS. BECKNER: I have no further questions. May I approach with the exhibits?

THE COURT: Yes. Probably be a good time to take our afternoon break, ladies and gentlemen. We'll commence with the cross-examination of Detective Perez at the end of that break. So Charlie will show you out.

(Proceedings out of the presence of the jury as follows:)

THE COURT: We can be off the record.

(Discussion off the record.)

(Short recess.)

THE COURT: Mr. West, are you ready to cross-examine?

MR. WEST: Yes, your Honor.

CROSS-EXAMINATION BY MR. WEST

Q. Good afternoon, Detective Perez. How are you

today?
A. Very good, Mr. West. And yourself?
Q. Fine. Thank you.
So it's our first opportunity to cross-examine. Sir, you have been working for the Providence Police Department for a while now; is that right?
A. Yes, sir.
Q. How long is that?
A. Five years completed.
Q. You're on patrol?
A. I was in patrol for three-and-a-half years, almost four, before I made narcotics.
Q. Now you're in narcotics?
A. Yes, sir.
Q. You work with Agent Naylor?
A. Sometimes. He works for the DEA Task Force. I work for my department in the narcotics and organized crime bureau.
Q. Do you work in combination with Agent Naylor sometimes?
A. Yes, sir.
Q. Did you work with Detective Colanduono?
A. Yes, sir.
Q. Work with him more frequently, right?
A. I would say the same, because Detective Colanduono

is also assigned to the Task Force. I'm just assigned to my department.
Q. So he doesn't work with the Providence police narcotics --
A. He's a detective in the narcotics bureau, but he's assigned to the DEA Task Force.
Q. So your paths don't cross that frequently; is that right?
A. Not that frequently, no, they don't.
Q. But you know him?
A. Yes, sir.
Q. Now, Detective Schiffer, do you know him?
A. Jaime Schiffer from the ATF, yes, I do, sir.
Q. That's Alcohol, Tobacco and Firearms, right?
A. Yes, sir.
Q. And you've worked with these folks before?
A. Yes, sir.
Q. I think you've said you've actually done some work for the United States Attorney's Office; is that right?
A. Yes, sir.
Q. You weren't on duty at the time you were doing some work for them, is that how it was?
A. I wasn't on duty. I was actually home. I got called from home to go assist them.
Q. Who called you?

A. My sergeant.
Q. Who did you work with at the U.S. Attorney's Office?
A. Mrs. Beckner and Mary Rogers.
Q. So you assisted Ms. Beckner, the prosecutor in this case, and Assistant U.S. Attorney Mary Rogers?
A. Yes, sir.
Q. Were you paid for going in and working for the United States Attorney's Office?
A. I believe I was paid overtime, yes.
Q. So Providence police paid you?
A. Yes.
Q. But you weren't working on a Providence police case at the time you went to the United States Attorney's Office, right?
A. No, sir.
Q. So you got extra pay for working for the U.S. Attorney's Office, is that fair to say?
A. Yes, you can say that.
Q. How many times did you do that?
A. Just that one day.
Q. Now, you also said that you get called around the city. I imagine just kind of visualizing this, you get called out frequently because you're one of the few Spanish-speaking officers, isn't that right?

A. There's a lot of Spanish-speaking officers, yes, but a lot of detectives when I was in patrol, they feel comfortable with me. I've worked with them before, translating with them. So some of them trust me and they'll -- they feel comfortable calling upon me to come help them out.
Q. It's probably true of people that you meet in your job, people in the street such as civilians. They feel comfortable speaking to a fellow countryman or a person who shares their language; is that right?
A. Yeah. Most of the time.
Q. And you don't do anything to disabuse them of that comfort. That works to your advantage, isn't that true, in your job?
A. Can you rephrase the question? I don't understand.
Q. You don't try to make it clear to them that you're always acting as a policeman, and you're not really their friend in this situation. You're a policeman.
A. I am a policeman, yes.
Q. But people who you're working with feel more comfortable talking to you rather than, for example, Agent Naylor. That's what you've said, right?
A. People as who, the victims or as far as the police department?

Q. Defendants. People who speak Spanish feel more comfortable talking to you. That's what you said, right?
A. They feel more comfortable speaking to a Spanish officer, yes.
Q. That's because they feel some kind of bond to you. You're usually one of the few Spanish-speaking officers in the circumstances where you arrive on the scene, isn't that right?
A. Yes.
Q. So you're the only one who speaks their language, and they naturally gravitate to you because you're speaking their language and no one else is?
A. Yes.
Q. Because they're a little concerned about speaking to someone in English because they don't completely understand it. Isn't that a necessarily logical assumption?
A. Yes.
Q. Okay. So they're depending on you more than just a policeman. They're depending on you as a language speaker who they can trust to try to say whatever it is they want to say, isn't that fair to say?
A. Most of the time, yes.
Q. Okay. Now, you don't do anything to put them off

of that feeling. You don't say, now, let's be real here, I'm first a policeman working for these guys. I'm not working for you. You don't go into anything like that, do you?
A. I'm a policeman. My integrity is always everything.
Q. I understand that. But do you get into that kind of discussion with, you know, victims, witnesses, potential suspects?
A. When all the above speak to me, they know that I'm a police officer. I approach them, and my name is Officer Perez from the police department.
Q. Okay. Now, Officer Perez, you've given a few testimonies about what happened on the night of December 18th, isn't that right?
A. Yes, sir.
Q. You didn't write a police report about this. Am I right about that?
A. No, I did not.
Q. So this happened December 18th, 2006?
A. Yes.
Q. Okay. And in preparation for your appearance here today, you had no notes to refer to about what happened on December 18th, 2006; is that right?
A. I had the police report made by my department, the

report made by the DEA, and my transcripts, yes.
Q. So you've read the transcripts of your prior testimony?
A. Yes, sir.
Q. You read Agent Naylor's report?
A. Yes.
Q. And you read Agent Colanduono's report?
A. Yes.
Q. Did you read anything else?
A. No.
Q. That's all you relied on?
A. And my memory.
Q. And your memory?
A. Yes, sir.
Q. But you didn't have any notes of your work that night; is that correct?
A. No.
Q. Okay. Now, Detective Perez, when you went to the scene, you were part of the investigating force there that night, isn't that true?
A. Yes, sir.
Q. Okay. And you were active in terms of you were translating the KEL to Detective Naylor and Detective Colanduono; is that correct?
A. Yes, sir.

Q. And you listened to Mr. Falette on the KEL and Mr. Soto on the KEL; is that right?
A. Yes.
Q. And you would tell what you thought they said to these two officers, correct?
A. What they said, yes.
Q. Okay. And then you participated in an arrest of the suspects, isn't that right?
A. I was there at the end.
Q. Okay. But you were there?
A. I was there, yes.
Q. Did you draw your gun?
A. No.
Q. Did others?
A. Yes.
Q. You were in the proximity of others with their guns drawn; is that right?
A. I was behind them.
Q. You were right behind them?
A. When I got to the scene, the informants and the suspects were already out of their car and handcuffed.
Q. So they were already handcuffed?
A. Yes.
Q. And you were coming from your remote location; is that correct?

A. Yes.
Q. Were you in one of those DEA vans with the see-through windows and all that?
A. No.
Q. Where were you?
A. I was in a regular undercover car. I don't remember what kind it was. I think it was a sedan. I'm not sure.
Q. PPD car?
A. No.
Q. DEA?
A. Yes.
Q. And just -- the second diagram on the right over there, could you just go over to that and point on that diagram, if it's factually accurate -- why don't you take a look at it first. Is that diagram factually accurate to the scene at the McDonald's on the night of arrest?
A. I'm assuming this is McDonald's.
Q. Yes. Detective, looking at that depiction on what is Defendant's Exhibit B, I believe, can you, of your own knowledge --
THE COURT: Just one moment. The actual exhibit is a document you gave me this morning. Let's put that on the projector. Let the defendant point to it using

the screen. If he has differences with respect to anything, I'll print a copy of whatever he marks up.
Q. Can you see that fairly well?
A. Yes.
Q. All right.
MR. WEST: This is a full exhibit so I suspect the jury can see it, as well?
THE COURT: Yes.
Q. And now, do you agree that this is a fair and accurate representation of the scene at the McDonald's on December 18th, 2006?
A. Yes.
Q. Okay. And could you point out the important features of where you think important aspects are here.
A. I'm assuming the box to the left, all the way to the left top corner, that's the McDonald's, right?
Q. When you touch the screen, it's going to put an arrow.
A. Thank you. Here's the McDonald's parking lot, Broad Street, Washington Street. This is -- I can't pronounce it. C-Y-R Street. Here's the bank in between here. There's two parking lots. It's well-litted, as well as there's lights all over.
Q. So where you just put the line on the exhibit, there's an arrow?

A. Right here?
Q. Right here.
A. Yep.
Q. Okay. Now, what is this right here?
A. This is the parking lot. That's a divider. There's two separate sections to the McDonald's parking lot.
Q. Were there cars here on that night?
A. No. Not that many. It was like maybe two.
Q. There were some cars in there?
A. Yeah. Like two cars.
MR. WEST: At this point, I do want to have the exhibit marked up by this officer, your Honor.
THE COURT: He can draw them in right on the screen.
MR. WEST: Will that preserve and print out?
THE COURT: Yes. So erase those arrows and have him draw what you want him to draw.
Q. If you'll put in that line again that you suggest. Is that like a line that represents some part of the -- does that line you were drawing in before represent an actual barrier?
A. Not a barrier, just like -- there's lights all over it. Two separate sections of the parking lot. That's all.

Q. Why don't you put it back in then.
A. It's not letting me.
Q. There you go. Now, if you draw the cars in where you remember them being.
A. I remember there was two right there.
Q. Can you draw the cars rather than the arrow?
A. I'll try my best.
Q. I know. Okay. So those were two cars parked there at the McDonald's across from -- that's all you remember, two cars?
A. Yeah. That's all I remember, sir. Well, the cars that were on that side of the parking lot. There was only two cars on that side.
Q. Okay. What do you remember on the other side of the parking lot?
A. There were three cars. When I first got there, there was two cars. There was a red vehicle and a green vehicle.
Q. Where were they parked?
A. Right there where you have them drawn here.
Q. Okay. So where was the red vehicle?
A. In the middle.
Q. Can you point to it? Okay. And the green vehicle. Is that a Toyota Camry?
A. Yes, sir.

Q. Okay. And is this red vehicle, do you remember what kind it was?
A. I don't remember.
Q. Okay. Now, looking at the spacing of this diagram, do those look like -- were they just parked in regular parking spots, is that fair to say?
A. Yeah, it is.
Q. Can you show us the front door of the McDonald's? Okay. And where did you first arrive at on this diagram?
A. When we first got to the scene, we pulled up on Broad Street right across from McDonald's, and we waited there for a couple of seconds.
Q. Could you see anything at that point?
A. No, not at that point. Seconds later the informant drove in from Broad Street, went inside the parking lot and parked here at that moment. We stayed there for a few minutes. Observed the female come out, come to the passenger side window, have a brief conversation, went back in. At this time, we're moving forward as this is happening. Do you want me to stop?
Q. Yes. Stop right there. This is the front, and is this the way the female came out right here?
A. There's two different doors. I just pointed to -- there's two different doors. She came out -- if my

memory serves me correct, she came up from the right side door.
Q. Where is that?
A. If I'm facing the McDonald's, it would be my left-hand side door.
Q. Can you put a dot?
A. It's right there already.
Q. We're down here now, right?
A. Yes, sir.
Q. Right there. She came out this door, which would have been fairly well right in front of Mr. Falette's car; is that correct?
A. Yes, sir.
Q. And she walked between her car and his car and into the passenger's side of the car, is that what you're saying?
A. She didn't go in. She approached the window. Like a brief conversation.
Q. You were listening to the conversation?
A. Yes.
Q. Now -- and then what happened?
A. They spoke. She went back in.
Q. In that door that you just pointed at right there?
A. Yes. She went in that door, same door. Moments later she came out with two subjects.

Q. Same door?
A. I don't remember if it was the same door or not, no.
Q. I've got to keep from moving this page. I think that's how it was. Is that how it was?
A. Yes.
Q. Okay. So you can't recall what door they came out later?
A. No.
Q. They all came out?
A. Yes. The female and two male subjects, yes, sir.
Q. And where were you at that point?
A. We were moving up slowly.
Q. Where? Show me.
A. Where the line is from the bottom, we were moving up slowly. We stopped right there for a couple of seconds. I want to say maybe a minute. Mr. Soto approached the informant's car window. Brief conversation at that time. The second subject, which is Mr. Mejia, was standing -- there's a little sidewalk there, looking up and down the street and in the parking lot.
Q. Where?
A. Right in front of the door. There's a sidewalk there. I can't tell you the exact point, but he was

right there. And he's looking up and down.
Q. By that top arrow that you --
A. No, no, no. That was just me touching it.
Q. Okay. So somewhere in here, Mr. Mejia --
A. Right there where the sidewalk is. Maybe a little to the left. He was close to the door. I can't give you an exact spot, but he's looking up and down. We're at this spot right here watching. Like a minute goes on. Maybe less than that, 30 seconds. Mr. Soto goes to the red car, gets a briefcase, opens the passenger side of the informant's car, puts the briefcase in. Mr. Mejia walks over to the passenger's side where I'm dotting here -- I'm sorry. Right here of the green vehicle. Up to the passenger's side. Opens the door. Puts his body in. Moments later he does something quick, closes the door, then he goes and he gets into the red vehicle.
At the same time, the female gets into the red vehicle and Mr. Soto was already in the vehicle. They back up. They backed up.
Q. Okay. Stop there. Where are you when you see that part?
A. We were right here.
Q. Where? Right there?
A. Yeah.

Q. Right there?
A. No. We were right there.
Q. Yes. Okay. Which seat are you in, the driver's side or --
A. The back side.
Q. You're in the back seat?
A. Back left.
Q. Who are you with?
A. I was with Detective Naylor and Detective Colanduono.
Q. Detective Naylor and Detective Colanduono.
A. Yes.
Q. Okay. What happens after that?
A. All parties got in the car. Mr. Mejia and the female get into the red vehicle. Mr. Soto, the first subject, gets into the informant's car. They back out from the parking spot and drive across -- they attempted to go to the entrance. As they're doing that, myself and the other detectives, we backed into one of these spots here. I don't know which one it was, but we backed in. And the informant's vehicle and the other vehicle passed us.
Q. Which way?
A. Going towards Washington. I'm trying to draw a line. Going towards Washington. They passed us.

There's about one, two telephone poles. At this time, the informant is saying -- I got to review the transcript, but he's saying that, you know, let me see it. They stop. He shows him the briefcase, opens up the briefcase. He says, Oh, wow. I believe that's what he says.

At that time, Detective Naylor makes a decision, we move in, and then the officers go and take the subjects into custody.

Q. So that's down here on Washington Street?

A. Yeah. Like there's a street, and there's a telephone pole here, and there's a telephone pole here. They don't get that far.

Q. And this was Falette and Soto?

A. The informant and Soto. I don't know the informant's name.

Q. It was a male?

A. Yeah. Male Dominican.

Q. And the female and Mr. Mejia are not there where that arrest was made; is that right?

A. They were there. They were right behind them.

Q. They were behind them?

A. Yes.

Q. In a separate vehicle?

A. Separate vehicle, yeah.

Q. Now, when you were back up here, when they were outside the McDonald's --
A. I can't see, sir.
Q. When they were up here outside of McDonald's and you saw Mr. Mejia at the Camry passenger door, did you see Ms. Perez say anything or go over to him in any way at that point in time to talk to him?
A. No, sir.
Q. Or signal him in any way?
A. No, sir.
Q. You don't recall seeing that?
A. I didn't see that.
Q. Okay. And you were in the back seat of the vehicle over here at that point, correct?
A. Yeah. I'm facing the McDonald's. If the vehicle is facing towards downtown, I'm in the left rear passenger seat.
Q. If I'm understanding you correctly, Mr. Mejia is over here on the sidewalk?
A. Yes.
Q. He's not pacing up and down the sidewalk, is he?
A. No. He's standing there just looking around.
Q. Standing there just looking around?
A. Just looking.
Q. All right. And there's cars parked over here?

A. Police cars, sir.
Q. You said there was two cars parked right there, right?
A. There was two cars parked down there, yes.
Q. This is across the parking lot. Then this over here is the actual street?
A. The street. Right. Well, the way the diagram, there is a street there. Unless somebody tried to draw it, unless that's the other side of the parking lot. I don't think so. That's a street.
Q. Would you say that's where the street belongs in this diagram?
A. The way I'm taking it, yeah. Unless somebody else drew it, or the way you drew it, you're saying that's the way you divide up the parking lot.
Q. In your memory as a Providence policeman, is there a street there in that location?
A. Yes, sir.
Q. If this is a street, Cyr Street, is it? C-Y-R?
A. C-Y-R, yes.
Q. So you have to cross this -- there's a set of parking here. There's a little lighted barrier here, right? A set of parking here, then you get to the street?
A. Yes.

Q. Usual Providence street with a sidewalk?
A. Yes.
Q. So there's a sidewalk, and there's all lights in here, isn't that right?
A. All lights in there, in the McDonald's, in the background.
Q. The dark of night otherwise, correct?
A. Yes.
Q. So Mr. Mejia was never over here looking up and down the street; is that right?
A. Not that -- no.
Q. I'm sorry. Yes or no?
A. No.
Q. No. He never came down here looking up and down the street, right?
A. No.
Q. He just stood outside the McDonald's looking around?
A. Yes, sir.
Q. Okay. Now, I think you said that you came up behind once Agent Naylor gave the signal, and you weren't the first ones to approach the vehicle; is that right? You and Agent Naylor?
A. No. There was other police officers in that surrounding area and on that street, as well.

Q. And they were Providence police?
A. DEA and one Providence police officer. Otherwise, Detective Colanduono.
MR. WEST: Can this be preserved at this point, your Honor?
THE COURT: Yes. You can print that as is.
MR. WEST: I would move that as my next exhibit full.
THE COURT: That will be Defendant's Exhibit E full. Any objection?
MS. BECKNER: No, your Honor.
(Defendant's Exhibit E admitted full.)
Q. So the arrest went down, and you were right there at the time of the arrest in terms of the men were in handcuffs and you had words with them; is that correct?
A. Yes, sir.
Q. And you seem to have recalled from memory the Spanish rights form; is that right?
A. Yes, sir.
Q. And I imagine you used the Spanish rights form from time to time in your work over the years; is that right?
A. Every time I'm questioning a suspect, I use it, yes, sir.
Q. You usually question Spanish-speaking subjects, is

that your experience?
A. And English. I always say it in English or in Spanish depending on what suspect I'm dealing with at the time.
Q. Okay. And how did you learn the words of the Miranda rights? Did you have that taught to you in Spanish?
A. No. I read them.
Q. Particular to that phraseology that Miranda contains?
A. I read them. We have a copy of them. I read them and then pretty much like in English I first read them. And then after you say them so many times, they become part of your memory.
Q. Okay. So you did not derive the translation from which you worked. You were given a Spanish translation of the Miranda rights, which you basically memorized?
A. From work, yes.
Q. Okay. Now, it's my understanding that you don't routinely translate English written words to Spanish written words; is that true?
A. Well, sir, I'm not really a professional translator or do I try to sound to be. No. I just speak Spanish.
Q. And, for example, you don't take a Spanish

newspaper at home; is that right?
A. No, sir, I do not.
Q. And you don't read books in Spanish; is that right?
A. No, I do not.
Q. And that's true of your whole life. I mean, this is just not a nuance thing. You're not into that?
A. No. I don't read, no, I don't.
Q. And it sounds to me like your children, who are youngsters, it sounds like -- you're a young man, I assume they're young.
A. I have a lot of kids, yes.
Q. They've learned English as their primary at-home language, right?
A. Yes, they do.
Q. And that's different from you, right?
A. Yes. Very different.
Q. Okay. Because in your house, they were speaking Spanish?
A. They do. My parents don't speak English.
Q. So in the house where your kids grow up, you speak English mostly?
A. I do, yes.
Q. And your wife does?
A. Unless she's mad, yes.

Q. I understand. So your household is an English-speaking household, isn't that fair to say?
A. Yes, sir.
Q. It's of late that you've decided to try to preserve some of that culture for your kids?
A. Well, if I can add to that. My parents, they just retired, and they do six months in Colombia and six months in the United States, and when they come back from Colombia they live with me. They don't pay no bills. I take care of my parents. And when they're home, we speak Spanish because, again, my parents don't speak English.
Q. How long are they with you when they come back?
A. Six months.
Q. Six months back with you?
A. Yes, sir. Every year, six months there, six months here.
Q. That gives you another opportunity to speak Spanish with them, that was spoken in your household?
A. Yes.
Q. Now, you said a moment ago that you're not a professional translator or interpreter; is that right?
A. No, sir, I'm not.
Q. Okay. And you don't pretend to be one; is that right?

A. No, I do not.
Q. Okay. And you are from Colombia and you lived there until you were four years old. How many dialects are there of the Spanish language in Colombia, sir?
A. Actually. There's different accents. There's Medellin, which would be the east coast. And Costeno, they are from the west coast. It's a different accent. Costeno are very strong between the -- they call it Paisas.
Q. Let's see now. Is there -- I'm going to say it wrong but a Paisas dialect?
A. I believe that's Paisa. From Paisa.
Q. Is there a Rolo dialect, or an R-O-L-O dialect?
A. I don't know.
Q. Bogota?
A. Bogota.
Q. Is that a southern or northern?
A. I don't know that, sir.
Q. You don't know that. How about a Caribbean dialect? Is that also spoken in --
A. No. I don't know none of that, no, sir.
Q. A Valley dialect?
A. I don't know, sir.
Q. Do you know a -- I'll say it wrong again. Caua (sic) River, C-A-U-A is?

A. No, I do not, sir.
Q. Between the Occidental and Central Cordil -- we know I don't speak Spanish.
A. Like I said, sir, I just was in the country when I was four. We were born there. My father tried to give us a better life, and by the grace of God we came to the United States. I went back when I was eight to visit family. My aunts still live there. I haven't been back yet, but I definitely want to plan now to go back there. My parents are there more often. But as far as different dialects and stuff, I just know Spanish from being at home and talking with my parents.
Q. And they were from Colombia?
A. Yes. From Medellin.
Q. You said you know some Dominicans; is that right?
A. I do know Dominicans.
Q. You said your brother-in-laws are there?
A. Both my brother-in-laws are Dominicans. And a lot of my friends are, too. A lot of police officers that I --
Q. Do you speak to your brother-in-law?
A. Yeah. Very good.
Q. What is Castilian Spanish?
A. Again, sir, I don't know any of those terminologies.

Q. And you have not, obviously, made a study of Dominican Spanish?
A. No, I have not.
Q. You haven't learned their dialect or their different ways of speaking; is that right?
A. No, sir.
Q. But in general terms, you speak some form of Spanish to your Dominican --
A. Spanish is all the same language. It's just sometimes a different accent. We all understand each other. Like I said before, I never had any problems with anybody telling me they don't understand what I'm saying or, if I talk to them, just ignore me because they're not understanding. I never had a problem with that in my whole life.
Q. Now, you've never been qualified as a court interpreter; is that right?
A. No, sir, I have not.
Q. Never took any tests for it?
A. No, sir.
Q. Never took any education for it?
A. No, sir.
Q. I will believe that you've seen court interpreters in action. You've seen one today; is that right?
A. Yes, sir. And they're good at what they do.

Q. Okay. And in the cases that you've been in, there's been court interpreters present; is that right, when you go to give testimony?
A. Yes, sir.
Q. And just comparing yourself to that form of rendering of the Spanish language, that's not what you're capable of; is that correct?
A. To what they're doing? No. I'm not capable of that.
Q. Would you say of yourself when you're speaking a standard variety of Spanish that you can use correct pronunciation and intonation without any significant effort?
A. Again, I'm not an interpreter. I speak Spanish fluently. My family speaks Spanish fluently. I have friends that have different nationalities fluently. As far as to sit here, sir, and tell you that what I know meanings of pronunciations of this and that, no, I don't. I wasn't educated in it. But do I speak it? Yes, I do.
Q. So the answer to the question is no; is that right?
A. To the book question, no.
Q. No, correct?
A. Yes.

Q. And I'm able to understand -- is this true about yourself, I'm able to understand standard varieties of Spanish usage from any country in the Spanish speaking world?
A. From the Spanish that I've met, I haven't had any problems understanding them and them understanding me.
Q. But you've met -- people you've met on duty. You haven't made a study of Spanish spoken around the world?
A. I have friends that are Bolivian, Guatemalan, Mexican. I had an uncle who was Mexican. My wife is Puerto Rican. My brother-in-law is a Dominican. Their family members, my wife's family members, I never had a problem speaking with them.
Q. Have you ever encountered non-Spanish Spanish?
A. Not understanding Spanish?
Q. Non-standard Spanish?
A. I don't understand what the term means.
Q. A variety of Spanish different from your own.
A. Have I ever encountered? As far as have I ever met?
Q. Yes.
A. Yes. I met many different nationalities.
Q. I don't mean nationalities. A different variety of the Spanish language from the one that you learned

at home. Have you ever encountered it?
A. Yes.
Q. Okay. And there are differences; is that right?
A. Yes.
Q. Different words for different things?
A. Some, very minimal.
Q. In your opinion?
A. In my opinion, yes.
Q. Are you able to render precise, accurate interpretations from Spanish into English without omissions or additions?
A. Most of the times.
Q. Are you able to maintain the Spanish speaker's register, formal versus informal language, in terms of level, in complexity of vocabulary, and sentence construction?
A. No.
Q. Now, let's just talk about that for a minute, a speaker's register. If someone is speaking in formal terms, you might take whatever you think they're saying and change it into a way that you understand it; is that correct?
A. No. Well, a lot of detectives, again, like using me because when I'm speaking to somebody in Spanish, I try to say it in the same way they said it to me in

Spanish so the victim or the suspect would understand it. And then in return, I would say it back to them in English. That's why Detective Naylor, Detective Colanduono, detectives in the robbery squad, in the homicide squad, they call me because they think I do a good job at it. And there's never been a problem with all the cases, or somebody's ever told me they don't understand. But as far as terminology words, I mean, I can sit here and tell you no, yes, no, but that doesn't mean nothing to me. I just speak Spanish.

Q. That doesn't mean anything to you. I understand that. And just for the record, you know of your own knowledge that Detective Naylor and Detective Colanduono don't speak Spanish and would have no way of evaluating whether you're doing a good job speaking Spanish; is that right?

A. No. They don't speak Spanish, no.

Q. We'll have to leave that for the moment.

A. Yes, sir.

Q. Is this true of you -- strike that. I've already asked you that one.

Would you be able to read and understand technical material in Spanish such as legal documents, probation, social service reports, medical reports?

A. Not fluently. No. I can read it. It will take

me a long time to read it, but I'll read it. Understanding it, it will take me a little bit.
Q. You can't understand written correspondence in Spanish that may be written in an archaic or semi-literate manner?
A. Not in the beginning, no. Take me a little bit. Like I said, I'm a fluent Spanish speaker. As far as educationwise, when it comes to reading, writing, never went to school with it. The only education I had was ninth grade and it was just more introduction to Spanish. My grandmother tried to teach me as far as reading so I can learn a little bit to help me out later on if I wanted to go back to Colombia, but that was just her. But as far as an education in it, I don't have it.
Q. And you would agree with me that one of the foundations of learning the English language, per se, is reading; is that right?
A. Yes, sir.
Q. And would you agree that learning vocabulary in the Spanish language would be greatly aided by reading it?
A. No. Not necessarily.
Q. Doesn't correspond?
A. If I'm having a conversation normal with you, do I

need to read before I can speak it? No. That's not the way I was taught in my household.
Q. So you accept the principle that building the English vocabulary is greatly aided by reading, but it's your position that the same is not true of Spanish?
A. Yes.
Q. Now, let's say this. Could you watch a nightly newscast in the English language and simultaneously render the newscast's speech into Spanish without falling behind?
A. No.
Q. You couldn't do that?
A. No, I can't.
Q. So can I extrapolate from that that you're not capable of doing simultaneous translation?
A. No. That's another reason why the detectives that I work with, they work with me because -- the guys that I work with, they know how I am. I want one sentence at a time. I'll give the gentleman, the victim or the suspect, the same sentence. That way there's no confusion. And then that's the way I do it.
Q. Well, we'll get to that.
A. That's the way I do it.
Q. Okay. So what you're asking the detective to do

is to give you one sentence?
A. At a time, yes.
Q. And from that one sentence, you're changing that sentence into a verbatim Spanish sentence?
A. Yes. I try my best to, yes, sir.
Q. Okay. Now, when you're doing that, are you taking into account the person who you're speaking to's ability to understand that sentence?
A. Yes.
Q. So are you --
A. The way I know they understand me is they answer me right back.
Q. I see. So your way of measuring a person's ability to understand a sentence is to see if they answer you?
A. No. It's just a normal conversation.
Q. Okay. I understand what you're saying, but I'm trying to get at the point do you take into account their age, their education? Do you try to understand what they may understand in the Spanish language?
A. I don't consider that, sir. When we're having a conversation, I'm assuming we understand each other. Obviously, we are, because we're exchanging words that we both know and he answers my questions when I'm asking questions. I'm not taking into consideration

their age or what their education is. Again, I don't have any education but I speak Spanish. When it comes to education in Spanish, I mean.

Q. So you're not taking into account whether the man has gone to eighth grade or high school or college or anything of that nature. You're just talking to him in Spanish and taking back his answer?

A. Yes, sir.

Q. You're not trying to phrase your sentence in a way that eighth grade education, high school education, college education might receive the sentence differently?

A. No, sir.

Q. You're just putting out what Agent Naylor says to you to ask him; is that right?

A. Yes, sir.

Q. Okay. So is this true of you, you're able to interpret consecutively in both directions what the speaker is saying?

A. Sometimes.

Q. Not all the time?

A. Not all the time. Sometimes.

Q. Is it true -- would you say this about yourself: You're able to interpret every oral utterance, even those embarrassing to me or other court participants in

either direction?
A. Sometimes.
Q. Sometimes. Would you say this about yourself: You're able to research the meaning of specific words and terms efficiently and effectively?
A. Sometimes.
Q. But not all the time?
A. Not all the time. Sometimes.
Q. So, for example, when you're working with the police on a given interview, if there's some phrase or something you don't understand, you have ready references to look up how to render it in Spanish effectively?
A. I would try to say it -- the way it's said to me in English, I would try to say it in a way for the person to understand it in Spanish, and the same meaning.
Q. But you wouldn't do any independent research in how to do it better in terms of how to present it in Spanish better?
A. I haven't done that, no.
Q. Okay. If someone reads you a passage that is descriptive, can you remember and repeat back what you heard word-for-word even if the passage is as many as 30 words long?

A. Sometimes.
Q. Have you ever done that?
A. You mean as far as speaking Spanish if somebody tells me something in English?
Q. If I told you a story in English, can you repeat it back verbatim what you heard word-for-word? Have you ever attempted that?
A. Not that I remember, no.
Q. When you said "sometimes," not really in this circumstance?
A. I don't think if I told you something in English in 30 words, I don't think you can say it word-for-word. I don't think anybody can do that.
Q. Okay. That's a fair statement. I'm just asking whether you can do it.
A. In Spanish, I don't know. I don't think I've done it, sir.
Q. Okay. So you speak Spanish back, you retain a certain amount of information and you render it back to Mr. Naylor in this circumstance; is that correct?
A. In this circumstance, there wasn't a lot of questions. It was just precise questions. I gave them back to the person in Spanish, the same exact questions. They understood. They never told me they didn't understand, and they answered me back the way I

asked them questions in their own response and I translated it in English. I never had any problem with that.

Q. All right. Now, you didn't take any notes while you were speaking in Spanish to Mr. Mejia, right?

A. No, I did not, sir.

Q. Are you able to take notes while you're speaking Spanish consecutively and not interrupt the flow of your Spanish?

A. No.

Q. You're not able to do that?

A. No.

Q. Now, Detective Perez, when you were talking to Mr. Mejia, you didn't record his statement; is that right?

A. No, sir.

Q. Now, you're a detective, correct?

A. Yes, sir.

Q. In the narcotics unit in the Providence police station, the new public safety complex just off the highway, right?

A. Narcotics and organized crime unit, yes, sir.

Q. You have a whole floor up there devoted to the narcotics?

A. Half the floor, yes, sir. Half the floor.

Q. Half the floor?
A. Yes.
Q. And all the modern equipment was put in there to get the building up and running, correct?
A. Yes, sir.
Q. And I take it you have in there interrogation rooms, right?
A. Yes, sir, we do.
Q. Did this interview happen in one of those interrogation rooms?
A. Yes.
Q. I take it in the performance of your duties you have recording equipment; is that correct?
A. It's not common practice for us to use recording equipment when it comes to speaking with an individual.
Q. Well, my question is, do you have recording equipment?
A. Yes, we do.
Q. Okay. You have various kinds of recording equipment, body wires?
A. Yes.
Q. Okay. You have digital recorders?
A. Yes.
Q. You have cellphones that can record?
A. I don't know about that one. I don't think so.

We don't have that one.
Q. You have video recorders?
A. Yes.
Q. Video cameras?
A. Yes.
Q. Tape recorders?
A. Yes.
Q. But on this night in question, you didn't use a recorder in that room; is that right?
A. Like I started to tell you earlier, sir, we don't commonly use recorders because sometimes when you're talking to an individual, they get scared. If you come on and you bring a recorder, say we're going to record you in this conversation, they won't say anything. They won't talk, just in case if they want to become an informant and that becomes recorded evidence and it has to be placed into court evidence. And as far as safety issues. So they get nervous and they won't talk. So it's not common practice for us to put recorders in unless a person asks and then we'll record it.
Q. So it's pretty clear that when you put a recorder out, everybody knows that that whole sequence is going to be replayed somewhere else like here?
A. Yes.
Q. Okay. So it's not as clear to a person that if

they're just talking to you that it won't be reproduced in a place like here? Is that the natural --
A. In the recording sense, no. But they don't know that after we talk there's going to be a written statement taken out. We'll take a typed statement from the subject.
Q. No written statement here though?
A. We started to with Mr. Mejia, but, like I said before when Mrs. Beckner was asking me questions, he was more worried about becoming an informant. He wanted to get out of the incident that he just was involved in. When we sat him down actually to type a statement from him, he didn't want to answer any questions regarding to the case. He was more evasive and just not answering, he just wanted to be an informant and was just talking about how can I do this. How can I order this guy up. I know people. I can be your eyes and ears on the street. So at that time, Detective Naylor and I said, you know what, we're going to end this conversation.
Q. Nothing wrong with being an informant. You use informants all the time?
A. Of course not. There's nothing wrong with being an informant.
Q. Okay. In fact, there were two informants in this

case?
A. At the time, I only thought there was one. Later on, because I wasn't involved in the case, my involvement was the day of the incident, but now I know there was two informants, yes.
Q. Now you know there was two?
A. Yes.
Q. The reason you didn't know there was one because Detective Naylor's police report didn't disclose Marie Perez as an informant?
A. Then he didn't tell me.
Q. And he didn't tell you either?
A. No. I'm pretty sure it wasn't on purpose. He was probably worried about the gentleman coming down with the drugs so we didn't really get to talk about who was there, who was an informant or not.
Q. So if she made a false move out there, you would have construed her as an active suspect when you were there?
A. Yes.
Q. Okay. Now, Detective, when you were taking this interview and Detective Naylor was speaking, you had asked the questions, right?
A. No. Detective Naylor would ask the questions.
Q. He would ask the questions, you'd repeat them in

Spanish?
A. Yes. Most of them.
Q. Most of them?
A. Yes.
Q. Ninety percent?
A. Actually, the majority was Spanish. I want to say less than that was -- the defendant would answer in English some questions that Detective Naylor asked.
Q. But most of it was in Spanish?
A. Yes.
Q. And you did the rights in Spanish?
A. Yes.
Q. You never read the rights in English?
A. No.
Q. Because you had no belief that he would understand the rights in English? Isn't that why you didn't read them in English.
A. Well, I asked him if he spoke English. He said no.
Q. He said he didn't speak English?
A. Yes.
Q. But yet Detective Naylor questioned him in English?
A. No. He didn't question him in English. He would ask me a question in English, I'd say it to him in

Spanish, and Mr. Mejia would answer that question in English. At the scene when we first got there, I asked both of them if they speak English. They both said no, and I guess they did.
Q. And you believed them that they didn't speak English?
A. Yeah. They told me no, so I believed them, yeah.
Q. In your presence, you never saw Detective Naylor directly examine Mr. Mejia in English?
A. He would ask me the questions. And -- no, he didn't.
Q. So he never asked Mr. Mejia any questions in English?
A. Everything was directed towards me until that first question. Then he would ask him a question looking at him to see if he knew it. But if Mr. Mejia didn't know the question, he would look at me or ask me what did he say in Spanish. He would say (speaking Spanish) what did he say. Or -- and then I would tell him in Spanish. And then he'd be like si, no, yes, no.
Q. So all of the questions that Detective Naylor asked, you put to the defendant in Spanish?
A. Not all of them. Yes. Well, if they were directed towards me, yes, to say it to him.
Q. And he never engaged in the direct questioning of

the defendant. Now, you're saying that Mr. Mejia tried to answer some of those questions in English?
A. Yes.
Q. Were they one-word answers?
A. One word, couple of word sentences. One he said -- you know, Detective Naylor said, what are you doing here with Soto? He said, you know, you know what I'm doing here. You know. No, we don't know. I'm assuming drug deal.
Q. Now, is that a direct quote from Mr. Mejia?
A. The, you know, yes. He's saying drug deal. I'm just trying to say the way he was saying it.
Q. Oh, so he's shrugging his shoulders?
A. Yes, sir.
Q. But he never said, "I'm here to do a drug deal"?
A. No, he didn't say that.
Q. He never said he knew Mr. Tejeda was here to do a drug deal, isn't that fair to say?
A. Directly, no. He didn't say that, no.
Q. And you never asked him if he had agreed to meet with Mr. Tejeda, with Mr. Falette, to transfer two kilograms of cocaine to Mr. Falette, did you?
A. No, I didn't, sir.
Q. You never put that question to him?
A. I didn't ask him that, no.

Q. And Detective Naylor never put it to him, either?
A. No.
Q. And in your questioning of him, you never asked him if he was making any money off this deal, or if any money was coming his way from this deal; is that right?
A. I don't remember that question, no.
Q. There's no question about a payment going on here; is that right?
A. I don't remember that.
Q. Okay. And now, when you were questioning Mr. Mejia, you never asked him how much cocaine was going to be involved in this transaction, did you?
A. No, I didn't.
Q. And you never asked him if any cocaine was going to be involved in this transaction; is that right?
A. No, I didn't.
Q. So all you did get from the defendant was kind of a shrugging, if I'm understanding you correctly and fairly representing what you said, is a shrugging and a drug deal?
A. He said, You know, you know what we're doing here, you know.
Q. Did he say, You know what we're doing here, or you know, you know?
A. He said, You know, you know what we're doing here.

You know.
Q. You know. You know. You know. Okay. And you said you don't know?
A. That's what we said. We don't know.
Q. Did he ever use the word "assume"?
A. No.
Q. You never heard the word "assume"?
A. Shrugged his shoulders and said drug deal.
Q. Never used the word "assumed"?
A. I don't remember him saying that word. No, I don't.
Q. And now, in terms of protect your back, protect his back --
A. Watch his back, I think he said. Watch or protect him, watch his back.
Q. Was it protect or watch or --
A. He said protect him, and a couple of sentences after he said watch his back.
Q. It was something like that? You can't be sure of which one? Was it watch or protect?
A. He said both of them. He said watch his back and then a couple of sentences after he said protect him, in English.
Q. In English?
A. Yes.

Q. So he said in English, protect him, or in English, watch his back?

A. He said, watch his back, and he said protect him. They were both in English, if my memory serves me correctly, yes.

Q. By the time you were doing this with -- when you were getting into this sequence, you know, you know, the bust had already gone down?

A. Yes. When he was saying this, we were in the interrogation room, yes.

Q. And you already told him you had informants out there, correct?

A. Once we told him -- that's how he was being in the beginning. Once we told him that we had informants, that, you know, the person he was supposed to meet was working for the police, that's when he changed everything around and just wanted to be an informant, and wanted to work for the police, wanted to introduce me to people so we can order drugs, make an arrest. He wanted to get paid, and he wanted to forget about this incident and go home.

Q. But that had nothing to do with any of the facts surrounding this incident; is that right? All that sequence had to do with some deal he wanted to make with you about being an informant?

A. Yes.
Q. Now, turning your attention to the firearm in question --
A. Yes.
Q. -- you had said that he made a statement regarding possession of the firearm; is that right?
A. He said that Enoc gave him the firearm.
Q. Okay. And was that in English?
A. In Spanish.
Q. That was in Spanish?
A. Yes, sir.
Q. Okay. And did he say when?
A. At the McDonald's.
Q. And did he say that he kept it or had it or did anything with it?
A. The only thing he said, after that sentence he said in Spanish, Enoc gave me the firearm, he gave me the gun in the McDonald's. And then when we drove away and the police came up, I took it from my waistband and I placed it underneath the driver's seat.
Q. He said all of that in Spanish?
A. Yes.
Q. And did you recount that report anywhere, that he said he put it under the driver's seat?
A. I'm sorry?

Q. Did you recount that language, that he said he put it under the driver's seat.
A. Yes. Is it in the report?
Q. Yeah. Is it in the report?
A. I believe it's in the report, in Detective Colanduono's report.
Q. In Detective Colanduono's report?
A. Yeah. The Providence police report.
Q. But you have a specific memory of him saying that?
A. Yes, sir.
Q. And that was in Spanish?
A. Yes, sir.
Q. Now, in the performance of your duties as a police officer, do you routinely make reports about your investigations?
A. If I'm the lead detective, yes.
Q. And those reports will contain everything important about a case; is that right?
A. Yes.
Q. And it's customary practice in your department that people who are not the lead detective will make supplementary police reports that are added to the lead report; is that correct?
A. A witness statement, yes.
Q. And that's routine?

A. Sometimes some detectives will ask you for it, and then you do a witness statement.
Q. Okay. In this case, was there any reason why you couldn't write down all of these facts?
A. No. There's no reason.
Q. You had the ability to do it. You had the paper. The computers were right there at the station?
A. Yes, they were. I'm assuming that it was already written in the report that I was there when I told Detective Colanduono what he said to me in the interview, so he wrote it in the police report.
Q. You didn't preserve anywhere a verbatim account of the Spanish or the English version of what transpired that night?
A. I believe in the police report it says I had an interview with Mr. Mejia. He then told us in Spanish he had the gun and he placed it underneath the seat of the car. It should be in the police report.
Q. But you didn't write it?
A. I didn't write it, no. I told Detective Colanduono. He was the lead detective.
Q. Did you review the report before it was published?
A. Did I review it before it was published?
Q. Yes.
A. What do you mean "published"?

Q. Before it was printed and put in the record.
A. No. He printed it out. I read it.
Q. You didn't file any supplemental reports or anything like that?
A. I didn't feel I needed to.
MR. WEST: May I have a moment, your Honor?
THE COURT: Yes.
MR. WEST: May I have the services of the interpreter?
THE COURT: Yes.
MR. WEST: Your Honor, would there be an opportunity at this point, I notice it seems to be 4:30, to confer with my client more in depth before I conclude this section of the testimony?
THE COURT: Are you going to have redirect, Ms. Beckner?
MS. BECKNER: If I did, maybe like a question, your Honor.
THE COURT: All right. Well, I guess we can do that. So we'll call it a day. We'll have you back tomorrow morning first thing.
MS. BECKNER: Actually, your Honor, Detective Perez has to testify in state court tomorrow.
THE COURT: Why don't you all come up here.
(Side-bar conference.)

THE COURT: First of all, how much more do you have?

MR. WEST: The guy has got a series of questions. He recalled this transaction. He wants me to go through these questions with him about what he recalls. It's been difficult to get interpreters to talk with him, I catch and catch can. He wrote this out at the prison and brought it in. He's talking to me about it. I want to make sure I got the whole thing right. It's an important witness.

(Discussion off the record.)

(End of side-bar conference.)

THE COURT: Ladies and gentlemen, it's late. I'm going to let you go at this time. We're going to complete the examination of Detective Perez first thing tomorrow morning. I want to remind you of all the instructions I've given you up to this point, not to discuss this case with anyone, not to do any independent research, not to read or listen to anything that may be related to this case in any way. You remember what I've told you. We won't go through it in depth.

We're going to begin tomorrow morning at 9:30. I expect we'll complete the testimony tomorrow, and depending on the timing of things, you may get the case

tomorrow, you may get it on Thursday morning first thing. I have to allot enough time for closing arguments and for instructions. With any luck, it will be tomorrow. I'll let you go. You have a nice night. See you in the morning.

(Proceedings out of the presence of the jury as follows:)

THE COURT: All right. First of all, while we're on the record, did we enter that photograph without any objection, the print? That's all set. All right. I think we can just go off the record at this point.

(Discussion off the record.)

(Court concluded at 4:45 p.m.)

JANUARY 30, 2008

THE COURT: Good morning, everyone. Good morning, ladies and gentlemen. I want to apologize for the late start this morning. It's entirely my fault. Dental appointment ran a little longer than I thought it was going to. And you know when you're in the middle you can't get out, so blame me for that, and I apologize.

ANDRES PEREZ, resumes stand.

Officer Perez, you're still on the stand in cross-examination. Mr. West, are you ready to proceed?

MR. WEST: Yes, your Honor.

CONTINUATION OF CROSS EXAMINATION BY MR. WEST

Q. Good morning, Officer Perez.

A. Good morning, Mr. West.

Q. Now, it's my understand you did not examine the defendant regarding any drug ledger activity; is that correct?

A. I don't remember. I don't think so.

Q. I'm going to show you some documents and see if you went over these with the defendant.

MR. WEST: May I have all of the "8" exhibits?

Q. You never went over these cards with the defendant in your examination; is that correct?

A. I don't recall, sir.

Q. This one?
A. No.
Q. Anything about this?
A. No.
Q. This ring a bell?
A. No.
Q. The backside?
A. No.
Q. This packet of cards, you didn't delve into at all; is that correct? Do you want to look at Exhibit 8C? Does that ring a bell at all? Did you review those with the defendant?
A. I don't recall.
Q. Now, Detective Perez, when you were asked questions of the subject, you're not asking, you know, for him to tell you the story. You asked him questions with facts in them like, for example, we know you had that gun in your belt. Isn't that an example of an interrogation technique you would use?
A. I didn't ask the defendant that question.
Q. Did you ask him anything in that respect, in that manner of questioning?
A. No, sir.
Q. So you never said to him, for instance, we saw you with that gun in that belt, as a ruse to get him to say

anything he knew about that?
A. No, sir.
Q. You didn't do that?
THE COURT: There's a question pending.
THE WITNESS: I'm sorry?
THE COURT: There was a question pending. Maybe you didn't --
THE WITNESS: I thought I answered, your Honor. I'm sorry. I said no.
THE COURT: Okay.
Q. Did you ask the defendant how he was feeling that night?
A. No.
Q. Did you ask him anything about injuries he may have had?
A. No.
Q. You didn't ask him anything about that?
A. No.
Q. So it's your statement to me that you did not ask questions with facts presumed in them, such as, you knew about the cocaine, didn't you, to the --
MS. BECKNER: Objection. Asked and answered.
THE COURT: Overruled.
Q. You did not ask questions as an interrogation technique, you knew about the cocaine, didn't you?

A. The question that I asked was what Detective Naylor asked me in English to ask him was, what were you doing down here? Why did you come with Mr. Soto?
Q. So you didn't ask the type of question I asked?
A. I did not.
Q. And you didn't say to him that because Tejeda already claimed possession of the cocaine you should claim possession of the gun?
A. No.
Q. And you didn't tell him that he'd be facing a lengthy prison term if he didn't cooperate with you and give you information on the gun?
A. No.
Q. You never brought up anything about a prison term?
A. No.
Q. You didn't tell him at age 36 he wouldn't be seeing the light of day until age 46?
A. No.
Q. Those are not your words?
A. No, sir.
Q. And you didn't begin the discussion of having him work as a cooperator, is that your testimony?
A. No. Mr. Mejia did. Once we told him we had a cooperating source, that's when he wanted to be an informant. He wanted to work with the police and help

himself out and not get arrested in that incident.

Q. Now, you were at the scene -- I believe I may have asked you yesterday -- at the arrest, but you did not witness Mr. Mejia being in possession of a firearm at all, is that your statement?

A. No, sir.

Q. Are you confirming what I just said?

A. Yes. I didn't see him, no.

Q. I think you did see the firearm?

A. No, I did not.

Q. You never saw the firearm at the scene?

A. No.

Q. And you never saw it on Mr. Mejia?

A. No.

MR. WEST: May I have just one moment, your Honor?

THE COURT: Yes.

MR. WEST: Thank you, Detective. No further questions, your Honor.

THE COURT: Okay. Redirect?

MS. BECKNER: Yes, your Honor.

REDIRECT EXAMINATION BY MS. BECKNER

Q. Detective Perez, when you and Agent Naylor were questioning the defendant, were you using any scientific terms?

A. No.
Q. Were you using any complicated terms?
A. No.
Q. Were you saying things such as, did you have a mixture and substance containing a detectable amount of cocaine?
A. No.
Q. Were you using formal speak like that?
A. No.
Q. Were you just talking with him?
A. Yes.
MS. BECKNER: If I could have just a moment. No further questions.
THE COURT: Very well.
MR. WEST: No redirect.
THE COURT: No redirect. Okay. Then Officer Perez, your testimony is complete, you may step down. Thank you very much.

C E R T I F I C A T I O N

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Anne M. Clayton

______________________________________

Anne M. Clayton, RPR

June 9, 2008

________________________________________

Date