IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * CRIMINAL ACTION
USA * 07-005S
VS. * JANUARY 30, 2008
RICARDO MEJIA * PROVIDENCE, RI
* * * * * * * * * * * * * * * *

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH
DISTRICT JUDGE
(TESTIMONY OF SUSANNA E. TORRES)

APPEARANCES:

FOR THE GOVERNMENT: SANDRA BECKNER, ATTY.
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

FOR THE DEFENDANT: GEORGE J. WEST, ESQ.
One Turks Head Place
Suite 312
Providence, RI 02903
(401) 861-9042

Court Reporter: Anne M. Clayton, RPR
One Exchange Terrace
Providence, RI 02903

Proceeding reported and produced by computer-aided stenography

I N D E X

| WITNESS | PAGE |
|---|---|
| SUSANNA E. TORRES | |
| Direct Examination by Mr. West: | 3 |
| Cross-Examination by Ms. Beckner: | 25 |
| Redirect Examination by Mr. West: | 36 |

___________________________

SUSANNA E. TORRES, first having been duly sworn, testified as follows:

THE CLERK: Please state your name and spell your last name for the record.

THE WITNESS: Susanna Torres. T-O-R-R-E-S.

THE COURT: Good afternoon, Ms. Torres.

THE WITNESS: Good afternoon.

THE COURT: And you may inquire, Mr. West.

MR. WEST: Thank you, your Honor.

DIRECT EXAMINATION BY MR. WEST

Q. Ms. Torres, I trust you're comfortable from your dental experience this afternoon. We're all aware of it.

A. Yes, I am. Thank you.

Q. Okay. Where are you currently employed?

A. I work for the State of Rhode Island.

Q. In what capacity?

A. For the coordinator of the interpreters office.

Q. Can you be right near that microphone so that we can all hear you. Thank you. I'm sorry. As a coordinator in the interpreters office?

A. Yes.

Q. Okay. What is your educational background?

A. I'm a graduate from Bentley College in the program for interpreters, legal and medical interpreters.

Q. And what sort of modes of interpretation did that training cover?
A. Consecutive, simultaneous and sight translation.
Q. Have you also attended other colleges or institutions?
A. For that particular training, no.
Q. In general.
A. Yes. Yes.
Q. And where did you go?
A. Back home in El Salvador, I attended the Universidad Catolica Centroamericana. That's a higher education college.
Q. Okay. Did you go to any other colleges in Rhode Island?
A. I have attended URI, CCRI and RIC.
Q. RIC. Very well. And have you been employed in the area of interpreting?
A. Yes, I have.
Q. And where have you worked?
A. I have worked mostly for International Institute of Rhode Island, and for the state.
Q. Okay. And what sorts of assignments have you had?
A. I started doing medical interpreting. I've also done community interpreting and legal interpreting.
Q. When you worked for the International Institute of

Rhode Island, what was your position there?
A. I held several positions.
Q. Could you tell us about them?
A. My first position there was as an ESL facilitator, English as a second language, facilitator. Later I was --
Q. What did that entail?
A. Teaching English to newcomers, to immigrants in the beginner, intermediate and advanced levels.
Q. Very well.
A. Also, I taught conversation, English conversation.
Q. Very well. And what else have you done at the Institute?
A. Later, I held a position as their program coordinator, the English language center coordinator.
Q. And what did that entail?
A. I had to supervise about a group of ten teachers, ESL teachers. Also, I was in charge of keeping records for about a student population of about 250.
Q. Were you still active as an interpreter at that time?
A. Yes. I was doing also -- I was a freelancer doing some interpreting assignments for the Institute for one of their units, the interpreting and translating unit.
Q. Very well. And what other roles have you had at

the Institute - the International Institute of Rhode Island?
A. I also held the position of immigration caseworker. In that position, I had to help people who needed immigration paperwork processed. And in that capacity, I also have to do interpreting and translating. I had to go with the clients to immigration, either here in Providence or in Boston before officers, INS officers.
Q. INS officers?
A. Yes. Immigration officers.
Q. Did that entail reading documents?
A. I had to read and translate documents, and I also had to interpret at the interviews.
Q. Okay. And what other positions have you had, any others at the Institute?
A. Yes. At the Institute, I also worked at the interpreting translating unit. I was hired as a part-time interpreter and translator. Later, I was hired as a coordinator for the interpreting and translating program, and I also worked later as the director of that program.
Q. And that still involving interpreting?
A. Yes.
Q. How frequent?

A. On a daily basis. And I had to -- when I was the coordinator, the program coordinator, I had to do mostly medical and legal interpreting. I didn't do much community interpreting. When I moved into the director position, I concentrated on legal interpreting.
Q. Okay. Medical interpreting is what?
A. Anything that has to do with interpreting at doctor's offices, or hospitals. In the meantime, I also had to do translations which covered a wide range of fields, medical, legal, financial, documents, manuals for companies, fliers, anything that needed to be translated into English.
Q. So that's a very broad amount of nomenclature. How would you go about learning that?
A. Well, I had a very good base from my education in El Salvador. I graduated in El Salvador. When we graduate from high school, in our last year we cover pretty much about 10 subjects per year in a span of three years. Would take about ten subjects, and we specialize in an area. When I graduated from high school, I specialized in biology, and so that gave me a good background, academic base, to be able to understand different vocabularies at different levels.
In addition to that, in my country, I also took

what you would call business training, so that gave me a good, broad base on legal, financial and commercial language.

Q. I take it that you had to do quite a bit of reading in your studies, is that fair to say?

A. Yes. And in addition to that, reading is one of my hobbies, so I do not read only for enjoyment but also to educate myself. And when I came to this country, I kept that habit because it is important for interpreters to learn a different variety of dialects, if you want to call it that. But it's very important for us to keep up with our language, with Spanish so that we don't lose it and we don't change it, and we make it as broad as possible. In order to do that, we have to read from different sources. We have to read literature and we have to read newspapers and, again, that's something in our profession that's very important.

Q. Okay. So I take it, you're talking about Spanish newspapers and Spanish literature and reading material?

A. Spanish and English.

Q. Spanish and English?

A. Yes.

Q. And when you were in El Salvador, was it?

A. Yes.

Q. You would be reading in preparation for your studies; is that right?
A. Correct.
Q. I take it you'll accept it as an article of faith that reading is an essential vocabulary builder in the Spanish language, isn't it?
A. It is.
Q. Now, Ms. Torres, did you have any work in the court system you were mentioning? In the court system? You said you worked for the state?
A. Yes, I do.
Q. What did you do in the state?
A. My position is program coordinator and in that position I have to oversee a staff of five Spanish speaking interpreters. In addition to that, I have to coordinate their assignments, where they're going to be assigned. And I'm pretty much stationed at Superior Court. And when a trial comes up, then I am the lead interpreter and I will interpret at the trial either for the defendant or for witnesses. And that's basically most of my daily routine, I would say. Besides trials, I would interpret at hearings and temporary restraining orders and different sets of motions, arraignments, mostly at Superior Court.
Q. And you've been doing that for how long again?

A. In that particular job, for the last three years, but previous to that, again, at my work at the Institute, I would be assigned to do a lot of interpretations of depositions, legal interpreting at depositions, and also at the court, when the court didn't have an interpreter's office.

Q. And is there a -- strike that. Did you have any associations that you belong to in this line of work?

A. Yes. I am a member of the National Association of Judiciary Translation and Interpreters, and I'm also a member of the American Translation Association.

Q. Have you given any speeches or talks in this area?

A. I have been invited to be a speaker at the Rhode Island Bar Association at their annual meeting, and I'm part of a panel that talks to new lawyers about diversity, cultural diversity, specifically the Hispanic culture, and also the use -- how to use an interpreter properly.

Q. And have you taught Spanish, as well?

A. Yes. I started teaching back in my country. I was a junior high school teacher, and the system is a little bit different in Central America where a junior high school teacher has to teach at least five subjects. Among them I had to teach Spanish. When I came to the United States, I was offered a position

also to teach at different organizations, and I have been teaching as a freelance since 1997, I believe.

Q. All right. Ms. Torres, what is it that you do as a court interpreter?

A. When I am informed that a trial is going to take place, I make sure to get some information about the trial, at least, basic information and then I have to assist as an interpreter just like the interpreter you have here today.

Q. Okay. And will you -- how will you go about performing that function? What are the key points you are going to do in performing the function?

A. Basically, it will really depend on the matter that is going to be heard. Usually, if it's an arraignment, arraignments are usually very fast. They don't take too long. Sometimes we have pretrial hearings where the interpreter is called and basically we don't really establish any relationship with defendants. We are called to the court. We go to the courtroom, and we're told who needs the interpreter. Sometimes, again, we don't know the defendant's name until the very time that they are asked what their name is. And then I will interpret exactly what's being said. Most of the time in the courtroom, the interpreting is done simultaneously.

Q. What does that mean?
A. It means that as you speak, the interpreter is speaking, just like the interpreter you have right now in the courtroom. Everything that is being said, the interpreter has to interpret without deletions, additions, without adding, deleting or editing.
Q. I see. But do you take into account when you're rendering this service the person you're speaking to, their age? Do you get a sense of their mastery of Spanish in how you're delivering what you have to say to them?
A. Very often what we do is we would ask the attorney if they know their client's country of origin. The reason why we do that is because, in that way, I prepare myself mentally to know -- to what kind of words this person might say. Even though we speak Spanish, there are 20 countries that speak Spanish. It may have some variations in terms of regional words. So if I know what country the person is from, then I do a mental check to prepare for some of the words that the person may come up with so that I have the equivalent in English.
Q. Okay. So you've made some sort of a study of different types of Spanish that's spoken in different countries; is that right?

A. Yes. And part of our education as interpreters is that we need to expose ourselves, or to read about different types of Spanish. Like we have to buy a lot of material and read a lot of material about the Spanish, the kind of Spanish that is spoken in Mexico or the Spanish that is spoken in Dominican Republic or in Puerto Rico or in Costa Rica.

So again, that would give us a broader base, linguistically speaking, so that we know if a person says a word that we already understand what that word is and to come up with the equivalent in English.

Q. Why can't you just talk general Spanish? Is there such a thing?

A. Well, it could be, but because we never know what the person's background is in terms of what is their academic background, how long they lived in the United States, how well they speak. Maybe there are a lot of defendants who speak English and sometimes we need to be aware of that. But we as interpreters really need to have a very broad base of different varieties of Spanish, different varieties of the way Spanish is spoken.

Q. Okay. What's a heritage speaker?

A. A heritage speaker is defined as someone who can speak or understand, and/or understand Spanish, in this

case at home. That's the language that was spoken at home, but the person never has any formal training in that language.

Q. Okay. And what's the difference between a heritage speaker and someone like yourself?

A. Well, a heritage speaker is their vocabulary is very limited. Very often that language is only spoken at home, or with close relatives, or with friends. It's spoken in a social environment. Also, heritage speakers will, most of the time, cannot hold a complete conversation in their heritage language because they don't have that ability. The heritage language is only spoken, again, in a very familiar, close setting.

An interpreter, on the other hand, is someone who does it, has had formal training in that language. Usually heritage speakers can only speak the language and understand it but they cannot read it or they cannot write it proficiently, or they cannot read it or write it at all. An interpreter, on the other hand, is someone who has had formal training in that language, can read it, can write it fluently, in addition to speak it, and has read enough in different areas that can really converse either in that language or in English.

Q. And if someone was in, let's say, Colombia until

the age of four years old, would they have had any formal schooling in the Spanish language? It may seem an obvious question, but I feel I have to ask you.
A. Probably -- the way that the educational system is here in this country, they don't offer language classes until they go to junior high or high school, and college, of course. But by that time, the person already has been listening enough. If in the home they only speak Spanish, it may be the case where a heritage speaker has only one parent who speaks the language so doesn't, again, doesn't have that exposure.
The classes that I've taught at high school level don't give enough experience to the person to be able to understand the different varieties. What I have seen in my experience is that most of the textbooks that are in high school are from Spain and that's not the language, that's not the kind of Spanish that is most common in my line of work.
Q. Okay. But if someone lived in Colombia until the age of four, they would be very unlikely to have had any education in school for language until the age of four years old?
A. No. Schooling begins -- in Latin America, you mean?
Q. Yes. Colombia.

A. It begins at five. It wouldn't be considered that.

Q. Now, someone who learns the language at home at age four and speaks to their family after moving to the United States, just spoken in the home but had no other training except for perhaps one high school course, would that be an adequate basis in Spanish to be able to understand different dialects across the Spanish-speaking world? Do you understand my question?

A. Yes. I'm just thinking how to answer your question. I think the person would have a very basic vocabulary, but would not be able to go into different fields or to speak about different matters, because, again, the language, the vocabulary that they have been exposed to, is at a very informal level.

Q. And is it important in your line of work to be a neutral in rendering interpretation?

A. Absolutely.

Q. Why is that important?

A. In fact, we have a code of ethics that we have to adhere to, and one of the canons in the code of ethics is we are impartial to the rendering. I have to say exactly what the person says. And again, because I am a neutral party, I have to say exactly what is being said. I don't have any interest in the outcome. We

have to, in addition to confidentiality issues, we have to render the exact words that are being said from anyone that is speaking the language that is not understood by the others.

Q. Let me just clarify that point for my own understanding. When you say you have to say exactly what's said, the art of interpreting means you're taking the meaning of what I'm saying, and as closely as you can you're relating it to the person in their language. Is that a fair summary of the act of an interpreter? It's not a verbatim statement from English to Spanish, is it?

A. No, it is not. I have to take into consideration how the person is going to understand it in the fashion that's being said. Sometimes we have to take cultural issues into consideration. What it makes sense in one language, if I render a word-by-word interpretation may not make sense in the other language, and that happens very often say, for example, with idiomatic expressions that have meaning only in one culture, or have a different meaning, or have no meaning in another culture.

Q. I hate when people do this to me, but I have to put you on the spot. Could you think of an idiomatic expression that might be an example?

A. Yes. And in fact, this is an idiomatic. The first time that I really got stuck when I was doing an interpretation someone said -- this was at a deposition, and the person said, would you say that she had a green thumb. And you know, green thumb. And I have a color and I have a body part. And if I had to interpret that exactly, it would not have made sense to the Spanish-speaking person. That is a cultural reference. So I had to explain to the person what it meant, because there is no equivalent -- there is an equivalent in Spanish for that idiomatic phrase, but again, I could not render a word-by-word interpretation.
Q. Because it would not have had the same meaning to a listener in the other language?
A. Not at all.
Q. You do that all the time as an interpreter, isn't that right?
A. Every day.
Q. And you put a lot of work into being able to do that, isn't that right?
A. When we are not interpreting in the courtroom, we are doing a lot of research, a lot of reading. In fact, we have to have a good library. I personally have spent thousands of dollars buying resource, buying

materials, how to educate myself, how to prepare myself, idiomatic expressions, that sort of material because, again, it's important. We never know what someone is going to come up with. So we have to have a pretty broad knowledge of expressions and sayings, and sometimes we do it by regions.

Q. And you must be tortured having to work in Rhode Island with Rhode Islandese spoken in our courtrooms, is that true?

A. I've always been interested in languages so I'm always picking on words and phrases. Again, I have compiled my own dictionary, glossary of sayings that, you know, phrases that are more common in one area than another, or just to listen to different kinds of speech. People who live in Cranston, from what I've heard, they have a very different way compared to people who live in Woonsocket, for instance.

Q. That was the example I was going to use. How about colloquialisms and slang, or street talk?

A. Again, we, at least once a week in my office, we meet with the other interpreters, or I meet with the other interpreters, and we talk about things or vocabulary that we have heard through the week. And again, we compile glossaries and, not dictionaries, but we do compile material, and then we discuss the best

rendition. And sometimes, again, even when we are in the courtroom and we are not interpreting, we always pick up some phrases or sayings, or the way that some people speak that use language in a different way than the usual. And we discuss that and talk about it. So it's a continuous education in terms of language. I think in my line of work, we're never done. It's an everyday learning process.

Q. In interpreting like a question put to a witness, and the question is sort of laced with street words like talking about ladies when referring to the quantity of cocaine or things like that, you're not going to say -- how would you handle something like that, if a code word was used when referring to the quantity of cocaine?

A. Again, we try to do research as much as possible beforehand. If someone comes up with a word, or a slang word that we are not familiar with, one of my duties as an interpreter is to ask for clarification. And if I don't understand a term because it's a street term, and when it comes to issues, or when it comes to street language that refers to drugs, they may change depending on the area it happens, or the nationality of the people involved.

So again, if we are not -- if the interpreter

finds herself in a situation where she doesn't know what it exactly means, then the interpreter has to render that in the native language, in the language that was said in hopes that somebody will ask for clarification and then I can interpret that.
Q. If you're putting -- if you're translating or interpreting to someone with pressure on them to give you an answer, does that affect the interpretation? First of all, do you do that? If you're pressing someone for an answer like in an interrogation, do you do that?
A. No. I wouldn't do it because I am not interrogating anyone. I'm only interpreting the interrogation. But my job as an interpreter is going to be to use pretty much that same tone of voice. Let's say if an attorney is interrogating a witness, and they are trying to -- it seems that they're trying to have the person give them an answer, I need to, when I do my interpretation, I need to keep that same tone of voice so that the person that I am interpreting for can also have that sense of urgency. If their answer is choppy, or if their answer is hesitant, my job as an interpreter is to keep that register to make it choppy, to make it hesitant, so that the other person has a very clear idea of what it is that the person and the

tone of voice that's being said.
Q. What is a register?
A. A register is the level of complexity that a speaker has. For example, a child has a low register because they use words that are very simple. An expert witness in chemistry is going to have a higher register because they will speak with very specific words, and the interpreter will have to be able to convey that in the same manner without changing the register, without changing the style or the word choice in that case.
Q. And you've had to do that in your job, right?
A. Yes.
Q. And I guess you're drawing on your experience with vocabulary and things of that nature to be able to do that?
A. Exactly.
Q. I just want to turn your attention to when you worked at the International Institute. It's my recollection that they make interpreters broadly available to assist, for example, lawyers who have to go out and talk to a client to help them prepare for a case; isn't that right?
A. That's correct.
Q. And I think it's no more than a phone call for someone to arrange for someone to come out and

interpret; isn't that right?
A. Yes.
Q. Is it your understanding, based on your work there, that those people readily arrange to be available? Is that your understanding?
A. Yes.
Q. Now, I take it you also interpret for police officers when they're on the stand; is that right?
A. That's correct.
Q. And you're interpreting to the client so the client can understand, or to the person in the trial such as a defendant, plaintiff, whomever it might be, so that they can understand what the police officer is saying; is that right?
A. That's correct. That's part of their due process.
Q. What do you mean by "due process"?
A. It's the way that -- it's the process by which the defendant has the right to know exactly what is being said by everyone in that courtroom so that the defendant is not out and cannot contribute, I assume, if they want to say something about what is being said that they did or didn't do.
Q. So it's required by the Court that you be there, isn't that right?
A. It is.

Q. Now, I want to just talk for a minute, if you know the answer to this question, do you know how many dialects are spoken in Colombia?
A. I believe that there are at least three that I'm aware of.
Q. Can you, from memory, say anything about them? Do you remember what they are?
A. No, I do not.
Q. Okay. Is it the same dialect, based on your understanding, that is spoken in the Dominican Republic?
A. No.
Q. What are the differences, to the best of your understanding?
A. The words that are used from one region. Again, Dominicans, and I think anyone from any other Hispanic country, have a very distinctive way of speaking not only in terms of rhythm but also in terms of the words that they use, because I think that in my experience, what I have learned, and this is based on my own experience, is that when someone speaks, sometimes we can tell in general if a person is from Colombia or if a person is from Guatemala. Again, that may be only because we all have a very different rhythm of speaking.

Q. Does that change the way you interpret to that particular person if you understand or get a sense they're from a different region?

A. Again, depending on what words, I would be expecting to hear some kind of word, a particular word for a particular thing.

Q. And you prepare yourself to deal with that; is that correct?

A. That's correct.

Q. And you use your education experience, reading, vocabulary, all of that to bring to bear on that challenge?

A. Exactly.

MR. WEST: Could I have a moment, your Honor, please?

THE COURT: Yes.

MR. WEST: Thank you, Ms. Torres. I have no further questions.

THE WITNESS: You're welcome.

THE COURT: Thank you, Mr. West. Ms. Beckner, cross-examination.

CROSS EXAMINATION BY MS. BECKNER

Q. Ms. Torres, I understand you to be saying that, when you serve as an interpreter, it's very important that you do a precise exact translation of what's being

said; is that correct?
A. Yes.
Q. That's a different way of communicating with an individual than if you were just engaging in a conversation, isn't that right?
A. Yes.
Q. And it's really important that you have all this education that you have because you have to do a precise translation, right?
A. Yes.
Q. And you have to do it in formal situations, isn't that correct?
A. It really depends on the assignment. If it's in court, in a courtroom, yes.
Q. So like in a courtroom, for example, you used the term "due process." It would be important for an interpreter to know how to say "due process" in Spanish, right?
A. Yes.
Q. That's because in a courtroom it's not only important that you say the exact same thing to the defendant, but that you also use the right terminology for it, right?
A. I think that because the judicial systems from Latin American and the United States are different,

some --

Q. I don't think you're answering my question.

THE COURT: She can finish her answer.

MR. WEST: Your Honor, I'd ask --

THE COURT: We can't tell if she's answering your question until she finishes the answer. She can finish her answer. Go ahead and finish your answer, ma'am.

A. Again, because the judicial systems are different, some words may not have an exact rendition, let's say, from English into Spanish. So in those cases what we do, as interpreters, is to do the research and see if there is an equivalent phrase or word. But again, sometimes it may not have the exact meaning from English into Spanish.

Q. So because of the nature of what goes on in a courtroom, it's important for you to research that area, right?

A. Yes.

Q. So that you can give as close approximation in Spanish as possible, right?

A. That term doesn't have an exact corresponding term in that other language, yes.

Q. And to be able to do that, it would be important to have education, wouldn't it?

A. Yes.
Q. You said you worked in the medical setting. Once again, that's a very specialized area, isn't it?
A. Yes, it is.
Q. And it would be important for you to be able to know the terms because somebody's life might depend on it, right?
A. Correct.
Q. So once again, that is a very specialized area that you would have to do research in, isn't that right?
A. It would really depend on, again, the kind of setting that I would be interpreting in. If I were to interpret in the emergency room, it's going to be different than if I only interpret in a doctor's visit.
Q. Well, I guess what I'm getting at is that it would be important for you to be -- in order to do your job in certain situations in the medical field, you would need to have education, right?
A. To do that interpreting, yes.
Q. And so an interpreter as opposed to, I think the term you used is heritage speaker, would have an advantage because of the education they've had, right?
A. If I want to perform as an interpreter, that would be part of my training.

Q. Because that's very different from a conversation, isn't that right?
A. A conversation that I would have to interpret or just a plain conversation?
Q. Right. I mean, being an interpreter is very different from a conversation.
MR. WEST: Objection. I think it calls for speculation at this point, your Honor.
THE COURT: Well, I don't know if it does or not, but I'm not sure I understand the question so maybe the witness is having a hard time with it, too. Maybe you could rephrase that.
Q. When you are serving as an interpreter, the way you do it, because you have to be so precise, is different from when you're just talking with someone, isn't that correct?
A. Correct.
Q. Now, let's say you were assisting a visiting engineer from Bolivia. In order for you to be successful at that, you'd probably have to do some research in engineering terms, isn't that right?
A. Yes.
Q. Once again, that's a situation where a trained, college-educated interpreter like yourself would have an advantage over a heritage speaker, isn't that

correct?
A. Well, I wouldn't compare a college-trained interpreter with a heritage speaker because they're different. I think for names like we are -- I don't know how else to explain it but it would be like you have two fruits. They're different. You have apples, and you have oranges. The only thing we have in common is that we can speak a language other than English, but one is specialized to perform in a different way. It's not just having a conversation.
Q. And that specialty gives you an advantage in a professional setting, isn't that right?
A. In comparison to what?
Q. Over a heritage speaker.
A. Again, I don't think that a heritage speaker can perform as an interpreter because they cannot -- haven't been trained to do that.
Q. I guess what my question is, is if you were, say, conducting an interpretation of a conversation and assisting an engineer from Bolivia, you would have an advantage over, say, just somebody off the street because you have specialized training, isn't that right?
THE COURT: Before you answer that -- I'm just confused about your question. Are you asking her if

she would have an advantage in interpreting that conversation over someone just off the street?

MS. BECKNER: Correct.

THE COURT: All right.

Q. Would you not have an advantage?

MR. WEST: I think there's a question pending.

THE COURT: There's a question pending so let her answer the first question.

A. It's difficult for me to answer that question with a yes or no only because I don't see a heritage speaker acting as an interpreter. I don't think that a person who is only a heritage speaker would take that challenge because they know that they're not prepared for that.

Q. Well, so then that gets to my next question. When you're talking about just interviewing someone, it's really not necessary to know how to say "due process" in Spanish, is it?

A. What kind of interview?

Q. If you're interviewing somebody about going down to the store to buy a Coke.

A. Well, that is not interviewing. That's only a simple question.

Q. Say you want to ask them what store they went to and what corner the store was on and how to get there,

that's a very different type of conversation from the kind of language you hear in a courtroom, isn't that correct?
A. That's correct.
Q. And that's a very different type of conversation from what you might hear in a doctor's office?
A. Yes. One is casual; the other one is not.
Q. So one of them would involve sort of technical terms, things unique to the field, and the other would be like, hey, where can I get a bottle of Coke? Would that be a fair comparison of the differences?
A. Again, how to get a Coke is a casual question that uses casual language.
Q. Would it be fair to say that when police officers interview a defendant, they wouldn't be using specific chemistry terms, would they?
MR. WEST: Objection. Foundation, your Honor.
THE COURT: Sustain the objection. You can ask a couple of foundation questions.
Q. Well, let me rephrase the question. Wouldn't it be fair to say ordinary people wouldn't, for example, say, where did you get the mixture and substance containing a detectable amount of cocaine hydrochloride? They might be more apt to say, where did you get the coke?

MR. WEST: Objection. It's a compound question.
THE COURT: I'm going to allow it.
A. I don't know.
Q. You would agree that it would be important to have specialized training and a broad basis in Spanish if you need to say something like cocaine hydrochloride, isn't that correct?
A. Yes.
Q. And that requires more training and experience than say if you just have to say coke?
A. Yes.
Q. You'd agree with me that a narcotics detective would be familiar with the language used in narcotics, isn't that right?
A. I don't know.
Q. Well, I notice you said you have to study when you are going to start interpreting in a different area, right?
A. Yes.
Q. So would it make sense to you that somebody that works in that area would already be familiar with that terminology?
MR. WEST: Asked and answered.
THE COURT: Overruled.
A. Probably.

Q. And that would be true for somebody that's working in English. They'd be familiar with English terms, isn't that right?
A. Yes. I assume.
Q. And if somebody were actually working in Spanish in that field, too, they would probably be familiar with the terms that are used in that business, isn't that right?
A. I don't know.
Q. So while this would be an area you would have to study at, the people already working at it would already be familiar with it, isn't that right?
MR. WEST: I think it's just been asked and answered, your Honor. I don't know.
THE COURT: It has been asked and answered, so sustained.
Q. I notice you talked about, I think you called them dialects of like one country versus another; is that right?
A. Yes. In the same way that English is spoken with some variation in rhythm throughout the United States or throughout the world.
Q. So when you're saying a dialect, I think the example you gave was somebody from Cranston versus somebody from Woonsocket, right?

A. Yes.
Q. But you're not saying that somebody from Cranston is going to have difficulty engaging in a casual conversation with somebody from Woonsocket, are you?
A. Unless they're using words that are particular to that area.
Q. Well, how about, say, somebody from Alabama speaks very different from somebody from Rhode Island, isn't that right?
A. There may be some confusions if they use words that are not particular to the other's knowledge.
Q. So you believe somebody from Alabama would have difficulty understanding somebody from Rhode Island?
A. I don't know.
Q. Do you believe somebody from Woonsocket would have difficulty understanding someone from Cranston?
A. I don't know, because, again, that's what I heard. I can hear differences in rhythm when people from different areas in the United States speak. But I don't know enough of that region's vocabulary to say I can hear a difference. If I travel to Texas, for example, I can hear that the rhythm of speech in Texas is different.
Q. Would you have trouble understanding Texans?
A. Sometimes I do. It's hard for me to catch some of

their words. I can't hear them because they don't register in my file of words that I know.
Q. Do you have trouble understanding somebody from Woonsocket?
A. I don't usually ask people where they're from. I only speak to them, so I don't know where they're from exactly.
MS. BECKNER: If I could have just a moment?
I have no further questions.
THE COURT: Thank you. Any redirect?
MR. WEST: Just a couple.

REDIRECT EXAMINATION BY MR. WEST

Q. Ms. Torres, do you consider it a conversation when someone is given their Miranda rights and has to sign a form with their Miranda rights on it and then is asked questions following the signature of their Miranda rights, do you consider that a casual conversation?
A. Not at all.
Q. What kind of conversation do you consider that?
A. Like counsel mentioned, "Where's the store? How are you today? How do you feel?" That's casual conversation.
Q. I know that's a casual conversation. But once the Miranda rights are given and questions are being asked, what kind of exchange is that?

A. That's a legal matter.
Q. Is that where your expertise would come into play anytime you've been involved in that sort of an exchange?
A. As soon as I hear something that has to do with legal process, then it's not conversation anymore. And I have to be -- I have to follow my code of ethics as an interpreter.
Q. And that would be one such setting, isn't it?
A. Yes.
Q. Why is it important for you to do that in that setting?
MS. BECKNER: Objection.
THE COURT: Overruled.
A. Well, it is important because at that moment I am an interpreter and I am a neutral party to that, that is happening, so I have to interpret. I have to render an interpretation without changing or without adding anything to that that needs to be interpreted.
Q. You've done some work on depositions, haven't you?
A. Yes, I have.
Q. Those aren't in-court activities, are they?
A. In court?
Q. Yes.
A. Well, depositions that I've done have been at

attorneys' offices.
Q. They're carried out outside the court, right?
A. That's correct.
Q. And there's a stenographer usually, right?
A. Yes, there is.
Q. The witness has to swear to tell the truth, the whole truth, and nothing but the truth so help them God?
A. That's correct.
Q. There's questions asked?
A. Yes.
Q. Do you consider that a casual conversation?
A. Not at all.
Q. Why? What's going to be done with those questions once they're being taken down by the stenographer?
A. They become the record.
Q. What can be done with them, in your experience?
A. They can be used.
Q. Where?
A. In the courtroom.
MR. WEST: Thank you. No further questions, your Honor.
THE COURT: Any recross?
MS. BECKNER: No, your Honor.
THE COURT: Okay. Ms. Torres, your testimony is

complete. Thank you very much. You may be excused.

C E R T I F I C A T I O N

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Anne M. Clayton

______________________________________

Anne M. Clayton, RPR

June 9, 2008

________________________________________

Date